## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SFX ENTERTAINMENT, INC., *et al.*,[1] | Case No. 16-10238 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  March 21, 2016 at 2:00 p.m.**<br>**Objection Deadline:  March 14, 2016 at 4:00 p.m.** |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING THE
IMPLEMENTATION OF (I) A KEY EMPLOYEE INCENTIVE PLAN
AND (II) A KEY EMPLOYEE RETENTION PLAN EACH IN CONNECTION WITH
THE SALE OF CERTAIN OF THE DEBTORS' NON-CORE BUSINESS UNITS**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")

hereby move the Court (the "**Motion**") pursuant to sections 105, 363(b), 503(b)(1) and 503(c)(3)

of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), for

entry of an order, substantially in the form annexed hereto, approving the implementation of

(a) the Debtors' proposed performance-based key employee incentive plan applicable to non-

core business units held for sale (the "**NCU KEIP**"), (b) the Debtors' proposed key employee

retention plan applicable to non-core business units held for sale (the "**NCU KERP**" and,

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are:  430R Acquisition LLC (7350); Beatport, LLC (1024); Core Productions LLC (3613); EZ Festivals, LLC (2693); Flavorus, Inc. (7119); ID&T/SFX Mysteryland LLC (6459); ID&T/SFX North America LLC (5154); ID&T/SFX Q-Dance LLC (6298); ID&T/SFX Sensation LLC (6460); ID&T/SFX TomorrowWorld LLC (7238); LETMA Acquisition LLC (0452); Made Event, LLC (1127); Michigan JJ Holdings LLC (n/a); SFX Acquisition, LLC (1063); SFX Brazil LLC (0047); SFX Canada Inc. (7070); SFX Development LLC (2102); SFX EDM Holdings Corporation (2460); SFX Entertainment, Inc. (0047); SFX Entertainment International, Inc. (2987); SFX Entertainment International II, Inc. (1998); SFX Intermediate Holdco II LLC (5954); SFX Managing Member Inc. (2428); SFX Marketing LLC (7734); SFX Platform & Sponsorship LLC (9234); SFX Technology Services, Inc. (0402); SFX/AB Live Event Canada, Inc. (6422); SFX/AB Live Event Intermediate Holdco LLC (8004); SFX/AB Live Event LLC (9703); SFX-94 LLC (5884); SFX-Disco Intermediate Holdco LLC (5441); SFX-Disco Operating LLC (5441); SFXE IP LLC (0047); SFX-EMC, Inc. (7765); SFX-Hudson LLC (0047); SFX-IDT N.A. Holding II LLC (4860); SFX-LIC Operating LLC (0950); SFX-IDT N.A. Holding LLC (2428); SFX-Nightlife Operating LLC (4673); SFX-Perryscope LLC (4724); SFX-React Operating LLC (0584); Spring Awakening, LLC (6390); SFXE Netherlands Holdings Coöperatief U.A. (6812); SFXE Netherlands Holdings B.V. (6898).  The Debtors' business address is 902 Broadway, 15th Floor, New York, NY 10010.

together with the NCU KEIP, the "**NCU Key Employee Programs**"),[2] each in connection with the sales of the Debtors' NCUs (as defined herein), and (c) granting administrative expense status to the bonuses paid thereunder.   In support of this Motion, the Debtors submit the declaration of Christopher T. Nicholls, the Associate Chief Restructuring Officer of the Debtors, and respectfully state as follows:

## Status of the Case

1.      On February 1, 2016 (the "**Petition Date**"), the Debtors commenced these cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.       No request has been made for the appointment of a trustee or examiner.

4.      On February 12, 2016, an official committee of unsecured creditors was appointed in these Chapter 11 Cases (the "**Committee**").

## Jurisdiction, Venue and Statutory Predicates

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

---

[2] The Debtors are still working with their DIP Lenders and the Ad Hoc Committee of certain Second Lien Noteholders in respect of the terms and conditions of the NCU Key Employee Programs, and certain revisions may be made to the NCU Key Employee Programs and the proposed order approving this Motion as a result of those continuing discussions.  The DIP Lenders and the Ad Hoc Committee of certain Second Lien Noteholders accordingly reserve their rights with respect to this Motion and the proposed order.

6.     The statutory predicates for the relief requested herein are sections 105(a), 363(b), 503(b)(1) and 503(c)(3) of the Bankruptcy Code.

## Background

7.     The Debtors along with their non-Debtor affiliates (collectively, "**SFX**") are a leading producer of live events and digital entertainment content focused exclusively on electronic music culture.  The Debtors commenced material operations in 2012 with the intent of acquiring and operating companies within the electronic dance music ("**EDM**") industry, specifically those engaged in the promotion and production of live music events, festivals and digital offerings attractive to EDM fans in the United States and abroad.  Over the next three years, the Debtors acquired a number of leading EDM brands, such as TomorrowWorld, Beatport, Mysteryland, Sensation and Electric Zoo, and expanded operations worldwide.

8.     Today, the Debtors are actively engaged in the production and promotion of EDM festivals and events both domestically and abroad.  In addition, Debtors manage large, event-driven nightclubs that serve as venues for performances by key electronic music talent. The Debtors also offer an online platform for EDM DJs, artists and fans to purchase, share and stream music components and to connect with each other.

9.     The Debtors and their 120 non-Debtor subsidiaries operate a business that spans the globe, with operations in over 34 countries.  The Debtors constitute substantially all of the domestic companies comprising SFX's business as well as select foreign subsidiaries.   The Debtors have more than 325 employees and, together with the non-Debtor entities, have more than 625 employees.

10.     The Debtors' capital structure is highly levered.  In 2015, the Debtors began to face significant liquidity issues.  While the Debtors attempted to enhance liquidity through a

3

September 2015 financing and potential sales of non-strategic assets, the Debtors concluded that they needed to restructure their liabilities through a bankruptcy process.

11.     Prior to the filing of these Chapter 11 Cases, the Debtors entered into a restructuring support agreement with holders of over 70% of their outstanding secured debt. The restructuring support agreement provides for a comprehensive restructuring of the Debtors' balance sheet.  As part of that transaction, certain of the holders of the secured debt also agreed to provide the Debtors with debtor-in-possession financing to allow for the Debtors to prosecute these Chapter 11 Cases.  The Debtors intend to use these Chapter 11 Cases to effect their balance sheet restructuring and implement operational improvements.

12.     A detailed factual background of the Debtors' businesses and operations, as well as the events precipitating the commencement of these Chapter 11 Cases, is more fully set forth in the *Declaration of Michael Katzenstein in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**") [Docket No. 13] filed on the Petition Date and incorporated herein by reference.

## Introduction

13.     As a preliminary matter, this Motion does <u>not</u> relate either to (i) a general retention program in respect of executives and employees who are key to the success of the businesses around which the Debtors will reorganize and exit these Chapter 11 Cases, or (ii) a sale of substantially all of the Debtors' assets.  Rather, this Motion seeks to establish incentive compensation programs in respect of the sale of certain of the Debtors' discrete non-core business units (the "**NCUs**"), as may be designated by the Special Committee of the Board of Directors of SFX Entertainment, Inc. (the "**Special Committee**").  The Debtors are in the process of formulating, and intend to seek approval by separate motion at a later date, key

4

employee programs that relate to the Debtors' retained businesses.  Such programs will be aligned with the Debtors' reorganization goals.  The NCU Key Employee Programs proposed by this Motion, on the other hand, relate only to the NCUs and the necessity to properly incent and retain employees to assist in the maximization of value of these assets held for sale.

