# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SFX ENTERTAINMENT, INC., *et al.*,[1] | Case No. 16-10238 (MFW) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF CHRISTOPHER T. NICHOLLS IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING THE IMPLEMENTATION OF (I) A KEY EMPLOYEE INCENTIVE PLAN AND (II) A KEY EMPLOYEE RETENTION PLAN EACH IN CONNECTION WITH THE SALE OF CERTAIN OF THE DEBTORS' NON-CORE BUSINESS UNITS**

Christopher T. Nicholls makes this declaration under 28 U.S.C. § 1746:

1. I am the Associate Chief Restructuring Officer ("**ACRO**") of SFX Entertainment, Inc. and its subsidiaries (collectively, "**SFX**"), including the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**").

2. I am a senior managing director with FTI Consulting, Inc. ("**FTI**") and FTI Capital Advisors, a subsidiary of FTI. My business address is FTI's New York office located at 3 Times Square, New York, New York 10036.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: 430R Acquisition LLC (7350); Beatport, LLC (1024); Core Productions LLC (3613); EZ Festivals, LLC (2693); Flavorus, Inc. (7119); ID&T/SFX Mysteryland LLC (6459); ID&T/SFX North America LLC (5154); ID&T/SFX Q-Dance LLC (6298); ID&T/SFX Sensation LLC (6460); ID&T/SFX TomorrowWorld LLC (7238); LETMA Acquisition LLC (0452); Made Event, LLC (1127); Michigan JJ Holdings LLC (n/a); SFX Acquisition, LLC (1063); SFX Brazil LLC (0047); SFX Canada Inc. (7070); SFX Development LLC (2102); SFX EDM Holdings Corporation (2460); SFX Entertainment, Inc. (0047); SFX Entertainment International, Inc. (2987); SFX Entertainment International II, Inc. (1998); SFX Intermediate Holdco II LLC (5954); SFX Managing Member Inc. (2428); SFX Marketing LLC (7734); SFX Platform & Sponsorship LLC (9234); SFX Technology Services, Inc. (0402); SFX/AB Live Event Canada, Inc. (6422); SFX/AB Live Event Intermediate Holdco LLC (8004); SFX/AB Live Event LLC (9703); SFX-94 LLC (5884); SFX-Disco Intermediate Holdco LLC (5441); SFX-Disco Operating LLC (5441); SFXE IP LLC (0047); SFX-EMC, Inc. (7765); SFX-Hudson LLC (0047); SFX-IDT N.A. Holding II LLC (4860); SFX-LIC Operating LLC (0950); SFX-IDT N.A. Holding LLC (2428); SFX-Nightlife Operating LLC (4673); SFX-Perryscope LLC (4724); SFX-React Operating LLC (0584); Spring Awakening, LLC (6390); SFXE Netherlands Holdings Coöperatief U.A. (6812); SFXE Netherlands Holdings B.V. (6898). The Debtors' business address is 902 Broadway, 15th Floor, New York, NY 10010.

3. I have over 29 years of strategy consulting, restructuring and corporate finance experience. I have assessed the current operations, financial models and business strategies of companies including Tribune; MediaNews; Morris; GateHouse; Star Tribune; Sandy Alexander; Broadview Networks; One Communications; McLeod; Allegiance; XO Communications; Broadwing; Level 3; Valor; Fairpoint; Rural Cellular; Houghton Mifflin; Rodale Press; RH Donnelley and Dex. I led more than 35 restructurings, managed numerous amendments, bondholder consent solicitations and exchanges, as well as advised on numerous pre-packaged, pre-arranged and free-fall bankruptcies and 363 sales. Recent representations include the $8 billion bank lender group of Tribune, the lenders of MediaNews, the bondholders of Morris Communications, the bondholders of Broadview Networks, creditors of Source Interlink, board of Readers Digest, the creditors of Cengage Publishing and the board of Freedom Communications. I also have experience growing investments under management and leading telecom workout and risk management teams at GE Capital.

