## <u>Exhibit B</u>

## Form Asset Purchase Agreement

**ASSET PURCHASE AGREEMENT**

by and between

**SFX MARKETING LLC d/b/a FAME HOUSE**

and

[_____],

Dated as of [_____], 2016

**TABLE OF CONTENTS**

Page

ARTICLE 1 DEFINITIONS..................................................................................................1

    1.1    Certain Terms Defined.......................................................................................1
    1.2    Interpretation......................................................................................................2

ARTICLE 2 PURCHASE AND SALE OF THE FAME HOUSE ASSETS; ASSUMPTION OF LIABILITIES............................................................................................................3

    2.1    Purchase and Sale of Fame House Assets..........................................................3
    2.2    Excluded Assets..................................................................................................4
    2.3    Assumption of Liabilities...................................................................................6
    2.4    Excluded Liabilities............................................................................................6
    2.5    Assignment and Assumption of Contracts and Other Fame House Assets. ...........7

ARTICLE 3 CONSIDERATION ..........................................................................................9

    3.1    Deposit ...............................................................................................................9
    3.2    Purchase Price ....................................................................................................9
    3.3    Allocation of Purchase Price..............................................................................9

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER .................................9

    4.1    Organization.....................................................................................................10
    4.2    Authorization of Agreement .............................................................................10
    4.3    Conflicts; Consents of Third Parties.................................................................10
    4.4    Title to Fame House Assets ..............................................................................11
    4.5    Contracts ..........................................................................................................11
    4.6    Real Property ...................................................................................................11
    4.7    Intellectual Property.........................................................................................12
    4.8    Permits .............................................................................................................12
    4.9    Employees........................................................................................................12
    4.10   Insurance..........................................................................................................12
    4.11   No Brokers or Finders......................................................................................13
    4.12   Litigation; Proceedings....................................................................................13
    4.13   Compliance with Laws ....................................................................................13
    4.14   Taxes ...............................................................................................................13
    4.15   Warranties Are Exclusive .................................................................................13

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PURCHASER .........................14

    5.1    Corporate Organization....................................................................................14
    5.2    Authorization and Validity ...............................................................................14
    5.3    Conflicts; Consents of Third Parties .................................................................14
    5.4    No Brokers or Finders......................................................................................15

| | 5.5 | Litigation | 15 |
|---|---|---|---|
| | 5.6 | Condition of the Fame House Business | 15 |
| | 5.7 | Financial Capability | 16 |
| | 5.8 | Independent Investigation | 16 |

ARTICLE 6 COVENANTS AND OTHER AGREEMENTS................................................16

| | 6.1 | Pre-Closing Covenants of Seller | 16 |
|---|---|---|---|
| | 6.2 | Pre-Closing Covenants of Purchaser | 18 |
| | 6.3 | Other Covenants of Seller and Purchaser | 18 |
| | 6.4 | Employment Covenants and Other Undertakings | 19 |
| | 6.5 | Approvals | 21 |
| | 6.6 | Transition Services Agreement | 22 |

ARTICLE 7 TAXES; BULK SALES LAWS .....................................................................23

| | 7.1 | Taxes Related to Purchase of Fame House Assets | 23 |
|---|---|---|---|
| | 7.2 | Waiver of Bulk Sales Laws | 23 |

ARTICLE 8 BANKRUPTCY COURT MATTERS ..............................................................23

| | 8.1 | Bankruptcy Court Filings | 23 |
|---|---|---|---|
| | 8.2 | Contracts | 23 |
| | 8.3 | Competing Transaction | 23 |
| | 8.4 | Procedure | 24 |

ARTICLE 9 CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES............24

| | 9.1 | Conditions Precedent to Performance by Seller | 24 |
|---|---|---|---|
| | 9.2 | Conditions Precedent to the Performance by Purchaser | 25 |
| | 9.3 | Frustration of Closing Conditions | 26 |

ARTICLE 10 CLOSING AND DELIVERIES......................................................................26

| | 10.1 | Closing | 26 |
|---|---|---|---|
| | 10.2 | Seller's Deliveries | 26 |
| | 10.3 | Purchaser's Deliveries | 27 |

ARTICLE 11 TERMINATION ..........................................................................................27

| | 11.1 | Termination | 27 |
|---|---|---|---|
| | 11.2 | Effect of Termination | 29 |

ARTICLE 12 MISCELLANEOUS ....................................................................................30

| | 12.1 | Survival | 30 |
|---|---|---|---|
| | 12.2 | Further Assurances | 30 |
| | 12.3 | Successors and Assigns | 30 |

| 12.4 | Governing Law; Jurisdiction; Service of Process | 31 |
|------|------------------------------------------------|----|
| 12.5 | Expenses | 31 |
| 12.6 | Severability | 31 |
| 12.7 | Notices | 31 |
| 12.8 | Amendments; Waivers | 32 |
| 12.9 | Entire Agreement | 33 |
| 12.10 | Disclosures | 33 |
| 12.11 | Headings | 33 |
| 12.12 | Counterparts | 33 |
| 12.13 | Name Change | 33 |
| 12.14 | Post-Closing Transfers | 34 |
| 12.15 | Schedules | 34 |
| 12.16 | Waiver of Jury Trial | 34 |
| 12.17 | No Third Party Beneficiaries | 35 |
| 12.18 | Remedies | 35 |

**Appendix A – Defined Terms**

**Exhibits**
**Exhibit A – Form of Transition Services Agreement**
**Exhibit B – Form of Bill of Sale**
**Exhibit C – Form of Assignment and Assumption Agreement**
**Exhibit D – Form of Trademark Assignment Agreement**
**Exhibit E – Form of Domain Name Assignment Agreement**
**Exhibit F – Bid Procedures Order**
**Exhibit G – Form of Sale Order**

**Schedules**
**Schedule 2.1(q) – Claims**
**Schedule 2.2(g) – Excluded Assets**
**Schedule 2.2(q) – Excluded Insurance Policies**
**Schedule 2.3(c) – Assumed Liabilities**
**Schedule 2.5(a) – Assumed Contracts**
**Schedule 4.3(a) – Conflicts of Seller**
**Schedule 4.3(b) – Seller Regulatory Approvals**
**Schedule 4.5 – Contracts**
**Schedule 4.6(i) – Leased Property**
**Schedule 4.6(ii) – Occupancy Agreements**
**Schedule 4.7(i) – Intellectual Property**
**Schedule 4.7(ii) – Registered IP**
**Schedule 4.7(iii) – Excluded IP**
**Schedule 4.8(i) – Permits**
**Schedule 4.8(ii) – Notices of Violation or Non-Renewal of Permits**
**Schedule 4.9(i) – Employee Benefit Plans**
**Schedule 4.9(ii) – Employees, Consultants and Independent Contractors**
**Schedule 4.10(i) – Insurance Policies**

**Schedule 4.10(ii) – Effectiveness of Insurance Policies**
**Schedule 4.11 – Brokers and Finders of Seller**
**Schedule 4.12 – Litigation; Proceedings**
**Schedule 4.13(i) – Compliance with Laws**
**Schedule 4.13(ii) – Notices of Violation of Law**
**Schedule 4.14 – Taxes**
**Schedule 5.3(b) – Purchaser Regulatory Approvals**
**Schedule 6.6 – Services**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (as amended, supplemented or otherwise modified from time to time, this "**Purchase Agreement**"), dated as of [_____], 2016 (the "**Execution Date**"), is made by and between SFX MARKETING LLC, a Delaware limited liability company ("**Seller**") and [_____] ("**Purchaser**"). Purchaser and Seller are collectively referred to herein as the "**Parties**" and each, a "**Party**".

## RECITALS

**WHEREAS**, Seller operates a digital marketing agency (the "**Fame House Business**");

**WHEREAS**, on February 1, 2016 (the "**Petition Date**"), SFX Entertainment, Inc. ("**Parent**"), Seller and certain other subsidiaries and Affiliates of Parent (collectively, the "**Debtors**") filed voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, the Debtors' chapter 11 bankruptcy cases are being jointly administered under Case No. 16-10238 (MFW) in the Bankruptcy Court (the "**Bankruptcy Cases**");

**WHEREAS**, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to acquire and assume from Seller, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Fame House Assets and the Assumed Liabilities, as more specifically provided herein and in the Sale Order;

**WHEREAS**, Seller intends to seek the entry of an order by the Bankruptcy Court approving this Purchase Agreement and authorizing Seller to consummate the transactions contemplated hereby upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, the transactions contemplated by this Purchase Agreement will be consummated pursuant to the Sale Order to be entered in the Bankruptcy Cases under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and such transactions and this Purchase Agreement are subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Seller and Purchaser hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    <u>Certain Terms Defined</u>.  Capitalized terms used in this Purchase Agreement and not otherwise defined herein shall have the meanings ascribed to such terms on **<u>Appendix A</u>** attached hereto and as set forth elsewhere herein.

1.2     Interpretation.

(a)     When a reference is made in this Purchase Agreement to a section or article, such reference shall be to a section or article of this Purchase Agreement unless otherwise clearly indicated to the contrary.

(b)     Whenever the words "include," "includes" or "including" are used in this Purchase Agreement they shall be deemed to be followed by the words "without limitation."

(c)     The word "or" is not exclusive.

(d)     The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Purchase Agreement as a whole and not to any particular provision of this Purchase Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Purchase Agreement unless otherwise specified.

(e)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(f)     A reference to any Party to this Purchase Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(g)     A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(h)     Any reference in this Purchase Agreement to "$" or "dollars" shall mean U.S. dollars.

(i)     The phrases "delivered" or "made available" means that the information or material referred to has been physically or electronically delivered to the relevant parties (including material that has been posted and retained through the date hereof through an electronic "virtual data room" established by or on behalf of Seller).

(j)     The Parties hereto have participated jointly in the negotiation and drafting of this Purchase Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Purchase Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party hereto by virtue of the authorship of any provision of this Purchase Agreement.

**ARTICLE 2**
**PURCHASE AND SALE OF THE FAME HOUSE ASSETS; ASSUMPTION OF**
**LIABILITIES**

2.1     Purchase and Sale of Fame House Assets.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions set forth in this Purchase Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the following assets, properties, and rights of Seller as of the Closing Date, in each case, solely to the extent that such assets, properties, and rights exist as of the Closing Date and solely relate to the Fame House Business (collectively, the "**Fame House Assets**"), in all cases free and clear of all Liens, Claims, Interests or Encumbrances other than Permitted Liens and any Liens or Encumbrances included in the Assumed Liabilities:

(a)     all accounts receivable, notes receivable, negotiable instruments, chattel paper and other receivables (including in respect of goods shipped, products sold, licenses granted, or services rendered that solely relate to the Fame House Business and all amounts that may be returned or returnable with respect to letters of credit drawn down prior to the Closing) from third parties, together with any unpaid financing charges accrued thereon and any payments with respect thereto, solely related to the Fame House Business;

(b)     all IP, including all rights to sue or otherwise claim for past, present or future infringement or unauthorized use or disclosure or breach thereof;

(c)     all PP&E;

(d)     all Inventories;

(e)     except to the extent related to an Excluded Asset or an Excluded Liability, all deposits (including, without limitation, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments, rights in respect of promotional allowances, vendor rebates and other refunds, Claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set-off and the right to receive and retain mail, and other communications of Seller solely related to the Fame House Business;

(f)     all (x) Leased Property (and any such agreement and rights related thereto or under such lease to the extent that such lease is an Assumed Contract), and (y) the Occupancy Agreements, in each case, together with all interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(g)     all Assumed Contracts;

(h)     all Books and Records;

(i)     all Permits, to the extent transferable;

(j) except to the extent that such insurance policy is an Excluded Asset set forth in **Section 2.2** below, all rights under or arising out of all insurance policies solely relating to the Fame House Business or any of the Fame House Assets, unless non-assignable as a matter of Law;

(k) the goodwill of Seller, solely to the extent relating to the Fame House Business and/or the Fame House Assets;

(l) all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties solely related to the Fame House Business;

(m) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products sold, or services provided, to Seller that solely relate to the Fame House Business or to the extent solely affecting any Fame House Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(n) all sales and promotional materials, marketing materials and databases, catalogues and advertising literature solely related to the Fame House Business or Fame House Assets;

(o) all of the Fame House Business as a going concern;

(p) all customers' lists solely related to the Fame House Business;

(q) all causes of action, claims and demands of whatever nature solely related to the Fame House Business and the operation of the Fame House Assets including but not limited to those set forth on **Schedule 2.1(q)** hereto;

(r) except as set forth on **Schedule 2.2(g)**, all Employee Benefit Plans set forth on **Schedule 4.9(i)** and all assets (whether in trust or otherwise) of each such Employee Benefit Plan; and

(s) all proceeds and products of any and all of the foregoing Fame House Assets.