14.    Accordingly, the NCU Key Employee Programs are designed exclusively to address the Debtors' sale of the NCUs, as may be designated by the Special Committee.  In consultation with the Special Committee, Michael Katzenstein, the Debtors' Chief Restructuring Officer (the "**CRO**"), will designate individuals entitled to participate in the NCU Key Employee Programs in respect of the NCUs to be sold.

15.    The Debtors' goal is to consummate the sale of several of their NCUs in the early stages of these Chapter 11 Cases.  The assistance of key employees in such NCUs will be critical to successful sale processes, as a majority of the value of the businesses held for sale relates to the human capital that will travel with these businesses.  The payments contemplated under the proposed NCU Key Employee Programs will be derived exclusively from the sale proceeds and/or the DIP Lenders' collateral, with their consent.

16.    The Debtors view the necessity to properly incentivize the Participants (as defined herein) separately from the necessity to properly incent employees in the retained businesses. The NCU Key Employee Programs set forth herein should thus not compromise or be limited by any other plan(s) proposed by the Debtors.

### Description of NCU KEIP

17.    The Debtors worked with their advisors to develop the terms of the NCU KEIP and to establish a structure for incentives thereunder designed to motivate NCU KEIP Participants (defined below) to help the Debtors achieve certain important business objectives

that will facilitate a timely and successful sale of the Debtors' NCUs, including substantially all of the assets of Debtor Beatport, LLC ("**Beatport**") and the Fame House business of Debtor SFX Marketing LLC ("**Fame House**").[3]  Incentivizing the NCU KEIP Participants is critical in order to ensure that these key members of the NCUs continue in their efforts to successfully maximize value for the benefit of all of the Debtors' stakeholders.  Below is a summary of the material terms of the NCU KEIP, which are set forth in more detail in the plan annexed as **Exhibit A** hereto:

    a.    Eligibility and Performance Objectives:

    i.    One or more businesses of the Debtors may be designated by the Special Committee as a Non-Core Unit held for sale (an "**NCU**").

    ii.    Upon designation of a business unit as an NCU, the CRO may, in his discretion and in consultation with the Special Committee, designate officers and employees of such NCU[4] as eligible to participate in the KEIP applicable only to NCUs (the "**NCU KEIP**"). All employees who are deemed eligible to participate in the NCU KEIP are defined as "**NCU KEIP Participants**."

    iii.    The CRO may, in his discretion and in consultation with the Special Committee, establish minimum hurdle rates in respect of the sale of any NCU such that an NCU KEIP Payment (as defined below) may only be earned if sale proceeds from the disposition of such NCU exceed a specific dollar threshold.

    iv.    Except as approved by the CRO in consultation with the Special Committee, to the extent an executive or employee of an NCU participates as a potential purchaser in connection with the sale process for such NCU, such executive or employee shall be ineligible to receive an NCU KEIP Payment.

    v.    An NCU KEIP Participant shall be entitled to NCU KEIP Payment(s) only in the event that (i) such NCU KEIP Participant participates in good faith in the sale process to the satisfaction of the CRO to maximize value for the Debtors' estates, (ii) an NCU KEIP Participant remains employed through the closing of a sale of their NCU, and (iii) the gross purchase price for

---

[3] The Debtors have filed motions for the approval of the sale (and establishing procedures in connection therewith) of Beatport and Fame House, and may file subsequent motions for the sale of other NCUs as may be designated by the Special Committee.

[4] Such officers and employees shall be limited to those managing the business of the NCU and shall not include executive officers of Debtor SFX Entertainment, Inc.

their NCU meets any minimum hurdle rate for such NCU established by the CRO in consultation with the Special Committee ((i) through (iii) together, the "**Performance Objectives**").

b.  Performance Period:  The term "**Performance Period**" as to an individual NCU KEIP Participant shall mean the period that begins on the commencement of the sale process in respect of such executive or employee's NCU and will continue until consummation of the sale of such NCU.

c.  Bonus:

   i.  An amount up to 5% of the gross sale proceeds associated with the sale of each NCU shall be available for the CRO to utilize to make payments to NCU KEIP Participants (an "**NCU KEIP Payment**") in connection with the NCU KEIP.  In respect of the sale of each NCU, the CRO may allocate the applicable pool of sale proceeds among the designated NCU KEIP Participants in his sole discretion, and only to the extent such NCU KEIP Participants have met the Performance Objectives during the Performance Period in respect of the applicable NCU.

   ii.  In no event shall any NCU KEIP Participant receive NCU KEIP Payments in an amount in excess of $250,000 under the NCU KEIP.

   iii.  NCU KEIP Payments will not exceed $400,000 per NCU sale, provided however if KEIP Payments utilized in respect of a particular NCU sale do not reach this cap, the CRO may, in consultation with the Special Committee, apply the balance of such funds to KEIP Payments in respect of the sale of another NCU, subject to the $400,000 per NCU cap and the $250,000 individual cap set forth in subsection (c)(ii), above, and notwithstanding the 5% sale proceeds limitations of subsection (c)(i), above.

   iv.  The aggregate NCU KEIP Payments to be paid under the NCU KEIP shall not exceed $2.2 million without further order of the Court.

d.  Bonus Adjustments:  To the extent that an NCU KEIP Participant is party to an executory employment agreement and is determined to be entitled to payments of incentive or retention compensation thereunder (whether in connection with payment of a cure amount or otherwise), then any NCU KEIP Payment payable to such NCU KEIP Participant hereunder shall be adjusted and reduced accordingly in the discretion of the CRO.

e.  Payment of Awards:  Each NCU KEIP Payment shall be paid as promptly as practicable following the closing of the sale of the particular NCU solely from the sale proceeds received by the Debtors in connection with the sale of such NCU (subject to subsection (c)(iii), above). Nothing in the NCU KEIP shall create a trust or establish or evidence any executive or employee's claim of any right.

18.     The NCU KEIP payouts are consistent with market standards.  The Debtors' proposed crisis and turnaround manager, FTI Consulting, Inc. ("**FTI**") undertook to define a set of relevant market comparables to that of the Debtors.  FTI benchmarked comparable KEIP plans from select chapter 11 cases of six (6) different companies that filed petitions from 2012 to 2015, three of which of are in the technology, media and telecom sectors.  The total liabilities of the companies reviewed by FTI ranged from $30 million to $1 billion.  Total asset sale values of such companies ranged from $15 million to $500 million.  Following a review of this set of market comparables, FTI observed a number of market practice factors.  Notably, the targeted total cost (based on expected sale proceeds, _e.g._, stalking horse value) of comparable KEIPs ranged from $730,000 to $1.6 million, with a median targeted cost of $1.55 million, with maximum payouts of $1.3 million to $3.7 million and a median maximum of $2.2 million.  In addition, three of the six plans of similarly situated companies reviewed did not cap the amount of KEIP payments to which participants were entitled.  On a percentage of sale proceeds basis, similarly situated companies ranged from 0.30% to 3.84%.