4. I submit this declaration (the "**Declaration**") in support of the *Motion of the Debtors for Entry of an Order Approving the Implementation of (I) A Key Employee Incentive Plan and (II) A Key Employee Retention Plan Each in Connection with the Sale of Certain of the Debtors' Non-Core Business Units* (the "**Motion**").[2]

A. **Overview of the NCU Key Employee Programs.**

5. As a preliminary matter, the Motion does <u>not</u> relate either to (i) a general retention program in respect of executives and employees who are key to the success of the businesses around which the Debtors will reorganize and exit these Chapter 11 Cases, or (ii) a sale of substantially all of the Debtors' assets. Rather, the Motion seeks to establish incentive

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

*NY 245683165v10*

compensation programs in respect of the sale of certain of the Debtors' discrete non-core business units (the "**NCUs**"), as may be designated by the Special Committee of the Board of Directors of SFX Entertainment, Inc. (the "**Special Committee**"). The Debtors are in the process of formulating, and intend to seek approval by separate motion at a later date, key employee programs that relate to the Debtors' retained businesses. Such programs will be aligned with the Debtors' reorganization goals. The NCU Key Employee Programs proposed by this Motion, on the other hand, relate only to the NCUs and the necessity to properly incent and retain employees to assist in the maximization of value of these assets held for sale.

6. Thus, the NCU Key Employee Programs set forth in the Motion and described herein are designed exclusively to address the Debtors' sale of the NCUs, as may be designated by the Special Committee. In consultation with the Special Committee, the CRO will designate individuals entitled to participate in the NCU Key Employee Programs in respect of the NCU assets to be sold.

7. The Debtors' goal is to consummate the sale of several of their NCUs in the early stages of these Chapter 11 Cases. The assistance of key employees in such NCUs will be critical to successful sale processes, as a majority of the value of the businesses held for sale relates to the human capital that will travel with these businesses. The payments contemplated under the proposed NCU Key Employee Programs will be derived exclusively from the sale proceeds and/or the DIP Lenders' collateral, with their consent.

8. The CRO, the Debtors and I view the necessity to properly incentivize the Participants separately from the necessity to properly incent employees in the retained businesses. The NCU Key Employee Programs set forth in the Motion and described herein should thus not compromise or be limited by any other plan(s) proposed by the Debtors.

NY 245683165v10

**B.     The NCU KEIP.**

9. Because of their financial difficulties, certain NCUs have experienced recent employee departures. As a result, management and their direct reports have had to take on new and expanded responsibilities in a time of crisis for the Debtors' business. Moreover, the onset of the Chapter 11 Cases and the added responsibilities resulting therefrom have increased the uncertainty and stress on the employees and acts as demotivating factor. Thus, the CRO and I believe it is necessary to properly incentivize the NCUs' key personnel to ensure their best efforts are applied towards maximizing the value of the NCUs in the anticipated dispositions of those businesses. With the assistance of FTI and Debtors' counsel, the CRO and I have determined that an incentive and retention plan is appropriate to ensure the NCUs' key personnel are motivated to ensure a successful sale process.

10. FTI worked with the Debtors and their advisors to develop the terms of the NCU KEIP and to establish a structure for incentives thereunder designed to motivate NCU KEIP Participants to help the Debtors achieve certain important business objectives that will facilitate a timely and successful sale of the Debtors' NCUs, including substantially all of the assets of Debtor Beatport, LLC ("**Beatport**") and the Fame House business of Debtor SFX Marketing LLC ("**Fame House**"). Incentivizing the NCU KEIP Participants is critical in order to ensure that these key members of the NCUs continue in their efforts to successfully maximize value for the benefit of all of the Debtors' stakeholders. The NCU KEIP we developed is annexed to the Motion as **Exhibit A** and summarized in the Motion.