2.2    Excluded Assets.  Other than the Fame House Assets as set forth in **Section 2.1**, Purchaser expressly understands and agrees that Purchaser is not purchasing or acquiring, and Seller is not selling or assigning, any other assets, properties or rights of Seller, and all such other assets, properties and rights shall be excluded from the Fame House Assets (the "**Excluded Assets**").  Notwithstanding anything in this Purchase Agreement to the contrary, Excluded Assets include the following assets, properties and rights of Seller:

(a) the corporate books and records of internal corporate proceedings (including, without limitation, stock certificates and membership interest certificates), Tax records, work papers and other records of Seller as they pertain to ownership, organization, qualification to do business or existence of Seller;

(b)     the rights of Seller under this Purchase Agreement, including with respect to the Cash Purchase Price (including the Deposit), and any other Contract between Parent or any of its Affiliates, on the one hand, and Purchaser, on the other hand;

(c)     all Cash;

(d)     all bank accounts, checkbooks and cancelled checks of Seller;

(e)     all shares of capital stock or other equity interests in or issued by Seller or any other Person, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in or issued by Seller or any other Person;

(f)     the IP listed on **Schedule 4.7(iii)** (the "**Excluded IP**");

(g)     the assets, if any, listed on **Schedule 2.2(g)**;

(h)     all rights under or arising out of insurance policies not solely relating to the Fame House Assets and any recovery thereunder;

(i)     all current and prior director and officer insurance policies of Seller, if applicable, and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(j)     Permits not transferred pursuant to **Section 2.1(i)**;

(k)     subject to **Section 2.5**, all Contracts that are not Assumed Contracts;

(l)     all rights and claims of Seller for any action under the Bankruptcy Code, including avoidance actions available under Sections 544 through 553 of the Bankruptcy Code, or any rights of avoidance or transfer under applicable state law of whatever kind or nature;

(m)     any and all assets of Parent or of any other Debtor;

(n)     any asset or class of assets excluded from the defined terms set forth in **Section 2.1(a)-(s)** by virtue of the limitations expressed or implied therein;

(o)     all Tax assets (including duty and Tax refunds, prepayments, net operating losses, loss carryforwards, credits, abatements or other recoveries for, or relating to, Taxes or any other Tax attribute of Seller), together with any interest due thereon or penalty rebate arising therefrom;

(p)     all Tax Returns and all Books and Records (including working papers) related thereto;

(q)     all insurance policies and rights thereunder listed on **Schedule 2.2(q)**;

(r)     all credits, prepaid expenses, deferred charges, advance payments, security deposits, prepaid items and duties to the extent related to any asset that is not a Fame House Asset;

(s)     any claim, deposit, prepayment, refund, suit, cause of action, chose in action, right of recovery, right of setoff and right of recoupment or similar right of Seller (A) against, or receivable from, Parent or any of its Affiliates or any employee of Parent or any of its Affiliates that is not a Newly Hired Employee, (B) against, or receivable from, any insurance policy by or for the benefit of any Person described in the foregoing subclause (A) or (C) against third parties relating to assets, properties, business or operations of Parent or any of its Affiliates (other than those solely related to the Fame House Business); and

(t)     any and all properties, rights, assets and claims of Seller that are not solely related to the operation of the Fame House Business.

2.3     <u>Assumption of Liabilities</u>.  Upon the terms and subject to the conditions of this Purchase Agreement and the Sale Order, Purchaser shall, effective at the time of the Closing, assume and discharge and perform when due, any and all Liabilities of Seller arising out of or relating to the Fame House Business or the Fame House Assets, other than the Excluded Liabilities (the "**Assumed Liabilities**"), including, without limitation, the following:

(a)     all Cure Amounts;

(b)     all of Seller's Liabilities under the Assumed Contracts;

(c)     those Liabilities of Seller identified on **Schedule 2.3(c)** attached hereto;

(d)     all Tax Liabilities relating to the Fame House Assets or the Fame House Business for any Tax period (or portion thereof) whether before or after the Closing Date (including the Transaction Taxes), but excluding all income Tax Liabilities of Seller for any Tax period ended prior to the Closing Date;

(e)     all Employee Liabilities arising out of the operation or ownership of the Fame House Assets or the Fame House Business during, and related to, any period following the Closing;

(f)     the Assumed WARN Obligations;

(g)     subject to **Section 2.4(d)**, all Liabilities arising under the Employee Benefit Plans set forth in **Schedule 4.9(i)**; and

(h)     all Liabilities arising in the Ordinary Course of Business on or after the Petition Date.

2.4     <u>Excluded Liabilities</u>.  Subject to **Section 2.3**, Purchaser shall not assume, be deemed to have assumed, or otherwise be responsible or liable for any of the following Liabilities of Seller (the "**Excluded Liabilities**"):

(a)     any and all Liabilities for indebtedness of Seller with respect to borrowed money (other than obligations with respect to capitalized leases that are Assumed Contracts);

(b)     any breach of Contract (excluding Purchaser's obligation to pay the Cure Amounts), tort, infringement or violation of Law (other than those related to the Liabilities assumed pursuant to **Section 2.3(c)**) arising from any facts, events or circumstances, acts or omissions arising on or prior to the Closing Date, in each case, of any kind or nature whatsoever and whether primarily related to the Fame House Assets or the Fame House Business or otherwise and regardless of when and if commenced;

(c)     any and all Liabilities for: (i) costs and expenses incurred by Seller or owed in connection with the administration of the Bankruptcy Cases (including, without limitation, the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Seller and the Committee and the fees and expenses of the post-petition lenders and pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Cases); and (ii) all costs and expenses of Seller incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Purchase Agreement; and

(d)     any Liability with respect to any Excluded Assets.

2.5     Assignment and Assumption of Contracts and Other Fame House Assets.

(a)     Assignment and Assumption at Closing.

(i)     **Schedule 2.5(a)** sets forth a list of all executory Contracts and unexpired leases to which Seller is party, which relate solely to the Fame House Business and which are to be included in the Fame House Assets (the "**Assumed Contracts**"). From and after the date hereof until the Sale Hearing, Seller shall make such additions and deletions to **Schedule 2.5(a)** as Purchaser shall request in writing; provided, however, that (A) Seller will not delete from **Schedule 2.5(a)**, and Purchaser shall not request that Seller delete from **Schedule 2.5(a)**, any Contract or lease that was either (x) entered into by Seller on or after the Petition Date or (y) previously assumed by Seller, (B) Purchaser shall not request that Seller add to **Schedule 2.5(a)**, and Seller shall not be required to add to **Schedule 2.5(a)**, any Contract or lease (x) to which Seller is not a party or (y) which does not solely relate to the Fame House Business, and (C) no such addition or deletion shall reduce the amount of the Cash Purchase Price.  Any such deleted Contract or unexpired lease shall be deemed to no longer be an Assumed Contract.  Any such added Contract or unexpired lease shall be deemed an Assumed Contract.  All Contracts of Seller, including all Contracts related to the Excluded IP, that are not listed on **Schedule 2.5(a)** shall not be considered an Assumed Contract and shall not be part of the Fame House Assets.

(ii)     Seller shall take all reasonable actions required to assume and assign the Assumed Contracts to Purchaser (other than payment of the Cure Amounts, which shall be the sole responsibility of Purchaser), including taking all reasonable actions required to obtain a Bankruptcy Court order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.  Purchaser shall, at or prior to Closing, reasonably cooperate with Seller in meeting all requirements under

section 365 of the Bankruptcy Code necessary to assign to Purchaser the Assumed Contracts (including, without limitation, by providing "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code)).

(iii)     At Closing, (x) Seller shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assume and assign to Purchaser each of the Assumed Contracts that are capable of being assumed and assigned and (y) Purchaser shall pay promptly all Cure Amounts (if any) in connection with such assumption and assignment (as agreed to among Purchaser and Seller or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Assignment and Assumption Agreement(s).  The Parties hereto acknowledge and agree that Seller shall not have any Liability with respect to the Cure Amounts or the payment thereof.

(b)     <u>Non-Assignment of Assets</u>.  Notwithstanding anything contained in this Purchase Agreement to the contrary, this Purchase Agreement shall not constitute an agreement to assign or transfer any Fame House Asset if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, (i) is prohibited by applicable Law or (ii) without the consent, waiver, approval or authorization required or necessary for such assignment or transfer (including any consent, waiver, approval or authorization required or necessary from any Governmental Authority), would constitute a breach thereof.  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of Seller, such prohibition under applicable Law is applicable but not waived with respect to a Fame House Asset, or such consent, waiver, approval or authorization (not including any approval under the HSR Act or other Antitrust Laws, if applicable) is required but not obtained with respect to a Fame House Asset, then (in any such case) neither Seller nor Purchaser shall be in breach of this Purchase Agreement nor shall the Purchase Price be adjusted nor shall the Closing be delayed or this Purchase Agreement terminated as a result thereof; <u>provided</u>, <u>however</u>, if the Closing occurs, then, with respect to any material Fame House Asset for which waiver, consent, approval or authorization to assignment or transfer thereof is required but not obtained, from and after the Closing, Seller shall reasonably cooperate with Purchaser in any reasonable arrangement Purchaser may request to provide Purchaser with all of the benefits of, or under, the applicable Fame House Asset; <u>provided</u>, <u>further</u>, to the extent that any such arrangement has been made to provide Purchaser with the benefits of, or under, the applicable Fame House Asset, (A) Seller shall not be required to provide such arrangement for longer than the earlier to occur of (I) the date that is the two (2) month anniversary of the Closing Date and (II) the effective date of any plan of reorganization or liquidation or dismissal or conversion of the Bankruptcy Cases (the "Arrangement Period"), and (B) during the Arrangement Period, Purchaser shall be responsible for, and shall promptly pay, (x) all costs and expenses of Seller to establish, implement, monitor, maintain, execute on, or carry into effect any such arrangement, and (y) all payment and other obligations under such Fame House Asset (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Fame House Asset had been assigned or transferred at Closing, and (C) after the end of the Arrangement Period, Seller shall be entitled to retain such Fame House Asset without any adjustment to the Purchase Price.  The obligation of Seller to cooperate with Purchaser set forth in this **<u>Section 2.5(b)</u>** shall not require Seller to incur any expenses or Liabilities or to provide any financial accommodation or to remain secondarily or

contingently liable for any Liabilities with respect to any applicable Fame House Asset. Any assignment to Purchaser of any Fame House Asset that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the waiver of any prohibition under applicable Law or the consent, waiver, approval or authorization of any Person for such assignment as aforesaid shall be made subject to such waiver of prohibition or such consent, waiver, approval or authorization being obtained.