19.     FTI has determined the cost of the proposed NCU KEIP to be within the range of market practice as compared to the plans proposed and approved at similarly-situated companies.  NCU KEIP Payments will not exceed $400,000 per NCU sale, and no more than $250,000 per individual.  However, if KEIP Payments utilized in respect of a particular NCU sale do not reach this cap, the CRO may, in consultation with the Special Committee, apply the balance of such funds to the KEIP Payments in respect of the sale of another NCU, subject to the $400,000 per NCU and $250,000 individual caps set forth in the preceding sentence (and notwithstanding the 5% of sale proceeds allocated for NCU KEIP Payments described below).  The per-individual NCU KEIP payment is below the low end of the range of

comparable KEIP transactions. The Debtors anticipate that they will attempt to sell approximately four NCUs. If it is the case that all four NCUs are successfully sold, total NCU KEIP Payments would be approximately in line with the median for the comparable KEIPs contained in the plans reviewed by FTI. Moreover, FTI anticipates that if all four NCUs are sold, the aggregate value realized will not be inconsistent with the range of sale values associated with the comparable KEIPs.

20. The CRO will have authorization for NCU KEIP Payments in an amount of up to 5% of sale proceeds from the sale of a particular NCU, to be distributed at the discretion of the CRO. Sale of the NCUs is an important component of these Chapter 11 Cases. Although the Debtors seek authority to pay a percentage of sale proceeds that facially is higher than average comparables, it is important to underscore why. As the Debtors market and sell the NCUs, which by definition are non-core businesses and therefore do not represent the Debtors' most significant assets, it is possible that certain of the NCUs may not be highly valued. Thus, a bonus pool of less than 5% of sale proceeds may be insufficient to properly incentivize employees tasked with ensuring a successful sale process for certain lower-value NCUs. In other instances, the CRO may determine that NCU KEIP Payments of less than 5% are sufficient to incentivize the KEIP Participants of a particular higher-value NCU. Due to the uncertain values of the NCUs, the necessity that such NCUs be sold forthwith and the importance of the NCU KEIP Participants to such sale processes, the Debtors seek the flexibility of a 5% cap. In any event, the aggregate cap will be $2.2 million, consistent with the median maximum identified in the comparable KEIPs, which creates certainty with respect to the total amount of NCU KEIP Payments and brings the NCU KEIP within the range of market standards.

21.     Without the expertise of the NCU KEIP Participants to efficiently and effectively assist in marketing the NCUs, making presentations regarding a potential sale, supporting the due diligence process, inducing potential purchasers to submit bids, and supporting the chapter 11 professionals and counsel in administering the sale processes, all on an extraordinarily expedited basis, the Debtors' sale efforts in respect of the NCUs would be significantly harmed. The assistance of the NCU KEIP Participants in such NCUs will be critical to successful sale processes, as a majority of the value of the businesses held for sale relates to the human capital that will travel with these businesses.  Not only have the NCU KEIP Participants continued to fulfill the normal tasks and projects required by the normal terms of their employment, but they have been, and will continue to be, required to expend additional time and resources on tasks relating to the implementation of the ongoing sales processes in respect of the NCUs.

22.     In order to effectively and efficiently accomplish a sale process in respect of the NCUs that maximizes recovery for all stakeholders, the Debtors determined that formulating the NCU KEIP was in the best interest of their estates and all parties in interest.  The NCU KEIP will help ensure that the key executives and employees designated by the CRO, in consultation with the Special Committee, are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest.  As a general matter, the use of key employee incentive plans is common practice in chapter 11 cases.  The structure of the plans varies based on the unique circumstances of each case but the general terms and conditions are consistent with the NCU KEIP proposed by the Debtors, including the conditions and proposed payment amounts set forth therein.

**Description of NCU KERP**

23.    In addition to the NCU KEIP, the Debtors also seek to implement the NCU KERP for certain individual non-insider employees, in order to ensure that the Debtors do not suffer significant and costly turnover of key employees during the Debtors' efforts to sell certain of their NCUs.  The loss of the NCU KERP Participants (as defined below) would hamper the Debtors' ability to conduct sales of the NCUs expected to be sold in these Chapter 11 Cases.  In particular, the circumstances of these Chapter 11 Cases are likely to increase employee turnover, especially in light of the challenges posed by the sales processes and the availability of alternatives for the Debtors' employees, many of whom are highly skilled.  Indeed, the majority of the value of the NCUs that have been and will be designated for sale relates to the human capital that will travel with these businesses.  As a consequence, the Debtors and their advisors have determined that a non-insider retention program for certain of the NCUs' key employees will be effective to retain those employees until sales are consummated.  Incentivizing the NCU KERP Participants is critical in order to ensure that these key members of the Debtors' team continue in their efforts to successfully maximize value for the benefit of all of the Debtors' stakeholders.

24.    Below is a summary of the material terms of the NCU KERP which are set forth in more detail in the plan annexed as **Exhibit A** hereto:

   a.    Eligibility and Performance Objectives:

      i.    Those individual non-insider employees of NCUs as may be designated by the Debtors' CRO in his discretion, in consultation with the Special Committee.  All employees who are deemed eligible to participate in the NCU KERP are defined as "**NCU KERP Participants**" (and, collectively with the NCU KEIP Participants, the "**Participants**").

      ii.    The CRO may, in his discretion and in consultation with the Special Committee, establish minimum hurdle rates in respect of the sale of any NCU such that an NCU KERP Payment (as defined below) may only be

11

earned if sale proceeds from the disposition of such NCU exceed a specific dollar threshold.

   iii. Except as approved by the CRO in consultation with the Special Committee, to the extent a non-insider employee of an NCU participates as a potential purchaser in connection with the sale process for such NCU, such employee shall be ineligible to receive an NCU KERP Payment.

   iv. An NCU KERP Participant shall be entitled to NCU KERP Payments only in the event that (i) such NCU KERP Participant participates in good faith in the sale process to the satisfaction of the CRO to maximize value for the Debtors' estates, (ii) an NCU KERP Participant remains employed through the closing of a sale of their NCU, and (iii) the gross purchase price for their NCU meets any minimum hurdle rate for such NCU established by the CRO in consultation with the Special Committee ((i) through (iii) together, the "**Performance Objectives**").

b. <u>Performance Period</u>:  The term "**Performance Period**" as to an individual NCU KERP Participant shall mean the period that begins on the commencement of the sale process in respect of such employee's NCU and will continue until consummation of the sale of such NCU.

c. <u>Bonus</u>: The bonus payable to any individual NCU KERP Participant (an "**NCU KERP Payment**") upon achievement of the closing of the sale of a particular NCU shall be in an amount determined by the CRO. Bonus payments made to NCU KERP Participants in respect of the sale of an NCU shall not exceed $150,000 in the aggregate per NCU sold, except as otherwise provided herein. Bonus payments to individual NCU KERP Participants shall be contingent on a determination by the CRO, in his sole discretion, that an individual NCU KERP Participant has satisfied the Performance Objectives during the Performance Period in respect of the applicable NCU being sold.

d. <u>Rollover of Excess Funds</u>:  In the event the $150,000 threshold is not reached in respect of a particular NCU that is sold, the CRO may, in consultation with the Special Committee, rollover the excess funds for use as NCU KERP payments in connection with another NCU held for sale; *provided however*, in no event shall total bonuses to NCU KERP Participants exceed $250,000 in respect of the sale of any one NCU, inclusive of any excess funds rolled over by the CRO.

e. <u>Bonus Adjustments</u>: To the extent that an NCU KERP Participant is party to an executory employment agreement and is determined to be entitled to payments of incentive or retention compensation thereunder, then any bonus payable to such NCU KERP Participant hereunder shall be adjusted and reduced accordingly in the discretion of the CRO.

f. <u>Maximum Aggregate Payment Amount</u>:  The aggregate amount that will be paid to any individual NCU KERP Participant is $40,000.

g. <u>Payment of Awards</u>:  Each bonus shall be paid upon the closing of the sale of the particular NCU solely from the sale proceeds received by the Debtors in connection with the sale of such NCU (subject to subparagraph (d), above). Each

NCU KERP Payment shall be paid as promptly as practicable following the closing of the sale of a particular NCU.  Nothing in the NCU KERP shall create a trust or establish or evidence any employee's claim of any right.