**C.     Reasonableness of the NCU KEIP.**

11. Based on my experience and the work the CRO and I have done on this matter, the NCU KEIP (i) is designed to be consistent with market practice; (ii) is reasonable given the

facts and circumstances of the Chapter 11 Cases; (iii) provides anticipated value that is appropriate to competitively motivate talented staff; and (iv) is required to maximize the value of the Debtors' estates in connection with the sale of the NCUs for the benefit of all parties in interest.

12. In connection with FTI's work on the NCU KEIP structure generally, FTI undertook to define a set of relevant market comparables to that of the Debtors. FTI benchmarked comparable KEIP plans from select chapter 11 cases of six (6) different companies that filed petitions from 2012 to 2015, three of which of are in the technology, media and telecom sectors. The total liabilities of the companies reviewed by FTI ranged from $30 million to $1 billion. Total asset sale values of such companies ranged from $15 million to $500 million. Following a review of this set of market comparables, FTI observed a number of market practice factors. Notably, the targeted total cost (based on expected sale proceeds, e.g., stalking horse value) of comparable KEIPs ranged from $730,000 to $1.6 million, with a median targeted cost of $1.55 million, with maximum payouts of $1.3 million to $3.7 million and a median maximum of $2.2 million. In addition, three of the six plans of similarly situated companies reviewed did not cap the amount of KEIP payments to which participants were entitled. On a percentage of sale proceeds basis, similarly situated companies ranged from 0.30% to 3.84%.

13. FTI has determined the cost of the proposed NCU KEIP to be within the range of market practice as compared to the plans proposed and approved at similarly-situated companies. NCU KEIP Payments will not exceed $400,000 per NCU sale, and no more than $250,000 per individual. However, if KEIP Payments utilized in respect of a particular NCU sale do not reach this cap, the CRO may in consultation with the Special Committee apply the balance of such funds to the KEIP Payments in respect of the sale of another NCU, subject to the

5

$400,000 per NCU and $250,000 individual caps set forth in the preceding sentence (and notwithstanding the 5% of sale proceeds allocated for NCU KEIP Payments described below). The per-individual NCU KEIP payment is below the low end of the range of comparable KEIP transactions. The Debtors anticipate that they will attempt to sell approximately four NCUs. If it is the case that all four NCUs are successfully sold, total NCU KEIP Payments would be approximately in line with the median for the comparable KEIPs contained in the plans reviewed by FTI. Moreover, FTI anticipates that if all four NCUs are sold, the aggregate value realized will not be inconsistent with the range of sale values associated with the comparable KEIPs.

14. The CRO will have authorization for NCU KEIP Payments in an amount of up to 5% of sale proceeds from the sale of a particular NCU, to be distributed at the discretion of the CRO. Sale of the NCUs is an important component of these Chapter 11 Cases. Although the Debtors seek authority to pay a percentage of sale proceeds that facially is higher than average comparables, it is important to underscore why. As the Debtors market and sell the NCUs, which by definition are non-core businesses and therefore do not represent the Debtors' most significant assets, it is possible that certain of the NCUs may not be highly valued. Thus, a bonus pool of less than 5% of sale proceeds may be insufficient to properly incentivize employees tasked with ensuring a successful sale process for certain lower-value NCUs. In other instances, the CRO may determine that NCU KEIP Payments of less than 5% are sufficient to incentivize the KEIP Participants of a particular higher-value NCU. Due to the uncertain values of the NCUs, the necessity that such NCUs be sold forthwith and the importance of the NCU KEIP Participants to such sale processes, the Debtors seek the flexibility of a 5% cap. In any event, the aggregate cap will be $2.2 million, consistent with the median maximum identified in

6

the comparable KEIPs, which creates certainty with respect to the total amount of NCU KEIP Payments and brings the NCU KEIP within the range of market standards.