## ARTICLE 3
## CONSIDERATION

3.1     Deposit.   Prior to the execution and delivery by the Parties of this Purchase Agreement, Purchaser has deposited with Seller or one of its representatives, a $[_____] deposit (the "**Deposit**")[1] by wire transfer of immediately available funds, to be applied as provided in the immediately following sentence.  The Deposit will be held in escrow by Seller or one of its representatives and paid only in accordance with the terms and provisions of this Purchase Agreement or the Bid Procedures Order.

3.2     Purchase Price.   In consideration of the sale of the Fame House Assets to Purchaser, and upon the terms and subject to the conditions set forth herein, the purchase price (the "**Purchase Price**") for the Fame House Assets shall be paid as set forth in **Section 10.3(a)** hereof and shall be in an aggregate amount equal to:

(i)      $[_____] (the "**Cash Purchase Price**"), plus

(ii)     assumption of the Assumed Liabilities.

3.3     Allocation of Purchase Price.

(a)      On the Closing Date, Seller shall deliver to Purchaser a statement (the "**Allocation Statement**") allocating, for Tax purposes, the Purchase Price and any other items that are treated as additional purchase price for Tax purposes among the Fame House Assets.  The Allocation Statement shall be prepared in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)      The Parties to this Purchase Agreement hereby agree to (i) be bound by the Allocation Statement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any other corresponding Tax forms), and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative proceeding).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Schedules, Seller hereby represents and warrants to Purchaser as of the Execution Date and as of the Closing Date as follows:

---

[1] Deposit to be equal to 10% of the Purchase Price.

4.1 <u>Organization</u>. Seller is duly organized, validly existing and, to the extent applicable, in good standing under the Laws of the State of Delaware and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its business is currently being conducted. Seller is qualified to do business and is in good standing in all jurisdictions where it owns or leases real property in connection with the operation of the Fame House Business or otherwise conducts the Fame House Business, except where the failure to so qualify or to so be in good standing would not have a Material Adverse Effect. Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

4.2 <u>Authorization of Agreement</u>. Subject to entry of the Sale Order:

(a) Seller has, or at the time of execution will have, all necessary limited liability company power and authority to execute and deliver this Purchase Agreement and each Ancillary Agreement to which Seller is or will become a party and to perform its obligations hereunder and thereunder;

(b) the execution and delivery of this Purchase Agreement and each Ancillary Agreement to which Seller is or will become a party and the performance of Seller's obligations hereunder and thereunder (including, without limitation, the consummation of the transactions contemplated by this Purchase Agreement) have been, or at the time of execution will be, duly authorized by all necessary limited liability company action on the part of Seller and no other limited liability company proceedings (member or otherwise) on the part of Seller is necessary to authorize such execution, delivery and performance; and

(c) this Purchase Agreement and each Ancillary Agreement to which Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Purchase Agreement and each Ancillary Agreement to which Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to general principles of equity.

4.3 <u>Conflicts; Consents of Third Parties.</u>

(a) Except as set forth on **Schedule 4.3(a)** and subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Purchase Agreement and each Ancillary Agreement to which Seller is or will become a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Seller with any of the provisions hereof and thereof do not, or will not, (i) result in the creation of any Lien upon the Fame House Assets, or (ii) conflict with, or result in any violation or breach of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provisions of:

(i) the certificate of formation, limited liability company agreement or comparable organizational documents of Seller;

(ii) any Assumed Contract or any Permit assigned pursuant to **Section 2.1(i)**;

(iii)     any order, writ, injunction, judgment or decree of any Governmental Authority applicable to Seller or any of the properties or assets of Seller as of the date hereof; or

(iv)     any applicable Law.

(b)     Subject to entry of the Sale Order, no consent, waiver, approval, order, Permit or authorization of, or declaration, filing or registration with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with (i) the execution, delivery and performance by Seller of this Purchase Agreement or any Ancillary Agreement to which Seller is or will become a party, (ii) the compliance by Seller with any of the provisions hereof or thereof, (iii) the consummation by Seller of the transactions contemplated hereby or thereby, or (iv) the assignment or conveyance by Seller of the Fame House Assets, except (x) as set forth on **Schedule 4.3(b)**, (y) where failure to obtain such consent, waiver, approval, order, Permit, authorization or action, or to make such filing, declaration, registration or notification, would not prevent or materially delay the consummation by Seller of the transactions contemplated by this Purchase Agreement and the Ancillary Agreements and would not have a Material Adverse Effect, or (z) as solely relates to Purchaser.

4.4     Title to Fame House Assets.  Seller owns or leases and has the legal title and/or right to use, as the case may be, all of the Fame House Assets (except for Leased Property and the Occupancy Agreements), and Purchaser will (subject to **Section 2.5(b)**) be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good and valid title to the Fame House Assets (except for Leased Property and the Occupancy Agreements) free and clear of all Liens, Claims, Interests and Encumbrances, upon entry of and as provided in the Sale Order, other than Assumed Liabilities and Permitted Liens.  Seller has not taken any action, or failed to take any action, which action or failure would preclude or prevent the Fame House Business as a legal matter from being conducted as now conducted, in all material respects.  No Fame House Asset (except for Leased Property and the Occupancy Agreements) is subject to any agreement, written or oral, for its sale or use by any Person other than Seller other than in the Ordinary Course of Business.

4.5     Contracts.  **Schedule 4.5** sets forth a complete list, as of the date hereof, of all material Contracts solely related to the Fame House Business to which Seller is a party and the estimated Cure Amounts with respect thereto.  Seller has not assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract. True and complete copies of each such written Contract have been made available by Seller to Purchaser.

4.6     Real Property.

(a)     Leased Property.  **Schedule 4.6(i)** contains a list of all Leased Property. Seller has made available to Purchaser true and complete copies of all Real Property Leases.  To Seller's knowledge, none of the Leased Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Property or any portion thereof that would materially impair the use of the Leased Property in the operation of the Fame House Business.  To Seller's knowledge, the Leased Property is not subject to any use restrictions,

exceptions, reservations or limitations which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business. To Seller's knowledge, there are no pending or threatened condemnation or other proceedings or claims relating to any of the Leased Property.

      (b)    Occupancy Agreements.  **Schedule 4.6(ii)** contains a list of easements, licenses, use agreements and other occupancy agreements for real property granted by third parties to Seller that are used or expected to be used in the operation of the Fame House Business (the "**Occupancy Agreements**").

      4.7    Intellectual Property.  Except as set forth on **Schedule 4.7(i)** or would not otherwise have a Material Adverse Effect, (i) Seller owns, or is licensed or otherwise possesses legally enforceable rights to use, all IP,  (ii) there are no pending or, to Seller's knowledge, threatened claims by any Person alleging infringement of any intellectual property rights of any Person by Seller as a result of its use of the IP, (iii) to Seller's knowledge, the conduct of the Fame House Business does not infringe any intellectual property rights of any Person, and (iv) to Seller's knowledge, there is no material infringement by any Person of the rights of Seller to or in connection with the IP included in the Fame House Assets.  **Schedule 4.7(ii)** sets forth a complete list, as of the date hereof, of all registered and applied-for IP owned by Seller (whether registered with the United States Patent and Trademark Office, the United States Copyright Office or otherwise).  **Schedule 4.7(iii)** sets forth a list of Excluded IP.

      4.8    Permits.  **Schedule 4.8(i)** sets forth a true and complete list of all Permits.  Except as set forth on **Schedule 4.8(ii)**, Seller has not received any written notice or other written communication from any Governmental Authority or other Person notifying Seller of the non-renewal, revocation or withdrawal of any Permit.  To the knowledge of Seller, Seller is in material compliance with the terms of the Permits.

      4.9    Employees.  **Schedule 4.9(i)** sets forth a true, correct and complete list of all Employee Benefit Plans of Seller and Parent.  **Schedule 4.9(ii)** sets forth a (i) true, correct and complete list of the names, positions, work locations, hire dates, and total compensation (listing separately applicable salaries and hourly rates), bonuses, commission, severance obligations and material perquisite arrangements, written or unwritten, of all Employees, consultants and independent contractors engaged in connection with the Fame House Business as of the Closing Date, and indicates which of such individuals, if any, are on disability leave or any other type of leave of absence and (ii) the Employee Assumption Amount for each Employee.

      4.10    Insurance.  Seller maintains the insurance policies relating to the Fame House Business set forth on **Schedule 4.10(i)**, which Schedule sets forth all insurance policies covering the property, assets, Employees and operations of the Fame House Business (including policies providing property, casualty, liability and workers' compensation coverage).  Such policies are in full force and effect and, except as set forth on **Schedule 4.10(ii)** and subject to the terms of the Sale Order, will continue in full force and effect immediately following the Closing (except to the extent any such policy has been replaced with comparable substitute insurance).  Seller has paid all premiums on such policies due and payable prior to the Closing Date.

4.11    No Brokers or Finders.  Except as set forth on **Schedule 4.11**, no agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution or performance of this Purchase Agreement or the transactions contemplated by this Purchase Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Purchase Agreement or such transactions for which Purchaser will be responsible.

4.12    Litigation; Proceedings.  As of the date hereof, except for the Bankruptcy Cases and any and all Actions arising therefrom or related thereto, and except as set forth in **Schedule 4.12**, there is no Action pending or, to the knowledge of Seller, threatened against or related to the Fame House Business, whether at Law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to the knowledge of Seller, are there any investigations relating to the Fame House Business pending or threatened (in writing) by or before any arbitrator or any Governmental Authority.

4.13    Compliance with Laws.  Except as set forth on **Schedule 4.13(i)** and as would not have a Material Adverse Effect, Seller has complied with, is in compliance with and has operated the Fame House Business in compliance with all applicable Laws.  Except as set forth on **Schedule 4.13(ii)**, Seller has not received any written notice or other written communication from any Governmental Authority or other Person asserting any violation of, or failure to comply with, any requirement of any applicable Law.

4.14    Taxes.  Except as would not have a Material Adverse Effect, (a) Seller has filed all Tax Returns required to be filed by it on or before the Closing Date with any Governmental Authority (collectively, the "**Pre-Closing Returns**"); (b) the Pre-Closing Returns have been filed in accordance with all applicable Laws and, as of the time of filing, were correct and complete in all material respects; (c) Seller has timely paid, withheld or reserved all Taxes shown as due and payable in the Pre-Closing Returns except for such Taxes that are being contested in good faith by appropriate proceedings; and (d) except as set forth on **Schedule 4.14**, there are no liens for Taxes upon the Fame House Assets except liens for current Taxes not yet due.

4.15    Warranties Are Exclusive.  EXCEPT AS EXPRESSLY SET FORTH IN THIS PURCHASE AGREEMENT, NEITHER SELLER, ANY RELATED PERSON OR AFFILIATE OF SELLER, NOR ANY OTHER PERSON AUTHORIZED BY SELLER MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, ORAL OR WRITTEN, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF SELLER'S ASSETS (INCLUDING THE FAME HOUSE ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS (INCLUDING THE FAME HOUSE BUSINESS), INCLUDING WITH RESPECT TO CONDITION, FAULTS OR VALUE, TITLE, POSSESSION, QUIET ENJOYMENT, USAGE, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, NON-INFRINGEMENT OR THE LIKE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.  SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (WHETHER ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR RELATED PERSONS (INCLUDING ANY

OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER OR ITS AFFILIATES OR RELATED PERSONS BY SELLER OR ANY RELATED PERSON OF SELLER OR ANY OF SELLER'S AFFILIATES).

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as of the Execution Date and as of the Closing Date as follows:

5.1     Corporate Organization.  Purchaser is duly organized, validly existing and in good standing under the Laws of the State of [_____].