25.     The NCU KERP payouts are consistent with market standards.  FTI undertook to define a set of relevant market comparables to that of the Debtors.  FTI benchmarked comparable key employee retention plans from select chapter 11 cases of eleven (11) different companies which filed petitions from 2011 to 2015 with bankruptcy case durations of between two months and two years and with total liabilities ranging from $100 million to $1 billion.  Following a review of this set of market comparables, FTI observed that the median total cost of KERPs approved for similarly situated companies was over $1 million and average costs per participant ranged from $10,000 to $40,620.

26.     FTI has found the design and the cost of the proposed NCU KERP to be within the range of market practice as compared to plans proposed and approved at similarly situated companies.  Specifically, FTI anticipates that the aggregate cost of the NCU KERP will not exceed $750,000, which is more than 25% below the median aggregate cost of KERPs approved for similarly situated companies.  Moreover, no NCU KERP Participant shall be entitled to receive in excess of $40,000 in NCU KERP Payments, which is within the range of average costs per participant for similarly situated companies reviewed by FTI.

27.     Certain of the KERP Participants to be selected by the CRO may hold the title of Vice President, but the CRO will not select as an NCU KERP Participant any individual that exercises management control over the NCU by which such Participant is employed.  The respective scopes of authority among the NCU KERP Participants to be selected by the CRO will be limited, and while their titles may reflect individual roles and functions, the same titles do not confer management authority over the Debtors.  The NCU KERP Participants are critical

employees who have the knowledge and experience to carry out the decisions of management in an efficient and effective manner, but will not be individuals who manage or control the NCUs. Thus, none of the NCU KERP Participants will be properly considered "officers" and, as a consequence, the NCU KERP Participants will not be "insiders" as defined in the Bankruptcy Code.

28.     The NCU KERP Participants have been faced with significant pressure to leave the Debtors' employ during the pendency of these Chapter 11 Cases due to uncertain job prospects following the completion of a reorganization or NCU sales.  It is critical to the NCU sale processes that the Debtors retain the services of the NCU KERP Participants throughout the duration of the NCU sale processes.

29.     In order to effectively and efficiently accomplish a sale process in respect of the NCUs that maximizes recovery for all stakeholders, the Debtors determined that formulating the NCU KERP was in the best interest of their estates and all parties in interest.  The NCU KERP will help ensure that the key non-insider employees designated by the CRO are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest.

30.     The NCU sales process has a necessary byproduct of creating a great deal of uncertainty for the very company personnel charged with maximizing the value.  As a result, it is entirely appropriate to provide benefits to such key personnel in order to counterbalance the distraction that such uncertainty would engender.  The structure of other key employee retention plans approved by this and other courts varies based on the unique circumstances of each case but the general terms and conditions are consistent with the NCU KERP proposed by the Debtors, including the conditions and proposed payment amounts set forth therein.

### The Debtors' Need for the NCU Key Employee Programs

31.     The success of the Debtors' NCU sale efforts is dependent upon the goodwill and support of their employees.  As the Debtors' implement the sales of their NCUs, it is imperative that the Debtors' key personnel are appropriately incentivized to maximize the price of any sale transaction to ensure optimum recovery for all stakeholders.  Indeed, as set forth above, the majority of the value of the NCUs the Debtors are preparing to sell (including Beatport and Fame House) relates to the human capital that will travel with the businesses in connection with a sale.  Accordingly, it is important to the success of the Debtors' sale efforts that the NCU Key Employee Programs be implemented. Moreover, the Participants have been and will be called upon to expend significantly more hours during the sale processes than contemplated by the normal terms of their employment.

32.     In order to successfully, effectively, and efficiently accomplish orderly sale processes that maximize recovery for all stakeholders, the Debtors determined that formulating the NCU Key Employee Programs was in the best interest of their estates and all parties in interest.  The NCU KEIP will help ensure that key executives and employees who are essential to the sale processes are properly motivated to maximize value for the Debtors, their estates, their creditors and their stakeholders.  The NCU KERP ensures that certain non-insider key employees, without whom the Debtors could not successfully market and effectuate a sale of their NCUs, remain with the Debtors throughout the NCU sale processes.

### Relief Requested

33.     By this Motion, the Debtors request that the Court enter an order, pursuant to sections 105(a), 363(b), 503(b)(1) and 503(c) of the Bankruptcy Code, approving the implementation of the proposed NCU Key Employee Programs.

**Basis for Relief Requested**

**A.    Implementation of the NCU Key Employee Programs Is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code**

34.    Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a "sound business purpose" for it.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification); *In re  Lionel Corp.*, 722 F. 2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 178-79 (Bankr. Del. 1991).

35.    Once the debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

36.    The business judgment rule has vitality in chapter 11 cases and shields a debtor's management and board from judicial second-guessing.  Historically, courts have approved

employee compensation programs that are outside of the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code.  *See id.*; *see also Martin*, 91 F.3d at 395; *Montgomery Ward*, 242 B.R. at 153 (affirming bankruptcy court approval of key employee retention program, stating that "[i]n determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); *In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment"); *In re Nobex Corp.*, Case No. 05-2005 (MFW), 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006) (approving incentive pay outside of ordinary course where it was "an appropriate exercise of the Debtors' business judgment").

37.    This and other courts have approved similar employee incentive and retention programs as valid exercises of business judgment.  *See, e.g.*, *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Dec. 1, 2015) (approving key employee incentive plan and key employee retention plan); *In re Quirky, Inc.*, Case No. 15-12596 (MG) (Bankr. S.D.N.Y. Oct. 27, 2015) (approving key employee incentive plan and key employee retention plan with payments based on successful consummation of sales); *In re RadioShack Corp.*, Case No. 15-10197 (KJC) (Bankr. D. Del. Mar. 4, 2015) (approving key employee incentive plan and key employee retention program); *In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014) (approving key employee incentive plan with payments based on achieving certain transaction value thresholds); *In re Brookstone Holdings Corp.*, Case No. 14-10752 (BLS) (Bankr. D. Del. May 12, 2014) (approving key employee retention plan and key employee incentive plan); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (approving key employee incentive plan with payments based on achieving certain

valuation thresholds); *In re Mervyn's Holdings, LLC*, Case No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2009) (approving task and target based incentive plan for certain members of debtor's management).