15. Without the expertise of the NCU KEIP Participants to efficiently and effectively assist in marketing the NCUs, making presentations regarding a potential sale, supporting the due diligence process, inducing potential purchasers to submit bids, and supporting the chapter 11 professionals and counsel in administering the sale processes, all on an extraordinarily expedited basis, the Debtors' sale efforts in respect of the NCUs would be significantly harmed. The assistance of the NCU KEIP Participants in such NCUs will be critical to successful sale processes, as a majority of the value of the businesses held for sale relates to the human capital that will travel with these businesses.  Not only have the NCU KEIP Participants continued to fulfill the normal tasks and projects required by the normal terms of their employment, but they have been, and will continue to be, required to expend additional time and resources on tasks relating to the implementation of the ongoing sales processes in respect of the NCUs.

16. In order to effectively and efficiently accomplish a sale process in respect of the NCUs that maximizes recovery for all stakeholders, the Debtors determined that formulating the NCU KEIP was in the best interest of their estates and all parties in interest.  The NCU KEIP will help ensure that the key executives and employees the CRO designates, in consultation with the Special Committee, are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest.  As a general matter, the use of key employee incentive plans is common practice in chapter 11 cases.  The structure of the plans varies based on the unique circumstances of each case but the general terms and conditions are consistent with the NCU KEIP proposed by the Debtors, including the conditions and proposed payment amounts set forth therein.

7

**D.    The NCU KERP.**

17.    In addition to the NCU KEIP, both the CRO and I worked with the Debtors and FTI to develop the terms of the NCU KERP for certain individual non-insider employees, in order to ensure that the Debtors do not suffer significant and costly turnover of key employees during the Debtors' efforts to sell certain of their NCUs.  The loss of the NCU KERP Participants would hamper the Debtors' ability to conduct sales of the NCUs expected to be sold in these Chapter 11 Cases.  In particular, the circumstances of these Chapter 11 Cases are likely to increase employee turnover, especially in light of the challenges posed by the sales processes and the availability of alternatives for the Debtors' employees, many of whom are highly skilled.  Indeed, the majority of the value of the NCUs that have been, and will be, designated for sale relates to the human capital that will travel with these businesses.  As a consequence, the Debtors and their advisors have determined that a non-insider retention program for certain of the NCUs' key employees will be effective to retain those employees until sales are consummated.  Incentivizing the NCU KERP Participants is critical in order to ensure that these key members of the Debtors' team continue in their efforts to successfully maximize value for the benefit of all of the Debtors' stakeholders.  The terms of the NCU KERP are annexed to the Motion as **Exhibit A** and summarized in the Motion.

**E.    Reasonableness of the NCU KERP.**

18.    Based on my experience and the work the CRO and I have done on this matter, the NCU KERP (i) is designed to be consistent with market practice; (ii) is reasonable given the facts and circumstances of the Chapter 11 Cases; (iii) provides anticipated value that is appropriate to competitively motivate talented staff; and (iv) is required to maximize the value of

8

the Debtors' estates in connection with the sale of the NCUs for the benefit of all parties in interest.

19. In connection with FTI's work on the NCU KERP structure generally, FTI undertook to define a set of relevant market comparables to that of the Debtors. FTI benchmarked comparable key employee retention plans from select chapter 11 cases of eleven (11) different companies which filed petitions from 2011 to 2015 with bankruptcy case durations of between two months and two years and with total liabilities ranging from $100 million to $1 billion. Following a review of this set of market comparables, FTI observed that the median total cost of KERPs approved for similarly situated companies was over $1 million and average costs per participant ranged from $10,000 to $40,620.

20. FTI has found the design and the cost of the proposed NCU KERP to be within the range of market practice as compared to plans proposed and approved at similarly situated companies. Specifically, FTI anticipates that the aggregate cost of the NCU KERP will not exceed $750,000, which is more than 25% below the median aggregate cost of KERPs approved for similarly situated companies. Moreover, no NCU KERP Participant shall be entitled to receive in excess of $40,000 in NCU KERP Payments, which is within the range of average costs per participant for similarly situated companies reviewed by FTI.