5.2     Authorization and Validity.

(a)     Purchaser has all necessary [corporate][limited liability company] power and authority to execute and deliver this Purchase Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder;

(b)     the execution and delivery of this Purchase Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder (including, without limitation, the consummation of the transactions contemplated by this Purchase Agreement) have been, or at the time of execution will be, duly authorized by all necessary [corporate][limited liability company] action on the part of Purchaser, and no other proceedings ([shareholder][member] or otherwise) on the part of Purchaser is necessary to authorize such execution, delivery and performance; and

(c)     this Purchase Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Purchase Agreement and each Ancillary Agreement to which Purchaser is or will become a party constitutes, or will constitute, when executed and delivered, Purchaser's valid and binding obligations, enforceable against Purchaser in accordance with their respective terms, subject to general principles of equity.

5.3     Conflicts; Consents of Third Parties.

(a)     Subject to **Section 5.3(b)** hereof, the execution, delivery and performance by Purchaser of this Purchase Agreement and any Ancillary Agreement to which Purchaser is or will become a party, the consummation by Purchaser of the transactions contemplated hereby and thereby, or compliance by Purchaser with any of the provisions hereof and thereof do not or will not (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order, writ, injunction, judgment or decree of any court or Governmental Authority applicable to Purchaser or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract or permit to which Purchaser is a party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject, in each case, other than any violation,

conflict, breach, event of default or default that would not adversely affect Purchaser's ability to perform its obligations under this Purchase Agreement on a timely basis.

(b)     Subject to entry of the Sale Order, no consent, waiver, approval, order, permit or authorization of, or declaration, filing or registration with, or notification to, any Person or Governmental Authority is required on the part of Purchaser in connection with the execution, delivery and performance by Purchaser of this Purchase Agreement or any Ancillary Agreement to which it is or will become a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation by Purchaser of the transactions contemplated hereby or thereby, or assumption by Purchaser of the Assumed Liabilities, except (a) as set forth on **Schedule 5.3(b)**, or (b) where failure to obtain such consent, waiver, approval, order, permit, authorization or action, or to make such filing, declaration, registration or notification, would not prevent or materially delay the consummation by Purchaser of the transactions contemplated by this Purchase Agreement and the Ancillary Agreements.

5.4     No Brokers or Finders.  No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Purchaser in connection with the negotiation, execution or performance of this Purchase Agreement or the transactions contemplated by this Purchase Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Purchase Agreement or such transactions for which Seller or any of its Affiliates will be responsible.

5.5     Litigation.  There is no Action that is pending or, to Purchaser's knowledge, threatened in any court, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, which would adversely affect Purchaser's ability to perform its obligations under this Purchase Agreement on a timely basis.

5.6     Condition of the Fame House Business.  Notwithstanding anything contained in this Purchase Agreement to the contrary, Purchaser acknowledges and agrees that neither Seller, any Related Person or Affiliate of Seller, nor any other Person authorized by Seller is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in **Article 4**, and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Fame House Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Purchaser further represents that neither Seller, any Related Person or Affiliate of Seller, nor any other Person authorized by Seller has made any representation or warranty, express or implied, as to the  accuracy or completeness of any information regarding the Fame House Assets, the Fame House Business or the transactions contemplated by this Purchase Agreement not expressly set forth in this Purchase Agreement, and none of Seller, its Affiliates or Related Persons, or any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to, or use by, Purchaser or its Related Persons of any such information, including any confidential memoranda distributed on behalf of Seller relating to the Fame House Business or other publications or data room information provided to Purchaser or its Related Persons, or any other document or information in any form provided to Purchaser or its Related Persons in connection with the transactions contemplated hereby.  Purchaser has not executed or authorized the execution of this Purchase Agreement or entered into the transactions contemplated hereby in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast,

representation or warranty whatsoever made or omitted to be made to Purchaser or any of its Representatives.

5.7    <u>Financial Capability</u>.  Purchaser has, and at the Closing will have, sufficient funds available to pay the Purchase Price (including the Deposit) and any other costs or expenses incurred by Purchaser or that are Purchaser's obligation in connection with the transactions contemplated by this Purchase Agreement, to pay or satisfy the Assumed Liabilities as they come due, and to operate the Fame House Business from and after the Closing.  Purchaser has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and Purchaser will not incur any obligation, commitment, restriction or Liability of any kind which would materially and adversely impair or affect such resources and capabilities.

5.8    <u>Independent Investigation</u>.    Purchaser has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) and assets of the Fame House Business and the Fame House Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller for such purpose.  Purchaser acknowledges and agrees that in making its decision to enter into this Purchase Agreement and to consummate the transactions contemplated hereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of Seller set forth in **Article 4**.

**ARTICLE 6**
**COVENANTS AND OTHER AGREEMENTS**

6.1    <u>Pre-Closing Covenants of Seller</u>.  Seller covenants to Purchaser that, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Purchase Agreement in accordance with the provisions of **Article 11**:

(a)    <u>Cooperation</u>.    Subject to **Section 6.5(f)**, Seller shall use commercially reasonable efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary or proper, consistent with applicable Law to satisfy the conditions set forth in **Article 9** and to consummate and make effective as soon as possible the transactions contemplated by this Purchase Agreement in accordance with the terms and conditions herein; <u>provided</u>, <u>however</u>, that nothing in this **Section 6.1(a)** shall be deemed to supersede the limitations on cooperation set forth in **Section 2.5(b)**.

(b)    <u>Access to Records, Properties and Management</u>.  Seller shall (i) provide Purchaser and its Representatives access upon reasonable notice to the facilities and offices of Seller, as solely related to the Fame House Business, and to the books and records (electronic or otherwise) of Seller, as solely related to the Fame House Business; and (ii) instruct the executive officers and senior business managers, employees, counsel, auditors and financial advisors of Seller to reasonably cooperate with Purchaser and its Representatives in connection with the transactions contemplated by this Purchase Agreement; <u>provided</u>, <u>however</u>, that any such investigation shall be conducted during normal business hours upon reasonable advance notice to Seller under the supervision of Seller's personnel, and in such a manner as not to interfere with the conduct of the Fame House Business.  Notwithstanding anything to the contrary in this

Purchase Agreement, Seller shall not be required to disclose any information to Purchaser or its Representatives if such disclosure would, in Seller's sole discretion: (x) cause competitive harm to Seller or the Fame House Business, if the transactions contemplated by this Purchase Agreement are not consummated; (y) jeopardize any attorney-client or other privilege; or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Purchase Agreement. Prior to the Closing, without the prior written consent of Seller, which may be withheld for any reason, Purchaser shall not contact any suppliers or service providers to, or customers of, the Fame House Business, except in the ordinary course of business of Purchaser and not related to the transactions contemplated hereby. Purchaser shall, and shall cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided to Purchaser, its Affiliates or any of their respective Representatives, the terms of which are incorporated herein by reference.

(c) <u>Conduct of Business Prior to Closing</u>. Except as expressly contemplated by this Purchase Agreement or required under the Bankruptcy Code or other applicable Law and except to the extent waived by Purchaser's prior written consent (such consent not to be unreasonably withheld, conditioned, delayed or denied):

(i) Seller shall use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (x) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (y) that would reasonably be expected to impair the ability of Seller to consummate the Closing in accordance with the terms and conditions herein or to materially delay such consummation;

(ii) Seller shall not, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Fame House Assets other than in the Ordinary Course of Business;

(iii) Seller shall not assume, reject or assign any Assumed Contract other than the assumption and assignment of the Assumed Contracts, as contemplated by this Purchase Agreement, to Purchaser (or to a third party in connection with an Alternative Transaction);

(iv) Seller shall comply in all material respects with all material Laws applicable to it with respect to the Fame House Business or any Fame House Asset; and

(v) Seller shall conduct the Fame House Business in the Ordinary Course of Business, and use commercially reasonable efforts to maintain the existing relations with customers, suppliers, and Employees of the Fame House Business.

(d) <u>Notice of Certain Events</u>. Promptly following Seller's receipt of knowledge thereof, Seller shall notify Purchaser of, and furnish Purchaser any information it may reasonably request with respect to the occurrence or nonoccurrence of any event or condition or the existence of any fact that would reasonably be expected or likely to cause (i) any of the conditions to Purchaser's obligations to consummate the transactions contemplated by this Purchase Agreement or by any Ancillary Agreement not to be fulfilled by the Termination Date,

(ii) any material breach or inaccuracy of any representation or warranty of Seller contained in this Purchase Agreement, or (iii) any Material Adverse Effect.

6.2     Pre-Closing Covenants of Purchaser.  Purchaser covenants to Seller that, during the period from the Execution Date through and including the Closing or the earlier termination of this Purchase Agreement in accordance with the provisions of **Article 11**:

(a)     Cooperation.  Subject to **Section 6.5(f)**, Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary or proper, consistent with applicable Law, to satisfy the conditions set forth in **Article 9** and to consummate and make effective as soon as possible the transactions contemplated by this Purchase Agreement in accordance with the terms and conditions herein.

(b)     Adequate Assurance Regarding Assumed Contracts and Required Orders.  Purchaser agrees that it will cooperate as reasonably requested by Seller to assist in establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code with regard to the Assumed Contracts.  Purchaser shall take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of the Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Purchase Agreement.

(c)     Financing.  Purchaser shall ensure that, on the Closing Date, Purchaser has sufficient liquidity and other resources to (i) pay the Cash Purchase Price, the Cure Amounts and the Employee Assumption Amount, (ii) pay or satisfy the Assumed Liabilities as they come due, and (iii) operate the Fame House Business from and after the Closing.

(d)     Permits.  Purchaser shall use all reasonable efforts to obtain or consummate the transfer to Purchaser of any Permit required to own or to operate the Fame House Assets or the Fame House Business under applicable Laws.

(e)     Notice of Certain Events.  Promptly following Purchaser's receipt of knowledge thereof, Purchaser shall notify Seller of, and furnish Seller any information it may reasonably request with respect to, any event that would reasonably be expected to cause any of the conditions set forth in **Section 9.1** not to be fulfilled by the Termination Date.

6.3     Other Covenants of Seller and Purchaser.

(a)     Disclosure Schedules and Supplements.  From time to time until five (5) Business Days prior to the Closing Date, Seller may deliver any schedules not previously delivered or supplement or amend the disclosure schedules (the "**Schedules**") to this Purchase Agreement with respect to any matter (such newly delivered, supplemented or amended disclosure schedules, the "**Schedule Updates**").  If Purchaser does not terminate this Purchase Agreement within three (3) Business Days of its receipt of such Schedule Update (provided that Purchaser would have the right to so terminate pursuant to **Section 11.1(d)(i)**), Purchaser shall be deemed to have irrevocably waived any right to terminate this Purchase Agreement with respect to such matter.

(b)     Personally Identifiable Information.   On or prior to the Closing Date, Purchaser shall adopt a written policy with respect to protection of the confidentiality of personally identifiable information regarding the Employees and the customers of the Fame House Business that is at least as restrictive as the written policies with respect thereto in effect on the Petition Date.   From and after the Closing Date, Purchaser shall (i) comply with such policy, or such successor policies adopted from time to time, (ii) comply with applicable Law with respect to the protection of personally identifiable information and (iii) otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

(c)     Access to Records after Closing.   From and after the Closing Date, each Party hereto shall provide the other Party hereto (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, solely to the books and records acquired pursuant to this Purchase Agreement as of the Closing Date so as to enable Purchaser and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions.   If any Party desires to dispose of any such records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove such records to be disposed of at the removing Party's expense.

6.4     Employment Covenants and Other Undertakings.

(a)     Employees.   At the Closing, Purchaser shall offer to employ on an at-will basis all of the Employees (all such Employees accepting such offer are hereinafter referred to as the "**Newly Hired Employees**").   The offer of employment shall be (i) at substantially the same hourly wage rate or salary level in effect on the Execution Date and (ii) provide benefits that are substantially similar, on the whole, to those benefits that were provided to each Employee on the Execution Date under the Employee Benefit Plans set forth on **Schedule 4.9(i)** (excluding performance-based or incentive compensation, bonuses and equity-based compensation, as applicable).   Each employment offer shall provide that such offer of employment shall take effect on the Closing Date.   Seller shall deliver to Purchaser on or before the Closing Date all personnel files and employment records relating to the Newly Hired Employees to the extent permitted by Law (including completed I-9 forms and attachments with respect to all Newly Hired Employees, except for such Employees as Seller certifies in writing are exempt from such requirement).