38.     As set forth herein, the Debtors have articulated valid business reasons for the implementation of the NCU Key Employee Programs.  The Debtors determined in their sound and reasonable business judgment that the implementation of the NCU Key Employee Programs is in the best interests of the Debtors' estates, their creditors and other stakeholders.  As contemplated by the Debtors' restructuring support agreement and the Senior Secured Superpriority Debtor-in-Possession Credit Agreement to which the Debtors are party, the Debtors must be on track to complete a sale of the assets of Beatport on a very strict timeline. The Debtors have also determined, in their business judgment, that, in order to maximize and preserve value for their estates, an expeditious sale of certain of their other NCUs, including Fame House, is necessary.

39.     While working towards these objectives, the Participants must also minimize disruption to the Debtors' businesses so as to maintain their going-concern value and maximize the value of the Debtors' estates.  To facilitate a successful sale of the Debtors' NCUs, the Debtors formulated the NCU Key Employee Programs.  The NCU Key Employee Programs will motivate the Participants to perform their tasks effectively, expeditiously and in a manner that will maximize the recoveries of the Debtors' estates, while only rewarding tangible results.  The Debtors have determined in their business judgment that the NCU Key Employee Programs serve this purpose.  Moreover, the NCU Key Employee Programs are structured to maximize value for the Debtors' estates and creditors by, in the NCU KEIP, incentivizing the Debtors' key executives to achieve the greatest possible purchase prices for the Debtors' NCUs through the

sale processes, and in the NCU KERP, incentivizing those employees crucial to the process to remain with the Debtors during the sale processes.  Additionally, as set forth above, payment levels under the NCU Key Employee Programs are reasonable and were determined based on a thorough analysis of benchmarks performed by the FTI.  Accordingly, the Debtors believe that valid business reasons exist for the implementation of the NCU Key Employee Programs and, thus, that their implementation should be approved.

**B.      The NCU Key Employee Incentive Plan Is Incentivizing and Thus Is
Not Governed by Bankruptcy Code Sections 503(c)(1) and 503(c)(2)**

39.      Section 503(c) of the Bankruptcy Code provides criteria for courts to use in approving certain types of payments to insiders and "other transfers or obligations that are outside the ordinary course of business."  Section 503(c) comprises three subsections: (1) a general prohibition against retention plans for insiders; (2) limitations on severance payments; and (3) standards governing other transfers to certain employees and consultants, among others, that are outside of the ordinary course.

40.      Under the statute's plain language, section 503(c)(1) pertains solely to retention plans of insiders, and section 503(c)(2) addresses only the requirements for severance plans, and neither provision applies to performance-based incentive plans.  *See*, *e.g.*, *Global Home*, 369 B.R. at 783 ("If [the proposed plans] are plans to incentivize management, the analysis utilizes the more liberal business judgment review under [section] 363"); *In re Nobex Corp.*, Case No. 05-20050 (MFW), Jan. 12, 2006, Hr'g Tr. at 67 (Bankr. D. Del. 2006); *In re Calpine Corp.*, Case No. 05-60200, Apr. 26, 2006, Hr'g Tr. at 84-85 (Bankr. S.D.N.Y. 2006) (Lifland, *J.*).  Indeed, one court held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may
> consider whether the payments are permissible under section
> 503(c)(3), which limits payments made to management and

19

> employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of chapter 11 case.  As one treatise points out, the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under section 503(b)(1)(A).

*In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006).   For the reasons set forth below, neither section 503(c)(1) nor section 503(c)(2) are implicated by the NCU KEIP.

41.    The NCU KEIP is not structured to provide bonuses for retention.  Instead, the NCU KEIP is comprised of only targeted incentive payments to Participants who play critical roles in the operations of the NCUs to be sold, the outcome of the Debtors' sale processes and the achievement of certain metrics during the sale processes.  Payment of a bonus is based upon the successful achievement of the performance objectives designed by the CRO, in consultation with the Special Committee, which are designed to maximize value for the Debtors' estates.  The NCU KEIP is therefore properly characterized as a performance-based, goal-oriented incentive plan, not a retention plan for insiders subject to the requirements of section 503(c)(1) of the Bankruptcy Code.

42.    Although certain Participants may be deemed "insiders" within the meaning of the Bankruptcy Code, the NCU KEIP has been crafted with great care to ensure that it directly incentivizes all Participants to meet certain performance objectives.  Even if the NCU KEIP has the indirect effect of reducing the Debtors' attrition rate among those employees covered by the NCU KEIP, this does not convert the NCU KEIP to a "retention" plan.  All successful performance-based incentive plans accompany the byproduct of incentivizing eligible employees to remain with the debtor.  Thus, while the Debtors acknowledge that one benefit of the NCU KEIP may be a reduced attrition rate, this does not convert the NCU KEIP to a "retention" plan,

nor does it detract from the primary purpose of the NCU KEIP, which is to motivate the Participants to meet certain performance criteria.

43.    The dedication of the Participants remains critical if a sale of the Debtors' NCUs is to be conducted in an expeditious fashion that brings a maximum return to the Debtors' estates.  The Debtors submit that the NCU KEIP will be a critical component of success in these Chapter 11 Cases and is necessary to motivate the Participants to contribute the many additional hours needed to successfully close asset sales in a manner that generates maximum recovery to the Debtors' estates.

44.    Accordingly, the NCU KEIP exists to incentivize and reward the Participants for their extraordinary efforts that will be needed for the successful achievement of the performance objectives thereunder and, ultimately, the consummation of a sale of the Debtors' NCUs.  Courts within this jurisdiction have approved similar management incentive plans.  *See*, *e.g.*, *In re RadioShack Corp.*, Case No. 15-10197 (KJC) (Bankr. D. Del. Mar. 4. 2015); *In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014); *In re Brookstone Holdings Corp.*, Case No. 14-10752 (BLS) (Bankr. D. Del. May 12, 2014); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013); *In re Solar Trust of Am., LLC*, Case No. 12-11136 (KG) (Bankr. D. Del. May 17, 2012); *In re Solyndra LLC*, Case No. 11-12799 (MFW) (Bankr. D. Del. Feb. 23, 2012); *In re Trident Microsystems, Inc.*, Case No. 12-10069 (CSS) (Bankr. D. Del. Jan. 30, 2012; Feb. 24, 2012; July 10, 2012); *In re SSI Grp. Holding Corp.*, Case No. 11-12917 (MFW) (Bankr. D. Del. Oct. 26, 2011); *In re Schutt Sports, Inc.*, Case No. 10-12795 (KJC) (Bankr. D. Del. Oct. 21, 2010).

45.    Further, the NCU KEIP also does not constitute severance for insiders subject to the provisions of Bankruptcy Code section 503(c)(2), because the payment of bonuses

21

thereunder occurs when performance goals are reached, not upon termination of the Participants' employment with the Debtors.  *See* 11 U.S.C. § 503(c)(2).  Therefore, the NCU KEIP is a management incentive plan, not a severance plan for insiders subject to the requirements of Bankruptcy Code section 503(c)(2).