21. Certain of the NCU KERP Participants the CRO selects may hold the title of Vice President, but the CRO will not select as an NCU KERP Participant any individual that exercises management control over the NCU by which such Participant is employed. The respective scopes of authority among the NCU KERP Participants the CRO selects will be limited, and while their titles may reflect individual roles and functions, the same titles do not confer management authority over the Debtors. The NCU KERP Participants are critical employees

NY 245683165v10

who have the knowledge and experience to carry out the decisions of management in an efficient and effective manner, but will not be individuals who manage or control the NCUs. Thus, none of the NCU KERP Participants will be properly considered "officers" and, as a consequence, the NCU KERP Participants will not be "insiders" as defined in the Bankruptcy Code.

22. The NCU KERP Participants have been faced with significant pressure to leave the Debtors' employ during the pendency of these Chapter 11 Cases due to staff reductions and uncertain job prospects following the completion of a reorganization or NCU sales. It is critical to the NCU sale processes that the Debtors retain the services of the NCU KERP Participants throughout the duration of the NCU sale processes.

23. In order to effectively and efficiently accomplish a sale process in respect of the NCUs that maximizes recovery for all stakeholders, the Debtors determined that formulating the NCU KERP was in the best interest of their estates and all parties in interest. The NCU KERP will help ensure that the key non-insider employees the CRO designates, in consultation with the Special Committee, are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest.

24. The NCU sales process has a necessary byproduct of creating a great deal of uncertainty for the very company personnel charged with maximizing the value. As a result, it is entirely appropriate to provide benefits to such key personnel in order to counterbalance the distraction that such uncertainty would engender. The structure of other key employee retention plans approved by this and other courts varies based on the unique circumstances of each case but the general terms and conditions are consistent with the NCU KERP proposed by the Debtors, including the conditions and proposed payment amounts set forth therein.

F.  **The Debtors' Need for the NCU KEIP and the NCU KERP.**

25. The success of the Debtors' NCU sale efforts is dependent upon the goodwill and support of their employees. As the Debtors' implement the sales of their NCUs, it is imperative that the Debtors' key personnel are appropriately incentivized to maximize the price of any sale transaction to ensure optimum recovery for all stakeholders. Indeed, as set forth above, the majority of the value of the NCUs the Debtors are preparing to sell (including Beatport and Fame House) relates to the human capital that will travel with the businesses in connection with a sale. Accordingly, it is important to the success of the Debtors' sale efforts that the NCU Key Employee Programs be implemented. Moreover, the Participants have been and will be called upon to expend significantly more hours during the sale processes than contemplated by the normal terms of their employment.

26. In order to successfully, effectively, and efficiently accomplish orderly sale processes that maximize recovery for all stakeholders, the Debtors determined that formulating the NCU Key Employee Programs was in the best interest of their estates and all parties in interest. The NCU KEIP will help ensure that key executives and employees who are essential to the sale processes are properly motivated to maximize value for the Debtors, their estates, their creditors and their stakeholders. The NCU KERP ensures that certain non-insider, key employees, without whom the Debtors could not successfully market and effectuate a sale of their NCUs, remain with the Debtors throughout the NCU sale processes.

27. As a general matter, the use of KEIPs is common practice in chapter 11 cases, and the use of KERPs is justified here given the ongoing sale processes, the associated uncertainty, and the value that the NCU KERP Participants provide to the NCUs. The structure of the plans approved in other cases varies based on the unique circumstances of each case but the general

terms and conditions are consistent with the NCU KEIP and the NCU KERP proposed by the Debtors.

Signed under penalty of perjury, pursuant to 26 U.S.C. § 1746, this 2nd day of March 2016.


*/s/ Christopher T. Nicholls*_____
**CHRISTOPHER T. NICHOLLS**

12

NY 245683165v10