(b)     Forms W-2 and W-4.   Purchaser shall prepare and file IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) for all Newly Hired Employees in the United States and equivalent procedures in other countries, if any, where any Newly Hired Employees may be located.

(c)     Employee Communications.   Purchaser shall not make any written communications to the Employees prior to the Closing Date pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Purchase Agreement that are materially different than contemplated under the express terms of this Purchase Agreement.

(d)     For all purposes of employee benefit plans of Purchaser or its Affiliates other than a "pension plan" (as defined in Section 3(2) of ERISA) for which a Newly Hired Employee otherwise becomes eligible, such Newly Hired Employee shall be given credit under such plan for all service prior to the Closing Date with Seller or Parent, as applicable.

(e)     The provisions of this Purchase Agreement shall not be deemed to be the adoption of, or an amendment to, any employee benefit plan, as that term is defined in Section 3(3) of ERISA, or otherwise to limit the right of Purchaser to amend, modify or terminate any such employee benefit plan.

(f)     For a period of ninety (90) days following the Closing Date, Purchaser shall not implement or permit any mass layoffs, employee layoffs, or similar events that individually or in the aggregate require the issuance of notice to any employee of Purchaser under the Worker Adjustment and Retraining Notification Act (WARN Act) or any similar state or local Law (collectively, "**WARN**").

(g)     Seller and Parent (as applicable) may, in their sole discretion, issue appropriate WARN notices related to the transactions contemplated hereby to its employees at any time and from time to time.  Purchaser agrees to assume, and indemnify and hold Seller and Parent (as applicable) harmless from and against, all obligations, if any, arising under WARN as a result of Seller's or Parent's (as applicable) termination of the employment of the Employees on the Closing Date (the "**WARN Liabilities**") except and to the extent that any such WARN Liabilities are avoided as a result of Purchaser's offer of employment to any of the Employees as contemplated in **Section 6.4(a)** (the "**Assumed WARN Obligations**").

(h)     In the event that this Purchase Agreement is terminated pursuant to **Section 11.1**, Purchaser agrees, on behalf of itself and its Affiliates, that for a period of two (2) years following such date of termination, none of Purchaser nor any of its Affiliates shall, either individually or through its Representatives, without the prior written consent of Seller, directly or indirectly solicit for employment or hire any Employee; provided, however, that the foregoing restriction on solicitation shall not prohibit a general solicitation (such as an advertisement) not specifically directed to employees of Parent and/or any of its subsidiaries.

(i)     Purchaser, on behalf of itself and its Affiliates, agrees that, in the event of a breach of **Section 6.4(h)**, the damage or imminent damage to the value and the goodwill of Seller shall be inestimable and that therefore any remedy at law or in damages would be inadequate.  Accordingly, the Parties hereto agree that, following prior written notice to Purchaser, Seller shall (without the necessity of posting any bond or other security), in addition to any losses incurred by reason of any such breach, be entitled to injunctive relief, including specific performance, with respect to any such breach against the breaching party.

(j)     Without limiting the generality of **Section 12.17**, Seller and Purchaser each acknowledge and agree that all provisions contained in this **Section 6.4** are included for the sole benefit of Seller and Purchaser and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including, without limitation, any current or former employees, directors, officers or consultants of the Fame House

Business, any participant in any Employee Benefit Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with Purchaser or any of its Affiliates.

6.5    Approvals.

(a)    Subject to **Section 6.5(e)**, each Party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Purchase Agreement and the performance of its obligations pursuant to this Purchase Agreement, in each case, as promptly as practicable.  Each Party shall cooperate fully with the other Party in promptly seeking to obtain all such consents, authorizations, orders and approvals.  Subject to the first sentence of this **Section 6.5(a)**, the Parties shall not willfully take any action that has, or is reasonably likely to have, the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.  If required by the HSR Act, each Party hereto agrees to make (or cause its ultimate parent entities, as such term is used in the HSR Act to make) an appropriate filing pursuant to the HSR Act with respect to the transactions contemplated by this Purchase Agreement within three (3) days after the date of the entry of the Sale Order (or such earlier date as Purchaser may reasonably determine) and to supply as promptly as practicable to the appropriate Governmental Authority any additional information and documentary material that may be reasonably requested pursuant to the HSR Act, which shall include using reasonable best efforts to certify compliance with any request for additional information or documentary material relevant to the transactions contemplated hereby from a Governmental Authority pursuant to the HSR Act (a "**Second Request**") as soon as practicable after receipt of such Second Request and to produce documents on a rolling basis.

(b)    Without limiting the generality of Purchaser's undertakings pursuant to this **Section 6.5**, Purchaser agrees to use reasonable best efforts and to take any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Law, competition or trade regulation Law or other Law that may be asserted by any Governmental Authority or any other party so as to enable the Parties hereto to close the transactions contemplated by this Purchase Agreement as promptly as possible, including proposing, negotiating, committing to and effecting, by consent decree, hold separate orders, or otherwise, the sale, divestiture or disposition of any of its assets, properties or businesses or of the assets, properties or businesses to be acquired by it pursuant to this Purchase Agreement, or otherwise make available to any Person any technology or other IP of the Fame House Business, or changing or modifying any course of conduct or otherwise making any commitment to any Governmental Authority regarding future operations of Purchaser's business or the Fame House Business, in any case, as may be required in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of materially delaying or preventing the consummation of the transactions contemplated by this Purchase Agreement.  In addition, Purchaser shall use reasonable best efforts to defend through litigation on the merits any claim asserted in court by any Person in order to avoid entry of, or to have vacated or terminated, any order (whether temporary, preliminary or permanent) that would prevent the consummation of the Closing.

(c)     All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of any Party before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with any consent, authorization, order or approval required from any Governmental Authority in connection with the Purchase Agreement (but, for the avoidance of doubt, not including (i) any interactions between Seller, on the one hand, and any Governmental Authority, on the other hand, in the Ordinary Course of Business or (ii) any disclosure which is not permitted by Law) shall be disclosed to the other Party hereto in advance of any filing, submission or attendance, it being the intent of the Parties that the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals.  Each Party shall give notice to the other Party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority in connection with any consent, authorization, order or approval required from any Governmental Authority in connection with the Purchase Agreement, with such notice being sufficient to provide the other Party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.  Each Party shall promptly inform the other Party hereto of any oral communication with, and provide copies of written communications with, any Governmental Authority regarding any of the foregoing matters.

(d)     Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this **Section 6.5** as "outside counsel only."  Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient without the advance written consent from the source of such materials and information (Seller or Purchaser, as the case may be).

(e)     The filing fees associated with the filings under the HSR Act shall be borne solely by Purchaser.  In addition, all reasonable documented out of pocket fees and expenses (including attorneys' fees and expenses), incurred by Seller due to Seller's compliance with any Second Request by a Governmental Authority pursuant to the HSR Act for additional information or documentary material relevant to the transactions contemplated hereby shall promptly be reimbursed by Purchaser upon presentment by Seller of appropriate invoices therefor.

(f)     To the extent this **Section 6.5** conflicts with **Section 6.1(a)** or **Section 6.2(a)**, this **Section 6.5** shall control.

6.6     Transition Services Agreement.  **Schedule 6.6** sets forth a complete list, as of the date hereof, of all material services provided (i) by Parent to Seller or (ii) by Seller to Parent or any Affiliate of Parent (other than Seller).  The Parties shall, and Seller shall cause Parent to, enter into a transition services agreement to provide for the continuation of certain of such services in accordance with the terms and conditions set forth therein, which transition services agreement shall be in substantially the form annexed hereto as **Exhibit A** (the "**Transition Services Agreement**").

## ARTICLE 7
## TAXES; BULK SALES LAWS

7.1     <u>Taxes Related to Purchase of Fame House Assets</u>.

(a)     All transfer, conveyance, recording, sales, use, value added, stamp, documentary and other similar Taxes, including all such federal, state, local and foreign Taxes, incurred in connection with the transfer of the Fame House Assets and/or the assumption of the Assumed Liabilities, and all recording and filing fees (collectively, "**Transaction Taxes**"), that are imposed as a result of the sale, transfer, assignment and delivery of the Fame House Assets shall be borne by Purchaser, provided that Transaction Taxes paid by Purchaser shall not include any Taxes of Seller in respect of gains, income or the like and any such Taxes shall be borne by Seller.

7.2     <u>Waiver of Bulk Sales Laws</u>.  Seller shall use commercially reasonable efforts to cause the Sale Order to provide that either (i) Seller has complied with the requirements of any applicable Law relating to bulk sales and transfer or (ii) compliance with the requirement of any applicable Laws relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

8.1     <u>Bankruptcy Court Filings</u>.  Seller has filed or shall file with the Bankruptcy Court, a motion seeking entry of the Sale Order (the "**Motion**").  Purchaser agrees that it will promptly take any such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Purchase Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that in no event shall Purchaser or Seller be required to agree to any amendment of this Purchase Agreement or changes to the Sale Order that are materially adverse to such Party.  Purchaser shall, with the prior written consent of Seller, file, join in, and otherwise support any motion or other pleading seeking approval of the transactions contemplated by this Purchase Agreement.  In the event the entry of the Sale Order is appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal.

8.2     <u>Contracts</u>.  Seller shall serve on all non-Debtor counterparties to all of the Contracts on **Schedule 2.5(a)** a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Contracts and shall notify such non-Debtor counterparties of the deadline for objecting to the Cure Amounts, if any, which deadline shall not be less than three (3) Business Days prior to the Sale Hearing.

8.3     <u>Competing Transaction</u>.  This Purchase Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of competing bids that Seller, in its sole discretion, deems in good-faith to be superior to the transactions set forth in this Purchase

Agreement (each such bid, a "**Competing Bid**").  At any time prior to the Closing, Seller may, and may cause its Affiliates and their respective Representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and their respective Representatives) in connection with any sale or other disposition of the Fame House Assets or any business combination involving the Fame House Assets or the Fame House Business or any part of the Fame House Business.  In addition, Purchaser acknowledges that Seller shall have the right to respond to any inquiries or offers to purchase all or any part of the Fame House Assets or any business combination involving the Fame House Assets or the Fame House Business or any part of the Fame House Business; to engage in discussions or negotiations with respect to any such inquiries or offers and to perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code or other applicable Law, including supplying information relating to the Fame House Business or the Fame House Assets to any prospective purchaser.  Seller, its Affiliates and their respective Representatives, in Seller's sole discretion, may engage in discussions with its creditor constituencies (and their Representatives) in the Bankruptcy Case regarding Competing Bids.

8.4     Procedure.  Seller shall provide Purchaser with drafts of any and all material pleadings material with respect to the sale of the Fame House Business, including without limitation, the Motion and proposed orders to be filed or submitted in connection with this Purchase Agreement for Purchaser's prior review and comment.  The Motion shall be reasonably acceptable to Purchaser to the extent such Motion relates to the Fame House Assets, any Assumed Liabilities or any of Purchaser's obligations hereunder.  Seller agrees to use commercially reasonable efforts to obtain entry of the Sale Order.  Seller shall materially comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

**ARTICLE 9**
**CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES**

9.1     Conditions Precedent to Performance by Seller.  The obligations of Seller to consummate the transactions contemplated by this Purchase Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in **Section 9.1(c)**, **Section 9.1(d)**, and **Section 9.1(e)**) may be waived by Seller in its sole and absolute discretion:

(a)     Representations and Warranties of Purchaser.  The representations and warranties of Purchaser contained herein shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date).