### C.    The NCU Key Employee Retention Plan Does Not Provide for Payments to Insiders and Thus Is Not Governed by Bankruptcy Code Sections 503(c)(1) and 503(c)(2)

46.    Neither section 503(c)(1) nor section 503(c)(2) of the Bankruptcy Code are applicable to evaluating the NCU KERP.  By the statute's plain language, sections 503(c)(1) and (2) of the Bankruptcy Code pertain solely to retention and severance plans for insiders.  None of the Participants to be selected by the CRO to participate in the NCU KERP will be an "insider" of the Debtors, within the meaning of section 101(31) of the Bankruptcy Code as, none of the NCU KERP Participants will be a director, officer, person in control, or general partner of any Debtor.  *See* 11 U.S.C. § 101(31).

47.    In particular, none of the NCU KERP Participants to be selected by the CRO will hold a title higher than Vice President and none of the NCU KERP Participants will exercise management control over the Debtors.  *See 455 CPW Assocs. v. Greater N.Y. Sav. Bank* (*In re 455 CPW Assocs.*), 225 F.3d 645, No. 99-5068, 2000 WL 1340569 (2d Cir. Sept. 14, 2000) (affirming a bankruptcy court's holding that a vice president of a limited partnership that was a limited partner of the debtor was not an insider because he was not "in control");  *NMI Sys. Inc. v. Pillard* (*In re NMI Sys. Inc.*), 179 B.R. 357, 368 (Bankr. D.D.C. 1995) (concluding that a "vice president" was not an "officer" or a "person in control" within the meaning of insider in the Bankruptcy Code because the employee was not in a position to influence corporate policy); *cf.*

*Gold v. Sloan*, 486 F.2d 340, 350 (4th Cir. 1973) (concluding, in the context of section 16(b)

Securities Exchange Act of 1934 lawsuit, that an officer's title was "merely titular" because such

officer was a member of lower level management and did not have access to or could not avail

himself of insider information); *C.R.A. Realty Corp. v. Crotty*, 878 F.2d 562, 566 (2d Cir. 1989)

(concluding that a vice president was not an "officer" within the meaning of section 16(b) of the

Securities Exchange Act of 1934 because, among other things, the officer did not have access to

inside information).

48.     The respective scopes of authority among the NCU KERP Participants are

limited, and while their titles reflect individual roles and functions, the same titles do not confer

officer status upon the NCU KERP Participants.   The NCU KERP Participants are critical

employees who have the knowledge and experience to carry out the decisions of management in

an efficient and effective manner, but they will not be individuals with management control over

the Debtors.  As a consequence, the NCU KERP Participants will not be "insiders" as defined in

the Bankruptcy Code, and accordingly sections 503(c)(1) and (c)(2) do not apply in this case.

**D.     The NCU Key Employee Programs Are Justified**
**Under the Facts and Circumstances Under Section 503(c)(3)**

49.     Finally, the NCU Key Employee Programs also satisfy the standard set forth in

Bankruptcy Code section 503(c)(3), which provides:

> [There shall neither be allowed, nor paid--] (3) other transfers or
> obligations that are outside the ordinary course of business and not
> justified by the facts and circumstances of the case, including transfers
> made to, or obligations incurred for the benefit of, officers, managers, or
> consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).

50.     To the extent that distributions under the NCU Key Employee Programs are

payments "outside the ordinary course of business," they should be evaluated under section

503(c)(3). *See, e.g., In re Nobex Corp.*, Case No. 05-20050 (MFW), Jan. 12, 2006, Hr'g Tr. at 67; *Dana*, 358 B.R. at 576; *In re Werner Holding Co. (DE). Inc.*, Case No. 06-10578 (Carey, J.) (Bankr. D. Del. July 28, 2006, Aug. 22, 2006, and Dec. 27, 2006) (ordering various relief requested in connection with debtor's incentive bonus plans pursuant to sections 363(b) and 503(c) of the Bankruptcy Code).

51.    Section 503(c)(3) of the Bankruptcy Code states, in relevant part, that "there shall be neither allowed nor paid . . . other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case . . . ." 11 U.S.C. § 503(c)(3).  Since courts have begun to analyze various payments under section 503(c)(3), they have been unanimous in holding that they must use the "business judgment" standard as the proper standard for determining whether incentive programs and the payments thereunder are justified.  *See, e.g., In re Werner Holding Co. (DE).  Inc.*, Case No. 06-10578 (Carey, J.) (Bankr. D. Del. July 28, 2006, Aug. 22, 2006, and Dec. 27, 2006); *In re Nobex Corp.*, Case No. 05-20050 (Bankr. D. Del. Dec. 21, 2005 and May 15, 2006); *In re Riverstone Networks. Inc.*, Case No. 06-10110 (Sontchi, J.) (Bankr. D. Del. Mar. 28, 2006); *In re Pliant Corp.*, Case No. 06-10001 (Walrath, J.) (Bankr. D. Del. Mar. 14, 2006).

52.    In *Nobex*, this Court stated:

> So I do read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside the ordinary course of business are those that are justified by the facts and circumstances of the case.  Nothing more – no further guidance provided to the Court by Congress, I find it quite frankly nothing more than a reiteration of the standard under 363 . . . under which courts had previously authorized transfers outside the ordinary course of business and that is, based on the business judgment [sic] of the debtor, the court always considered the facts and circumstances of the case to determine whether it was justified.

*In re Nobex Corp.*, Case No. 05-20050 (Walrath, J.) (Bankr. D. Del. Jan. 12, 2006). *See also Dana*, 358 B.R. at 584 (agreeing that management incentive programs should be evaluated under the business judgment standard).

53.     In assessing a debtor's business judgment regarding the implementation of incentive programs, this Court has set forth factors to be considered for guidance to evaluate a proposed incentive or retention program under Bankruptcy Code section 503(c)(3).[5]

54.     Courts balance the foregoing factors, and a debtor need not satisfy every factor to demonstrate that its proposed compensation structure should be approved under section 503(c)(3).   *See Global Home*, 369 B.R. at 786 (holding that performance-based compensation structure was a proper exercise of business judgment, even though, for instance, the debtors did not use a benefits consultant to structure the program).   These factors weigh in favor of approval of the NCU Key Employee Programs, and the NCU Key Employee Programs represent a reasonable exercise of the Debtors' business judgment, for the following reasons:

      a.     The NCU Key Employee Programs Are Reasonably
           Calculated to Maximize Recovery to the Estates

55.     The NCU Key Employee Programs are reasonably calculated to achieve the desired result of maximizing recovery to the Debtors' estates by incentivizing the Participants to engage in activities that go beyond even the increased duties in normal bankruptcy cases, including without limitation, marketing the Debtors' NCUs, making presentations regarding a potential sale, supporting the due diligence process, inducing potential purchasers to submit bids,

---

[5] The factors include: (a) whether there is a reasonable relationship between the plan proposed and the results to be obtained; (b) whether the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential; (c) whether the scope of the plan is fair and reasonable, applies to all employees, discriminates unfairly; (d) whether the plan or proposal is consistent with industry standards; (e) whether the debtor put forth sufficient due diligence efforts in formulating the plan; and (f) whether the debtor received sufficient independent counsel in performing any due diligence and formulating the plan. *Global Home*, 369 B.R. at 786 (citing *Dana*, 358 B.R. at 576).

and supporting the chapter 11 professionals and counsel in administering the sale processes, all on an extraordinarily expedited basis.  The NCU Key Employee Programs are predicated upon certain metrics that create a reasonable set of thresholds for payment of a bonus that are well within the Debtors' sound business judgment and more than amply justified by the facts and circumstances of these Chapter 11 Cases.