(b)     Performance of the Obligations of Purchaser.  Purchaser shall have performed and complied, in all material respects, with all its obligations and agreements required under this Purchase Agreement to be performed by Purchaser on or before the Closing Date (except with respect to obligations which Purchaser is to perform as of the Closing under this Purchase Agreement (including, without limitation, the obligation to pay the Purchase Price)).

(c)     <u>Bankruptcy Court Approval</u>.  The Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay.

(d)     <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)     <u>Governmental Approvals</u>.  To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the Antitrust Laws of any other relevant Governmental Authority applicable to the purchase of the Fame House Assets contemplated by this Purchase Agreement shall have expired or shall have been terminated.

(f)     <u>Deliverables</u>.  Purchaser shall have delivered, or shall have caused to be delivered, to Seller all of the items set forth in **Section 10.3**.

For the avoidance of doubt, there shall be no conditions precedent to Seller's obligation to consummate the transactions contemplated by this Purchase Agreement, except for those conditions precedent specifically set forth in this **Section 9.1**.

9.2     <u>Conditions Precedent to the Performance by Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Purchase Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in **Section 9.2(c)**, **Section 9.2(d)**, and **Section 9.2(e)**) may be waived by Purchaser, in its sole and absolute discretion:

(a)     <u>Representations and Warranties of Seller</u>.  The representations and warranties of Seller contained herein shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct, taken together, do not result in or constitute a Material Adverse Effect (without giving effect to any materiality or Material Adverse Effect qualifications in such representations and warranties, if any).

(b)     <u>Performance of the Obligations of Seller</u>.  Seller shall have performed and complied, in all material respects, with all of its obligations and agreements under this Purchase Agreement that are to be performed by Seller on or before the Closing Date (except with respect to obligations which Seller is to perform as of the Closing under this Purchase Agreement).

(c)     <u>Bankruptcy Court Approval</u>.  The Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay.

(d)     <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)     <u>Governmental Approvals</u>.  To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the Antitrust Laws of any

other relevant Governmental Authority applicable to the purchase of the Fame House Assets contemplated by this Purchase Agreement shall have expired or shall have been terminated.

(f)     _Deliverables_.  Seller shall have delivered, or shall have caused to be delivered, to Purchaser all of the items set forth in **Section 10.2**.

For the avoidance of doubt, there shall be no conditions precedent to Purchaser's obligation to consummate the transactions contemplated by this Purchase Agreement (including any financing or due diligence condition), except for those conditions precedent specifically set forth in this **Section 9.2**.

9.3     _Frustration of Closing Conditions_.   Neither Seller nor Purchaser may rely on the failure of any condition set forth in **Section 9.1** or **Section 9.2**, as the case may be, if such failure was caused by such Party's, or any of its Affiliate's, failure to comply with any provision of this Purchase Agreement.

# ARTICLE 10
# CLOSING AND DELIVERIES

10.1     _Closing_.  Upon the terms and subject to the conditions of this Purchase Agreement, the sale and purchase of the Fame House Assets and the assumption of the Assumed Liabilities contemplated by this Purchase Agreement shall take place at a closing (the "**Closing**") to be held on the first Business Day after the date on which all conditions (other than those conditions which are to be satisfied only on the Closing Date) to the obligations of the Parties hereto set forth in **Article 9** to consummate the transactions contemplated hereby are first satisfied and/or waived (the date that the Closing occurs being the "**Closing Date**").  The Closing shall occur on the Closing Date at 10:00 a.m., New York time, in the offices of Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166.  Upon consummation of the Closing, the purchase and sale of the Fame House Assets and the assumption of the Assumed Liabilities hereunder shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

10.2     _Seller's Deliveries_.  At the Closing:

(a)     Seller shall have duly executed and delivered to Purchaser (i) a Bill of Sale, which agreement shall be in substantially the form annexed hereto as **Exhibit B** (the "**Bill of Sale**"), (ii) an Assignment and Assumption Agreement, which agreement shall be in substantially the form annexed hereto as **Exhibit C** (the "**Assignment and Assumption Agreement**"), (iii) a Trademark Assignment Agreement, which agreement shall be in substantially the form annexed hereto as **Exhibit D**, with respect to IP constituting Fame House Assets that are trademarks (the "**Trademark Assignment Agreement**"), (iv) a domain name assignment agreement, which agreement shall be in substantially the form annexed hereto as **Exhibit E** (the "**Domain Name Assignment Agreement**") for all domain names included in the Fame House Assets, and (v) the Transition Services Agreement;

(b)     Seller shall deliver an officer's certificate, duly executed by an officer of Seller, certifying the matters set forth in **Section 9.2(a)** and **Section 9.2(b)**; and

(c)     Seller shall deliver a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code.

10.3     <u>Purchaser's Deliveries</u>.  At the Closing:

(a)     Purchaser shall (i) pay the Cash Purchase Price (less the amount of the Deposit) by wire transfer of immediately available funds to an account designated by Seller prior to the Closing; and (ii) cause to be distributed to Seller the full amount of the Deposit;

(b)     Purchaser shall have duly executed and delivered to Seller, (i) the Bill of Sale, (ii) the Assignment and Assumption Agreement, (iii) the Trademark Assignment Agreement, (iv) the Domain Name Assignment Agreement and (v) the Transition Services Agreement;

(c)     Purchaser shall have paid to each Employee its Employee Assumption Amount; and, solely with respect to each Employee that is a Newly Hired Employee, to the extent payment for unused vacation days accrued in the Ordinary Course of Business prior to the Closing Date is not required by Law, Purchaser shall have credited such unused vacation days to each such Newly Hired Employee; and

(d)     Purchaser shall deliver a certificate, duly executed by a senior officer of Purchaser, certifying the matters set forth in **Section 9.1(a)** and **Section 9.1(b)**, in form reasonably satisfactory to Seller.

# ARTICLE 11
# <u>TERMINATION</u>

11.1     <u>Termination</u>.  This Purchase Agreement may be terminated only in accordance with this **Section 11.1**.  This Purchase Agreement may be, or, as applicable, shall be, terminated at any time before the Closing as follows:

(a)     by mutual written consent of Seller and Purchaser;

(b)     by either of Seller or Purchaser, upon the issuance of a final and non-appealable order, decree, or ruling by a Governmental Authority to permanently restrain, enjoin or otherwise prohibit the Closing; <u>provided</u> that the right to terminate this Purchase Agreement under this **Section 11.1(b)** shall not be available to any Party whose breach of, or failure to fulfill any obligation under, this Purchase Agreement shall have been the cause of, or shall have resulted in, the issuance of a final and non-appealable order, decree, or ruling by a Governmental Authority to permanently restrain, enjoin or otherwise prohibit the Closing;

(c)     by either of Seller or Purchaser if the Closing shall not have occurred by the date that is fifteen (15) days following the date that the Sale Order shall have been entered by the Bankruptcy Court (the "**Termination Date**"); <u>provided</u> that the right to terminate this Purchase Agreement under this **Section 11.1(c)** shall not be available to any Party whose failure to fulfill any covenant or other agreement under this Purchase Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the

Termination Date; *provided*, *further*, that if the Closing shall not have occurred within such fifteen (15) day period solely due to a delay in obtaining approval under the HSR Act or any other Antitrust Law under **Section 6.5** hereof, the Parties shall have an additional twenty (20) days to consummate the Closing;

        (d)     by Purchaser:

        (i)     if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Purchase Agreement (or shall have delivered a Schedule Update which would give rise to such a breach or failure to perform), which breach or failure to perform (A) would result in the failure of a condition set forth in **Section 9.2** and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the Termination Date; *provided*, *however*, that Purchaser is not then in breach of its covenants or other agreements under this Purchase Agreement in any material respect;

        (ii)     if the Bankruptcy Court has entered an order dismissing Seller's Bankruptcy Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee in its Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Fame House Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), which order is not reversed or vacated within fourteen (14) days after the entry thereof; or

        (iii)     if the Sale Order has been stayed, revoked, rescinded or modified in any material respect and the order staying, revoking, rescinding or modifying the Sale Order is not reversed or vacated within fourteen (14) days after the entry thereof;

        (e)     by Seller if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Purchase Agreement, which breach or failure to perform (A) would result in the failure of a condition set forth in **Section 9.1** and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the Termination Date; *provided*, *however*, that Seller is not then in breach of its covenants or other agreements under this Purchase Agreement in any material respect; *provided*, *further*, that the failure of Purchaser to deliver any portion of the Cash Purchase Price as required hereunder shall not be subject to cure hereunder unless otherwise agreed to in writing by Seller;

        (f)     by Seller if, after consultation with its counsel and financial advisors, it determines in good faith that consummation of the transactions contemplated by this Purchase Agreement is inconsistent with the fiduciary obligations under applicable Law of Seller or any of its shareholders, officers, directors, employees or professionals;

        (g)     by Purchaser or Seller, if, following the Sale Hearing, the Bankruptcy Court determines that Purchaser is not the Successful Bidder or Backup Bidder (as such term is defined in the Bid Procedures Order); or

        (h)     automatically, upon consummation of an Alternative Transaction.

Each condition set forth in this **Section 11.1** pursuant to which this Purchase Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in **Section 11.1** is applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Purchase Agreement is to be terminated. Subject to **Section 11.1(d)(ii)**, the Parties acknowledge and agree that no notice of termination or extension of the Termination Date provided pursuant to this **Section 11.1** shall become effective until five (5) days after the delivery of such notice to the other Party, and only if such notice shall not have been withdrawn during such five (5) day period or otherwise become invalid.

11.2    Effect of Termination.

(a)    In the event of termination pursuant to **Section 11.1**, other than (i) as set forth in this **Section 11.2** or (ii) with respect to reimbursements pursuant to **Section 6.5** (solely to the extent that amounts have been incurred as of the date of termination), this Purchase Agreement shall become null and void and have no effect and no Party hereto shall have any Liability to the other Party hereto except (a) nothing herein shall relieve any Party from Liability for any willful breach of this Purchase Agreement occurring prior to such termination (it being understood that the failure of Purchaser to deliver any portion of the Cash Purchase Price as required hereunder shall constitute a willful breach of this Purchase Agreement); and (b) with respect to the provisions of **Sections 6.4(h)** and **6.4(i)**, **Article 11** and **Article 12**, which shall expressly survive termination hereof; provided that upon such termination, each of the provisions of the Confidentiality Agreement shall survive and remain in full force and effect for the longer of (x) the remainder of the term of survival applicable to such provision as set forth in the Confidentiality Agreement and (y) two (2) years following such termination.

(b)    The Parties hereby agree that it is impossible to determine accurately the amount of damages that Seller would suffer if the transaction was not consummated as a result of any breach of this Purchase Agreement by Purchaser.

(c)    Notwithstanding anything in this Purchase Agreement to the contrary, Purchaser and Seller hereby agree that:

(i)    if this Purchase Agreement is terminated by Seller pursuant to **Section 11.1(e)**, then Seller shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon);

(ii)    if this Purchase Agreement is terminated pursuant to **Section 11.1(c)**, and at the time of such termination all conditions to Closing set forth in **Section 9.2** have been satisfied or waived as provided herein, then Seller shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon); and

(iii)    if this Purchase Agreement is terminated pursuant to **Section 11.1(b)** on account of an order, decree, or ruling by a Governmental Authority, then Seller shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon).