56.    The NCU Key Employee Programs are designed to allocate bonuses to those employees who are in the best position to ensure successful sales of the Debtors' NCUs, thereby maximizing value for the Debtors' estates.  As this Court has noted:

> The Debtor argues, persuasively, . . . some of the [sale-related]
> services yet to be performed . . . from due diligence to transition
> and other sale related services . . . are the most important activity
> of the company at the moment.  The activity, most likely, to
> produce the most value for the Estate.  And to incentivize
> employees to achieve those goals and perform those activities,
> which would not otherwise be within their normal job descriptions,
> I think is necessary under these circumstances. These employees . .
> . have specific technical or other knowledge about the business or
> the industry, which is necessary for the conduct of the Debtor's
> business and for achieving and taking sales to their conclusion.

Hr'g Tr. 259:21 to 260:17, May 7, 2007, *In re New Century TRS Holdings Inc.*, Case No. 07-10416 (Bankr. D. Del. May 25, 2007) (approving key employee incentive plan in connection with sale of debtors' servicing business and certain pools of mortgage related assets).

57.    The Participants are the only people with the requisite knowledge and experience to ensure the best possible sale outcome for the Debtors' estates.  With special knowledge of the NCUs' business models and capabilities, understanding of the NCUs' business and finances, and relationships with the various players in the networks of the respective NCUs, the Participants are able to communicate with and provide comfort to potential bidders on the health, capabilities

and reliable transition of the NCUs designated for sale by the Special Committee, all of which functions are critical to ensure a maximum recovery to the Debtors' estates.

58.     As Judge Sontchi recognized:

> [A]ll the covered employees are performing above and beyond their normal job responsibilities, some extraordinarily so.  I don't think that's particularly surprising.  Chapter 11 is . . . an expensive and time consuming process for management.  That is the nature of Chapter 11, and that's, you know, I take issue with [counsel for the creditors' committee's] sort of blanket statement that every Chapter 11 [case] doesn't deserve some sort of incentive management program.  Certainly not every case can afford it, and some cases maybe call out for it more than others.  A business like this [automotive glass supplier] where we're talking about a very volatile, competitive, people-intensive business is really a poster child for a management incentive program, especially in a sales process where people are working themselves out of a job.

Hr'g Tr. 88:14 to 89:4, May 8, 2008, *In re Diamond Glass, Inc.*, Case No. 08-10601 (Bankr. D. Del. June 6, 2008) (approving payment of incentive awards to twenty-one senior managers upon consummation of sale to stalking horse bidder, among other metrics.)

59.     The Debtors have also been impacted by the recent departure of a number of employees.  As a result, the remaining employees have been asked to assume additional responsibilities, for which their prepetition compensation did not account.  In light of the increased workload being borne by the Participants and the significant risk to the value of the business units being sold and to the Debtors' estates as a whole without the participation of the Participants, the Debtors believe the bonuses are reasonably proportionate as compared to prepetition compensation, and when compared to incentive and retention plans approved in this Court.  *See, e.g.*, *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Dec. 1, 2015) (authorizing incentive payments not to exceed an aggregate of $1,470,000 and non-insider employee pool in the amount of $859,556); *In re RadioShack Corp.*, Case No. 15-10197 (KJC)

(Bankr. D. Del. Mar. 4. 2015) (authorizing incentive payments not to exceed an aggregate of $1,500,000 and maximum aggregate KERP bonus pool of approximately $1,000,000); *In re Brookstone Holdings Corp.*, Case No. 14-10752 (BLS) (Bankr. D. Del. May 12, 2014) (authorizing incentive payments based on multiple metrics, estimated to be approximately $850,000 and KERP payments ranging from 17% to 50% of base salary and not to exceed an aggregate of $1,282,429; *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (authorizing incentive payments not to exceed an aggregate of $2,200,000 and total anticipated KERP payments in the amount of $540,000); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 20, 2009) (authorizing incentive payments ranging from 20% to 183% of base salary and KERP with an aggregate payout not to exceed $12,400,000).

60.     Here, the NCU Key Employee Programs fall within the range of, and are reasonably proportionate to, incentive and retention plans approved in this Court.  Accordingly, the Debtors submit that the NCU Key Employee Programs are reasonably calculated to achieve the desired and actual result of maximum of recoveries for the Debtors' NCUs.

b.     <u>Award Amounts Are Reasonable</u>

61.     Beyond being reasonably calculated to achieve the desired performance, the NCU Key Employee Programs are also reasonable in amount because they significantly improve the estates' chances of recovering value and involve a small cost relative to the potential benefit to be realized by the Debtors upon the occurrence of goals set forth in the NCU Key Employee Programs.  *See, e.g.*, Hr'g Tr., at 261:13-24, May 7, 2007, *In re New Century TRS Holdings Inc.*, Case No. 07-10416 (Bankr. D. Del.) ("[T]he total amount to be paid is about $3.3 million . . . . But this amount is a fraction of the total value to be achieved and preserved by this Estate, and

it's a small fraction.  So it seems to me that in the Debtor's business judgment, if it spends this amount of money, it can preserve literally tens of millions of dollars, or potentially more, worth the value for the Estate, it seems to me to be a very small amount of money well spent."); *see also In re Nobex Corp.*, Case No. 05-20050 (MFW), 2006 WL 4063024, at *3-4 (Bankr. D. Del. Jan. 19, 2006) (authorizing payment of incentive awards to senior managers up to aggregate 9% of gross purchase price from sale of substantially all of debtors' assets).  Accordingly, the facts and circumstances of these Chapter 11 Cases justify approval of the NCU Key Employee Programs and the Debtors' reasonable business judgment thereon.

      c.     The NCU Key Employee Programs Are Reasonable in Scope and Do Not Discriminate Unfairly

62.    As mentioned above, the NCU Key Employee Programs are narrowly tailored to incentivize only those employees that the CRO, in consultation with the Special Committee, believes will be significantly involved in achieving the performance goals set forth therein.  The bonuses thereunder will be allocated according to the ability of such Participants to positively influence the outcome of the Debtors' NCU sale efforts and contribute to the gain ultimately realized.  Courts frequently approve incentive awards to a key number of senior managers or key employees in the context of a sale of a debtor's assets, which serves as the basis for the NCU Key Employee Programs. *See*, *e.g.*, *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Dec. 1, 2015) (authorizing transaction bonuses to three (3) key executive and fourteen (14) non-insider employees); *In re RadioShack Corp.*, Case No. 15-10197 (KJC) (Bankr. D. Del. Mar. 4. 2015) (authorizing transaction bonuses to eight (8) executive employees and up to thirty (30) non-insider employees); *In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014) (authorizing transaction bonuses for nine (9) executive employees); *In re Brookstone Holdings Corp.*, Case No. 14-10752 (BLS) (Bankr. D. Del. May 12, 2014)

(authorizing transaction bonuses to four (4) executive employee and up to thirty-three (33) non-insider employees); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (authorizing transaction bonuses to seven (7) executive employees and twenty-two (22) non-insider employees); *In re Trident Microsystems, Inc.*, Case No. 12-10069 (CSS) (Bankr. D. Del. Jan. 30, 2012; Feb. 24, 2012; July  10, 2012) (authorizing transaction and wind-down bonuses to six (6) executive employees); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 20, 2009) (authorizing transaction bonuses for ninety-two (92) senior executives and eight-hundred and eighty (880) non-insider employees).  Here, the NCU Key Employee Programs fall within the range of, and are reasonably proportionate to, incentive and retention plans approved in this Court.  In this case, the NCU Key Employee Programs do not discriminate unfairly, as they are designed to compensate those employees that the Debtors believe can and will add distinct value to the Debtors' NCU sale efforts based on their unique industry knowledge, experience, technical expertise and position within the Debtors' NCUs designated for sale.