(d)     Except for the right of Seller to recover damages for any willful breach by Purchaser of any of its representations, warranties, covenants or other obligations set forth in this Purchase Agreement (which damages shall be in addition to receipt by Seller of the Deposit), the receipt of the Deposit by Seller pursuant to **Section 11.2(c)** (i) shall be deemed to be liquidated damages against Purchaser for all Liabilities of Purchaser under this Purchase Agreement, (ii) such liquidated damages shall be the sole and exclusive remedy, at Law and/or equity, of Seller against Purchaser, and (iii) none of Purchaser or any of its Related Persons shall have any further Liability of any kind to Seller or any of its Related Persons, directly or indirectly, on account of or in relation to this Purchase Agreement.  If this Purchase Agreement is properly terminated under circumstances where no amount of the Deposit is payable to Seller pursuant to **Section 11.2(c)**, then the entire Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) shall be returned to Purchaser.  In the event that any disbursement from the Deposit is due pursuant to this **Section 11.2**, the applicable Party shall promptly make such disbursement.

(e)     Nothing in this **Section 11.1** or elsewhere in this Purchase Agreement shall be deemed to impair the right of Seller to bring any Action or Actions for specific performance, injunctive and/or other equitable relief (including, without limitation, the right of Seller to compel specific performance by Purchaser of its obligations under this Purchase Agreement).

## ARTICLE 12
## MISCELLANEOUS

12.1   Survival.  No representations, warranties, covenants or agreements of Seller or Purchaser made in this Purchase Agreement shall survive the Closing Date and neither of the Parties shall have any Liability to each other after the Closing for any breach thereof; provided, however, that each of the covenants and agreements set forth in this Purchase Agreement that are to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or agreement until fully performed.

12.2   Further Assurances.  At and after the Closing, and without further consideration therefor, but at the sole expense of Purchaser, Seller shall execute and deliver to Purchaser such further instruments and certificates of conveyance and transfer as Purchaser may reasonably request to convey and transfer the Fame House Assets from Seller to Purchaser.

12.3   Successors and Assigns.  This Purchase Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and shall be binding upon the Parties hereto and their respective successors and permitted assigns and any trustee appointed in any of the Bankruptcy Cases or in any subsequent Chapter 7 case (if any), if the Bankruptcy Cases are dismissed.  Neither this Purchase Agreement nor any of the rights, interests or obligations hereunder may be transferred or assigned (including by operation of Law in connection with a merger or sale of stock, or sale of substantially all the assets, of a Person) by either of the Parties hereto without the prior written consent of the other Party hereto (which consent may be granted, withheld, conditioned or delayed in such other Party's sole and absolute discretion), and any attempted assignment in contravention or breach of the foregoing shall be void and of no force or effect.

12.4    Governing Law; Jurisdiction; Service of Process.  This Purchase Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of New York (without giving effect to the principles of conflicts of laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code and/or other applicable federal Law.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Purchase Agreement, and consent as to the foregoing to the exclusive jurisdiction of, the Bankruptcy Court.  After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Purchase Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in New York, New York.  Each Party hereby consents to process being served by either Party in any Action by delivery of a copy thereof in accordance with the provisions of **Section 12.7**.

12.5    Expenses.  Except as otherwise provided in this Purchase Agreement, each of the Parties hereto shall pay its own expenses in connection with this Purchase Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated.

12.6    Severability.  In the event that any part of this Purchase Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Purchase Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date (if any) this Purchase Agreement was last amended.

12.7    Notices.

(a)    All notices, requests, demands, consents, waivers and other communications required or permitted to be given under the terms of this Purchase Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, if delivered personally; (ii) when sent, if sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); (iii) on the day of transmission, if sent via electronic transmission to the email address below (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); and (iv) if sent by overnight courier service, one (1) Business Day after deposit with an overnight courier service with next day delivery specified, in each case, properly addressed to the Party to receive the same.  The addresses, email addresses and facsimile numbers for such communications shall be:

If to Seller:

SFX Entertainment, Inc.

c/o SFX Marketing LLC
902 Broadway, 14th Floor
New York, NY 10010
Attention:  Michael Katzenstein, CRO
Fax:  (646) 417-7393
Email:  Mike.Katzenstein@fticonsulting.com

With a copy (which shall not constitute notice) to:

Greenberg Traurig, LLP
MetLife Building
200 Park Avenue
New York NY 10166
Attention:  Maria J. DiConza, Esq.
Fax:  (212) 801-6400
Email:  DiConzaM@gtlaw.com

And a copy (which shall not constitute notice) to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attn:  Jonathan D. Canfield/Joshua M. Siegel
Fax:  (212) 806-6006
E-mail: jcanfield@stroock.com
        jsiegel@stroock.com

If to Purchaser:

[_____]

With a copy (which shall not constitute notice) to:

[_____]

(b)    Any Party hereto may change its address, facsimile number or email address for the purpose of this **Section 12.7** by giving the other parties written notice of its new address, facsimile number or email address in the manner set forth above.  Written confirmation of receipt (i) given by the recipient of such notice, request, demand, consent, waiver or other communication, (ii) mechanically or electronically generated by the sender's facsimile machine containing the time, date and recipient facsimile number or (iii) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iv) of **Section 12.7(a)** above, respectively.

12.8    Amendments; Waivers.  This Purchase Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived,

only by a written instrument executed by Purchaser and Seller, or in the case of a waiver, by the Party hereto waiving compliance.  Any waiver by any Party hereto of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Purchase Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Purchase Agreement.

12.9    Entire Agreement.  This Purchase Agreement, together with the Confidentiality Agreement, the Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein (all of which are hereby incorporated herein by reference), (i) supersede all other prior oral or written agreements among the Parties hereto solely with respect to the matters contained herein and therein, and (ii) contain the entire understanding of the Parties hereto solely with respect to the matters contained herein and therein.  For clarification purposes, the Recitals are part of this Purchase Agreement.

12.10    Disclosures.  After notice to and consultation with Purchaser, Seller shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Purchase Agreement and all information provided by Purchaser in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Cases and other Persons bidding on the Fame House Business or any part thereof.  Other than statements made in the Bankruptcy Court (or in pleadings filed therewith) pursuant to the previous sentence, neither of the Parties hereto shall issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of the other Party hereto, which consent shall not be unreasonably withheld or delayed; provided, however, that Seller, without the prior consent of Purchaser, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Authority with competent jurisdiction.  Purchaser, without the prior consent of Seller, may issue such press release or make such public statement, filing or disclosure as may, upon the advice of counsel, be required by applicable Law or any Governmental Authority with competent jurisdiction.

12.11    Headings.  The article and section headings in this Purchase Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Purchase Agreement.

12.12    Counterparts.  This Purchase Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each Party and delivered to the other Party.  In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the Party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

12.13    Name Change.  Promptly following the Closing, Seller shall discontinue the use of the name "Fame House" (and any other similar trade names currently utilized by Seller) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Fame House" without the prior written consent of Purchaser.  From and after the

Closing, Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the IP rights utilized by Seller solely in the conduct of the Fame House Business, which rights shall be included in the Fame House Assets purchased hereunder. Promptly following the Closing, Seller shall file all necessary organizational amendments with Secretary of State of Seller's jurisdiction of formation and in each State in which Seller is qualified to do business to effectuate the foregoing.

12.14   <u>Post-Closing Transfers</u>.  If, following the Closing, Seller receives or becomes aware that it holds any asset, property or right which constitutes a Fame House Asset, then Seller shall transfer such asset, property or right to Purchaser as promptly as practicable for no additional consideration.  If, following the Closing, Purchaser receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then Purchaser shall transfer such asset, property or right to Seller as promptly as practicable for no additional consideration.

12.15   <u>Schedules</u>.  Notwithstanding anything to the contrary contained in the Schedules or in this Purchase Agreement, each disclosure in any section or subsection of the Schedules shall be deemed disclosed in each other section or subsection of the Schedules, regardless of the existence or absence of cross-references, provided it is reasonably apparent that the matter is related to such other section.  The disclosure of any matter or item in any Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in or constitute a Material Adverse Effect.  The information contained in the Schedules is disclosed solely for the purposes of this Purchase Agreement, and no information contained therein shall be deemed to be an admission by any Party hereto to any third party of any matter whatsoever, including of any actual or possible violation of Law, breach of any agreement or any Liability.

12.16   <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, RELATING TO OR ARISING OUT OF THIS PURCHASE AGREEMENT.   THE   SCOPE   OF   THIS   WAIVER   IS   INTENDED   TO   BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS PURCHASE AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS PURCHASE AGREEMENT, AND THAT EACH PARTY WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.   EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY     SUBSEQUENT     AMENDMENTS,     RENEWALS,     SUPPLEMENTS,     OR

MODIFICATIONS TO THIS PURCHASE AGREEMENT. IN THE EVENT OF ANY LITIGATION, THIS PURCHASE AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

12.17 <u>No Third Party Beneficiaries</u>. This Purchase Agreement is intended for the benefit of the Parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person; <u>provided</u>, <u>however</u>, that Parent and its legal representatives, successors and assigns are express beneficiaries of **Section 6.4(g)** and may enforce their rights thereunder in accordance with the terms and conditions thereof.

12.18 <u>Remedies</u>. The Parties acknowledge and agree that: (i) irreparable damage would occur if any provision of this Purchase Agreement was not performed in accordance with the terms and conditions hereof; (ii) there would be no adequate remedy at law or in damages to compensate for such performance failure; and (iii) the Parties shall be entitled (without the requirement to post a bond) to an injunction or injunctions to prevent breaches of this Purchase Agreement, or to enforce specifically the performance of the terms and provisions hereof, in the Bankruptcy Court, in addition to any other remedy to which they are entitled by Law or in equity.

[Signature page follows.]

IN WITNESS WHEREOF, the Parties hereto have caused this Purchase Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

[_____]


By:_____
   Name:
   Title:




**SFX MARKETING LLC**


By:_____
   Name:
   Title:

## APPENDIX A
## DEFINED TERMS

The following terms have the meanings set forth in the Preamble hereto or the Sections hereof set forth below:

| Definitions | Location |
|---|---|
| "Allocation Statement" | Section 3.3 |
| "Arrangement Period" | Section 2.5(b) |
| "Assignment and Assumption Agreement" | Section 10.2(a) |
| "Assumed Contracts" | Section 2.5(a)(i) |
| "Assumed Liabilities" | Section 2.3 |
| "Assumed WARN Obligations" | Section 6.4(g) |
| "Bankruptcy Cases" | Recitals |
| "Bankruptcy Code" | Recitals |
| "Bankruptcy Court" | Recitals |
| "Fame House Assets" | Section 2.1 |
| "Fame House Business" | Recitals |
| "Bill of Sale" | Section 10.2(a) |
| "Cash Purchase Price" | Section 3.2 |
| "Closing" | Section 10.1 |
| "Competing Bid" | Section 8.3 |
| "Closing Date" | Section 10.1 |
| "Debtors" | Recitals |
| "Deposit" | Section 3.1 |
| "Domain Name Assignment Agreement" | Section 10.2(a) |
| "Excluded Assets" | Section 2.2 |
| "Execution Date" | Preamble |
| "Excluded Liabilities" | Section 2.4 |
| "Newly Hired Employees" | Section 6.4(a) |
| "Parent" | Recitals |
| "Parties" or "Party" | Preamble |
| "Petition Date" | Recitals |
| "Pre-Closing Returns" | Section 4.14 |
| "Purchase Agreement" | Preamble |
| "Purchaser" | Preamble |
| "Real Property Lease" | Definition of Leased Property |
| "Schedules" | Section 6.3(a) |
| "Schedule Updates" | Section 6.3(a) |
| "Second Request" | Section 6.5(a) |
| "Seller" | Preamble |
| "Termination Date" | Section 11.1(c) |
| "Trademark Assignment Agreement" | Section 10.2(a) |
| "Transaction Taxes" | Section 7.1(a) |
| "Transition Services Agreement" | Section 6.6 |
| "WARN" | Section 6.4(f) |
| "WARN Liabilities" | Section 6.4(g) |

"**Action**" means any demand, Claim, action, suit or proceeding, arbitral action, litigation, inquiry, criminal prosecution or investigation by or before any Governmental Authority.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Alternative Transaction**" means any sale of all or substantially all of the Fame House Assets of, or any issuance, sale or transfer of any equity interests in, Seller, or any other transaction, including a plan of liquidation or reorganization, that transfers or vests ownership of, economic rights to, or benefits in all or a substantial portion of the Fame House Assets to any party other than Purchaser or any of its Affiliates.