63.    The NCU sale processes will require the talent, focus and energy of the Participants, who will ensure that potential buyers recognize the available value in the Debtors' NCUs.  It is extremely unlikely that any other party, including the Debtors' professionals, could provide similarly credible comfort to any bidders.  Accordingly, the Debtors submit that the NCU Key Employee Programs are fair and reasonable and will not discriminate unfairly.

        d.        The Bonuses Comport with Incentives
                Provided in Recent Comparable Cases

64.    The structure, scope and amounts of the bonuses contemplated by the NCU Key Employee Programs are consistent with other performance-based bonuses approved by this Court.  *See, e.g.*, *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Dec. 1, 2015)

(approving incentive and retention programs for key employees upon successful reorganization or sale); *In re RadioShack Corp.*, Case No. 15-10197 (KJC) (Bankr. D. Del. Mar. 4. 2015) (approving incentive and retention programs for key employees based solely on occurrence of successful sale of debtor's business); *In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014) (approving incentive program for key employees upon sale or recapitalization); *In re Brookstone Holdings Corp.*, Case No. 14-10752 (BLS) (Bankr. D. Del. May 12, 2014) (approving incentive and retention programs for key employees upon sale of debtor's business); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (approving incentive and retention programs for key employees upon sale or recapitalization of debtor's business); *In re Solar Trust of Am., LLC*, Case No. 12-11136 (KG) (Bankr. D. Del. May 17, 2012) (approving incentive program for employees upon the occurrence of a sale of the debtor's business); *In re Solyndra LLC,* Case No. 11-12799 (MFW) (Bankr. D. Del. Feb. 23, 2012); (authorizing multi-tier incentive program where bonuses vested upon sale of debtor's assets and/or consummation of a plan of reorganization); *In re SSI Grp. Holding Corp.*, Case No. 11-12917 (MFW) (Bankr. D. Del. Oct. 26, 2011) (approving incentive payments to employees based on result of sale transaction or confirmation of a plan of reorganization).

65.     Although the Debtors seek authority to pay a percentage of sale proceeds in the NCU KEIP that facially is higher than average comparables, the aggregate cap on payments thereunder is consistent with the median maximum identified in the comparable KEIPs, which creates certainty with respect to the total amount of NCU KEIP Payments and brings the NCU KEIP within the range of market standards.  As discussed above, an NCU KEIP bonus pool of less than 5% of sale proceeds may be insufficient to properly incentivize employees tasked with

ensuring a successful sale process for certain lower-value NCUs. Accordingly, the Debtors submit that their NCU Key Employee Programs are reasonable under the circumstances.

    e.  Debtors' Diligence and Assistance of Professionals
       In Structuring NCU Key Employee Programs

66. The NCU Key Employee Programs reflect reasonable incentive payments that will compensate the Participants for realizing maximum recoveries for the Debtors' estates. The NCU Key Employee Programs were principally designed by the Debtors and FTI. The CRO, in consultation with the Special Committee and the CEO of each NCU designated for sale, will conduct due diligence on their employee roster and agree to compensate only those employees that they determine are absolutely essential to a successful sale of the Debtors' NCUs. FTI has reviewed key employee incentive and retention plans proposed by chapter 11 debtors in this district, and the NCU Key Employee Programs, while generally comporting with such performance-based incentive and retention plans, are structured to also address the particular circumstances of these Chapter 11 Cases.

67. The NCU Key Employee Programs and bonuses contemplated thereunder are appropriate under the facts and circumstances of these Chapter 11 Cases and the NCU Key Employee Programs satisfy the applicable standards. The NCU Key Employee Programs are calibrated to achieve the desired performance. The proposed bonus structure is fair and reasonable in scope and payments made thereunder are proportionate to the benefits realized by the Debtors upon the occurrence of the performance goals set forth in the NCU Key Employee Programs.

68. As outlined above, the NCU Key Employee Programs are structured to maximize recoveries for the Debtors' estates. Indeed, the bonuses under the NCU Key Employee Programs are all related to income being realized by the Debtors through the sale of their NCUs. Through

the implementation of the NCU Key Employee Programs, the interests and motivations of Participants will be aligned with the motivations of the Debtors and their creditors and other stakeholders.  Providing incentives to encourage the Participants to focus on the Debtors' objectives and to motivate them to provide optimal levels of performance beyond their normal duties is necessary for the success of the Debtors' NCU sale efforts and, ultimately, the Debtors' success in these Chapter 11 Cases.

69.     In addition, the overall cost of the NCU Key Employee Programs are reasonable, particularly in light of the additional work beyond the duties placed on employees in normal bankruptcy cases and the extraordinary speed at which the Participants are demanded to perform those additional duties.  It is not too much to say that the Debtors' ability to generate any real recovery for their estates depends largely upon the Participants' dedication and focus toward the efficient and timely execution of NCU sales.  Accordingly, the Debtors submit that the NCU Key Employee Programs constitute a reasonable exercise of the Debtors' sound business judgment and should be approved as in the best interests of their estates, creditors and other stakeholders.

### The Court Should Waive the Stay Under Bankruptcy Rule 6004(h)

70.     To implement the relief requested herein as soon as possible, the Debtors request a waiver of the 14-day stay of an order authorizing, *inter alia*, the use of the Debtors' property under Bankruptcy Rule 6004(h).  The Debtors view the NCU Key Employees Programs as critical to the morale of their workforce and accordingly view the relief sought herein as exigent in nature.  Therefore, the Debtors submit that immediate relief is justified under the circumstances.

### Notice

71.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the DIP Lenders; (c) the Committee; (d) those parties requesting notice pursuant to Bankruptcy Rule 2002; (e) the Office of the United States Attorney General for the District of Delaware; (f) the Internal Revenue Service; and (g) the Securities and Exchange Commission.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

72.     No prior request for the relief sought in this Motion has been made to this or any other court.

**[concluded on the following page]**

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form attached hereto as **Exhibit B** granting the relief sought requested herein and such other and further relief as is just.

Dated: March 2, 2016

**GREENBERG TRAURIG, LLP**

By:  */s/ Dennis A. Meloro*
Dennis A. Meloro (DE Bar No. 4435)
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360
Email:  melorod@gtlaw.com

-and-

Nancy A. Mitchell (admitted *pro hac vice*)
Maria J. DiConza (admitted *pro hac vice*)
Nathan A. Haynes (admitted *pro hac vice*)
200 Park Avenue
New  York, New York 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
Email:  mitchelln@gtlaw.com
          diconzam@gtlaw.com
          haynesn@gtlaw.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*