"**Ancillary Agreement**" means any of the Bill of Sale, the Assignment and Assumption Agreement, Trademark Assignment Agreement, Domain Name Assignment Agreement or Transition Services Agreement.

"**Antitrust Laws**" means any applicable Law that is designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"**Auction**" means the auction for the sale and assumption of the Fame House Assets and the Assumed Liabilities conducted by Seller in the Bankruptcy Cases in accordance with the Bid Procedures Order.

"**Bid Procedures Order**" means the *Order (A) Approving Bid Procedures Relating To The Sale Of All Or Substantially All Of The Assets Of the Fame House Business, (B) Approving Notice Procedures, And (C) Granting Related Relief* [Docket No. ____], substantially in the form of **Exhibit F**, issued by the Bankruptcy Court that, among other things, establishes procedures for an Auction process to solicit competing bids.

"**Books and Records**" means all books, ledgers, files, reports, plans, records, manuals and other materials (in any form or medium) of, or maintained for, Seller, but excluding any such items to the extent they are related to any Excluded Asset or not solely related to the Fame House Business.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York are authorized by Law or other governmental action to close.

"**Cash**" means all cash on hand and in banks, cash equivalents, marketable securities, short-term investments, treasury bills, money orders, checks (including cash in transit such as checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), checking account balances, instruments for the payment of money, certificates of deposit and other time deposits and letters of credit.

"**Claim**" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and Liabilities of any kind or nature under contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"**Committee**" means the official committee of unsecured creditors formed on February 12, 2016 in respect of the Bankruptcy Cases.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of _____, by and between Parent and [Purchaser].

"**Contract**" means any written agreement, contract, lease (including, without limitation, leases for the Leased Property), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding, and any amendments, modifications or supplements thereto.

"**Cure Amounts**" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assumed Contracts so that they may be sold and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"**DIP Lenders**" means the lenders party to that certain senior secured super-priority debtor-in-possession credit agreement dated as of February 10, 2016, by and among Parent as borrower, Seller and the other guarantors named therein, the DIP Lenders and Wilmington Savings Fund Society, FSB, as administrative agent.

"**Employee Assumption Amount**" means, collectively, to the extent that any of the following amounts exist, (x) solely with respect to each Employee that is a Newly Hired Employee, an amount equal to the dollar value of the vacation days for any unpaid or unused vacation days of each Newly Hired Employee that have accrued in the Ordinary Course of Business prior to the Closing Date, solely to the extent such dollar amount is required by Law to be paid out to such Newly Hired Employee or if such vacation days are not otherwise credited to such Newly Hired Employee, (y) with respect to each Employee that is not a Newly Hired Employee, an amount equal to the dollar value of the vacation days for any unpaid or unused vacation days for such Employee that have accrued in the Ordinary Course of Business prior to the Closing Date, solely to the extent such dollar amount is required by Law to be paid out to such Newly Hired Employee, and (z) any payroll and employee withholding Taxes in connection with amounts described in clauses (x) and (y) hereof.

"**Employee Benefit Plans**" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA related to the Fame House Business and (b) employee welfare benefit plans as defined in Section 3(1) of ERISA related to the Fame House Business, in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or Parent, as applicable, or any ERISA Affiliate or equivalent and that covers any current Employee (or their dependents, spouse or beneficiaries) related to the Fame House Business.

"**Employees**" means all individuals employed by (i) Seller solely in connection with the Fame House Business and (ii) all individuals employed by Parent solely in connection with the Fame House Business, in each case, as of the Closing Date.

"**Encumbrances**" means, to the extent not considered a Lien, any security interest, pledge, hypothecation, mortgage, lien or encumbrance, other than any licenses of IP.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) which is treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**Excluded IP**" has the meaning set forth in **Section 2.2(f)**.

"**Federal Rules of Bankruptcy Procedure**" means the rules of bankruptcy courts promulgated by the United States Supreme Court and published as an appendix to title 11 of the United States Code.

"**Governmental Authority**" means any foreign or United States federal, national, supranational, state, county, provincial, municipal or local court, tribunal or government, or any governmental department, agency, ministry, board, commission, authority, or other similar body exercising executive, legislative, judicial, regulatory or administrative authority or functions of or pertaining to government, including any authority or other self-regulatory organization or quasi-governmental agency established to perform any of such functions, and also including any non-governmental trade association, union or organization, guild or similar body.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations thereunder.

"**Improvements**" means buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to the Leased Property.

"**Interest**" means "interest" as that term is used in Bankruptcy Code Section 363(f).

"**Inventories**" or "**Inventory**" means all inventory of any kind or nature (other than PP&E), merchandise, and goods, solely related to the Fame House Business or Fame House Assets and maintained, held or stored by or for Seller at the Closing, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same.

"**IP**" means all intellectual property owned and/or controlled exclusively by Seller and solely related to the Fame House Business, including, without limitation, (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) Software, (g) internet addresses, uniform resource locaters, domain names, websites and web pages, and (h) any and all other intellectual property and proprietary rights, in each case, owned and/or controlled exclusively by Seller, to the extent solely used in the operation of the Fame House Business or solely related to the Fame House Assets.

"**knowledge of Seller**" or "**Seller's knowledge**" means the actual knowledge, without obligation of inquiry, of the executive officers of Seller.

"**Law**" means any law, statute, ordinance, regulation, rule, code, administrative or judicial doctrine or rule of common law or otherwise of, or any order (including, without limitation, the Sale Order), judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"**Leased Property**" means the real property leased by Seller, as tenant, solely for use in the Fame House Business, together with, to the extent leased by Seller solely for use in the Fame House Business, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of Seller attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the Fame House Business or the Fame House Assets (each such real property lease a "**Real Property Lease**," and collectively, the "**Real Property Leases**").

"**Liability**" means any indebtedness, debt, claim, liability, commitment or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"**Lien**" has the meaning given to that term in the Bankruptcy Code.

"**Material Adverse Effect**" means any circumstance, change in or effect on the Fame House Business that, individually or in the aggregate, is materially adverse to the results of operations or the financial condition of the Fame House Business, taken as a whole; provided, however, that none of the following, either alone or in combination, shall be considered in determining whether there has been a "Material Adverse Effect": (a) events, circumstances, changes or effects that generally affect the industry in which the Fame House Business operates, other than as may materially disproportionately impact the Fame House Business (but then only to the extent of such materially disproportionate impact); (b) general economic conditions or events, circumstances, changes or effects affecting the economy or the financial or securities markets generally, other than as may materially disproportionately impact the Fame House Business (but then only to the extent of such materially disproportionate impact); (c) changes arising from the consummation of the transactions contemplated by, or the announcement of the execution of or existence of, this Purchase Agreement, including (i) any actions of competitors or customers, (ii) any actions taken by or losses of employees, or (iii) any litigation, in each case related thereto; (d) any circumstance, change or effect that results from any action taken (or omitted to be taken) (i) at the request of Purchaser in a separate writing to Seller, or (ii) as required or permitted by this Purchase Agreement; (e) conditions caused by acts of sabotage, terrorism or war (whether or not declared) or any natural or man-made disaster, weather phenomenon or acts of God; (f) the fact that Seller and Parent filed as debtors pursuant to the Bankruptcy Code; (g) the effect of any changes in applicable Laws, regulations or accounting rules, including the United States generally accepted accounting principles (GAAP), or the interpretation or enforcement thereof, other than as may materially disproportionately impact the Fame House Business (but then only to the extent of such materially disproportionate impact); (h) any failure by any Person to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period with respect to the Fame House Business; (i) any action taken (or omitted to be taken) by Seller or any of its respective Affiliates pursuant to any order of the Bankruptcy Court; (j) any matter set forth in the Schedules; (k) any matter of which Purchaser is actually aware of on the date hereof; (l) any adverse change, effect, event, occurrence, state of facts or development which is cured on or prior to the Closing Date; (m) any downgrade (actual, announced or contemplated) by any rating agencies with respect to any indebtedness of Seller or any of its Affiliates; (n) the commencement of the Bankruptcy Case or events that would typically result from the commencement of the Bankruptcy Case; or (o) actions required to be taken under applicable Law or Contracts in effect on the date hereof.

"**Ordinary Course of Business**" means the conduct by Seller of the Fame House Business and maintenance of the Fame House Assets in substantially the same manner as conducted as of the Execution Date consistent with past practice after taking into consideration changes that are a result of, relating to, in connection with or resulting from the Bankruptcy Cases.

"**Permits**" means all material approvals, permits, certificates, qualifications, authorizations, licenses, franchises, consents, orders and registrations, together with all modifications, amendments, supplements and extensions thereof, of all United States federal, state and local Governmental Authority and any other Person that are used by Seller solely in its ownership of the Fame House Assets or operation of the Fame House Business.

"**Permitted Liens**" means: (a) all defects, exceptions, restrictions, easements, quasi-easements, rights of way, covenants, Encumbrances and other similar matters of record that would be shown by a current title report or other similar report or listing and which do not materially interfere with the operation of the Fame House Business or use of the Fame House Assets; (b) statutory liens for Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an adequate reserve is established therefor; (c) landlord's, lessors', mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (d) zoning, entitlement and other land use and environmental regulations by any Governmental Authority which do not materially interfere with the operation of the Fame House Business or use of the Fame House Assets; (e) title of a lessor under a capital or operating lease; (f) other Liens that, individually or in the aggregate, would not materially impair the value or use of the Fame House Assets; (g) Liens to lenders incurred in deposits made in the Ordinary Course of Business in connection with maintaining bank accounts; (h) deposits or pledges to secure the payment of workers' compensation, unemployment insurance, social security benefits or obligations arising under similar Laws, or to secure the performance of public or statutory obligations, surety or appeal bonds, and other obligations of a like nature; or (i) Liens and Encumbrances that will be released and/or discharged pursuant to the Sale Order.

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"**PP&E**" means all equipment, machinery, industrial and motor vehicles owned or leased by Seller and used solely in the Fame House Business, fixtures, all specialized equipment used by Seller solely in the Fame House Business, office equipment, computers and other data processing or design hardware and other equipment of a like nature, furniture and all other tangible property used solely in the Fame House Business.

"**Qualified Bid**" means a written offer that meets the requirements set forth in the Bid Procedures Order.

"**Related Person**" means, with respect to any Person, all past, present and future directors, officers, members, managers, partners, limited partners, stockholders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, consultants, lenders, financial advisors or representatives of any such Person.

"**Representatives**" means, with respect to any Person, such Person's officers, managers, directors, members, general partners, employees, outside counsel, accountants, financial advisors and consultants.

"**Sale Hearing**" means the hearing to consider the entry of the Sale Order.

"**Sale Order**" means an order issued by the Bankruptcy Court pursuant to Bankruptcy Code sections 105, 363 and 365 in form and substance reasonably satisfactory to Purchaser, (i) approving this Purchase Agreement and (ii) authorizing and directing (A) Seller to consummate

the transaction contemplated hereby and (B) the assumption and assignment of the Assumed Contracts to Purchaser, substantially in the form of **Exhibit G**.

"**Software**" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"**Successful Bidder**" means the entity or entities submitting the highest and/or best Qualified Bid in the business judgment of the DIP Lenders and the Committee.

"**Tax**" or "**Taxes**" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of Contract, assumption, transferee liability, operation of Law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"**Tax Return**" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"**Treasury Regulation**" means, with respect to any referenced provision, such provision of the regulations promulgated by the United States Department of the Treasury.