## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SFX ENTERTAINMENT, INC., *et al.*,[1] | Case No. 16-10238 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  April 5, 2016 at 10:30 a.m.**<br>**Objection Deadline:  March 29, 2016 at 4:00 p.m.** |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING THE IMPLEMENTATION OF (I) KEY EMPLOYEE INCENTIVE PLANS AND (II) A KEY EMPLOYEE RETENTION PLAN**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")

hereby move the Court (the "**Motion**") pursuant to sections 105, 363(b), 503(b)(1) and 503(c)(3)

of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), for

entry of an order, substantially in the form annexed hereto, approving the implementation of

(a) the Debtors' proposed performance-based key employee incentive plans for (i) their corporate

and North American retained businesses, exclusive of SFX-React Operating LLC ("**React**") (the

"**CNA KEIP**") and (ii) React (the "**React KEIP**," and together with the CNA KEIP, the

"**KEIPs**"); (b) the Debtors' proposed key employee retention plan (the "**KERP**" and, together

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are:  430R Acquisition LLC (7350); Beatport, LLC (1024); Core Productions LLC (3613); EZ Festivals, LLC (2693); Flavorus, Inc. (7119); ID&T/SFX Mysteryland LLC (6459); ID&T/SFX North America LLC (5154); ID&T/SFX Q-Dance LLC (6298); ID&T/SFX Sensation LLC (6460); ID&T/SFX TomorrowWorld LLC (7238); LETMA Acquisition LLC (0452); Made Event, LLC (1127); Michigan JJ Holdings LLC (n/a); SFX Acquisition, LLC (1063); SFX Brazil LLC (0047); SFX Canada Inc. (7070); SFX Development LLC (2102); SFX EDM Holdings Corporation (2460); SFX Entertainment, Inc. (0047); SFX Entertainment International, Inc. (2987); SFX Entertainment International II, Inc. (1998); SFX Intermediate Holdco II LLC (5954); SFX Managing Member Inc. (2428); SFX Marketing LLC (7734); SFX Platform & Sponsorship LLC (9234); SFX Technology Services, Inc. (0402); SFX/AB Live Event Canada, Inc. (6422); SFX/AB Live Event Intermediate Holdco LLC (8004); SFX/AB Live Event LLC (9703); SFX-94 LLC (5884); SFX-Disco Intermediate Holdco LLC (5441); SFX-Disco Operating LLC (5441); SFXE IP LLC (0047); SFX-EMC, Inc. (7765); SFX-Hudson LLC (0047); SFX-IDT N.A. Holding II LLC (4860); SFX-LIC Operating LLC (0950); SFX-IDT N.A. Holding LLC (2428); SFX-Nightlife Operating LLC (4673); SFX-Perryscope LLC (4724); SFX-React Operating LLC (0584); Spring Awakening, LLC (6390); SFXE Netherlands Holdings Coöperatief U.A. (6812); SFXE Netherlands Holdings B.V. (6898).  The Debtors' business address is 902 Broadway, 15th Floor, New York, NY 10010.

with the KEIPs, the "**Key Employee Programs**"),[2] and (c) granting administrative expense status to the bonuses paid thereunder.   In support of this Motion, the Debtors submit the declaration of Christopher T. Nicholls, the Associate Chief Restructuring Officer of the Debtors, and respectfully state as follows:

### Status of the Case

1.      On February 1, 2016 (the "**Petition Date**"), the Debtors commenced these cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.       No request has been made for the appointment of a trustee or examiner.

4.      On February 12, 2016, an official committee of unsecured creditors was appointed in these Chapter 11 Cases (the "**Committee**").

### Jurisdiction, Venue and Statutory Predicates

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

6.      The statutory predicates for the relief requested herein are sections 105(a), 363(b), 503(b)(1) and 503(c)(3) of the Bankruptcy Code.

---

[2] The Debtors are still working with their DIP Lenders and the Ad Hoc Committee of certain Second Lien Noteholders in respect of the terms and conditions of the Key Employee Programs, and certain revisions may be made to the Key Employee Programs and the proposed order approving this Motion as a result of those continuing discussions.  The DIP Lenders and the Ad Hoc Committee of certain Second Lien Noteholders accordingly reserve their rights with respect to this Motion and the proposed order.

**Background**

7.     The Debtors along with their non-Debtor affiliates (collectively, "**SFX**") are a leading producer of live events and digital entertainment content focused exclusively on electronic music culture.  The Debtors commenced material operations in 2012 with the intent of acquiring and operating companies within the electronic dance music ("**EDM**") industry, specifically those engaged in the promotion and production of live music events, festivals and digital offerings attractive to EDM fans in the United States and abroad.  Over the next three years, the Debtors acquired a number of leading EDM brands, such as TomorrowWorld, Beatport, Mysteryland, Sensation and Electric Zoo, and expanded operations worldwide.

8.     Today, the Debtors are actively engaged in the production and promotion of EDM festivals and events both domestically and abroad.  In addition, Debtors manage large, event-driven nightclubs that serve as venues for performances by key electronic music talent.  The Debtors also offer an online platform for EDM DJs, artists and fans to purchase, share and stream music components and to connect with each other.

9.     The Debtors and their 120 non-Debtor subsidiaries operate a business that spans the globe, with operations in over 34 countries.  The Debtors constitute substantially all of the domestic companies comprising SFX's business as well as select foreign subsidiaries.   The Debtors have more than 325 employees and, together with the non-Debtor entities, have more than 625 employees.

10.     The Debtors' capital structure is highly levered.  In 2015, the Debtors began to face significant liquidity issues.  While the Debtors attempted to enhance liquidity through a September 2015 financing and potential sales of non-strategic assets, the Debtors concluded that they needed to restructure their liabilities through a bankruptcy process.

11.     Prior to the filing of these Chapter 11 Cases, the Debtors entered into a restructuring support agreement with holders of over 70% of their outstanding secured debt. The restructuring support agreement provides for a comprehensive restructuring of the Debtors' balance sheet.  As part of that transaction, certain of the holders of the secured debt also agreed to provide the Debtors with debtor-in-possession financing to allow for the Debtors to prosecute these Chapter 11 Cases.  The Debtors intend to use these Chapter 11 Cases to effect their balance sheet restructuring and implement operational improvements.

12.     A detailed factual background of the Debtors' businesses and operations, as well as the events precipitating the commencement of these Chapter 11 Cases, is more fully set forth in the *Declaration of Michael Katzenstein in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**") [Docket No. 13] filed on the Petition Date and incorporated herein by reference.

13.     As a preliminary matter, this Motion does <u>not</u> relate to the proposed incentive compensation programs in respect of the sale of certain of the Debtors' discrete non-core business units (the "**NCUs**"), as may be designated by the Special Committee of the Board of Directors of SFX Entertainment, Inc. (the "**Special Committee**").  The NCU Key Employee Programs proposed by the Debtors on March 2, 2016 [Docket No. 173] relate only to the NCUs and the necessity to properly incentivize and retain employees to assist in the maximization of value of the assets held for sale.  The instant Motion seeks approval of the key employee programs that relate to the businesses the Debtors anticipate retaining.  The Debtors will work with the DIP Lenders, the Committee and the Office of the United States Trustee to provide them with further specifics of the Key Employee Programs, including the identities of the Participants, the amounts individual Participants would receive and the metrics behind the Key Employee

4

Programs (the "**Supplement**").  The Debtors may seek to file certain portions of the Supplement under seal.

### Description of KEIPs

14.     Without the expertise of the Debtors' senior management teams to efficiently and effectively operate the Debtors' businesses and the proper incentives to induce them to commit the time necessary to successfully navigate the Debtors through these Chapter 11 Cases, the Debtors' ability to successfully reorganize will be significantly inhibited.  Accordingly, it is critical that the Debtors' senior managers, who continue to work against the backdrop of uncertainty regarding their continued employment, be properly incentivized and motivated to work harder than ever before to enhance the Debtors' operational performance and execute a comprehensive restructuring so as to maximize value for all of the Debtors' constituents.

15.     The Debtors worked with their advisors, their crisis and turnaround manager, FTI Consulting, Inc. ("**FTI**"), their Chief Restructuring Officer, Michael Katzenstein (the "**CRO**") and their Associate Chief Restructuring Officer, Christopher Nicholls, to develop the terms of the KEIPs and to establish a structure for incentives thereunder designed to motivate the participants in each KEIP (collectively, the "**KEIP Participants**") to help the Debtors achieve certain important business objectives throughout these Chapter 11 Cases.  Although KEIP payouts would not be made until the Debtors emerge from chapter 11, the Debtors seek this Court's approval of the KEIPs at this stage of these Chapter 11 Cases to assure KEIP Participants that their continued hard work and success will ultimately be rewarded.  In the Debtors' business judgment, incentivizing the KEIP Participants is critical in order to ensure that these key members of the Debtors' retained businesses continue in their efforts to successfully maximize value for the benefit of all of the Debtors' stakeholders.  Below is a summary of the material

terms of the CNA KEIP and the React KEIP, which are set forth in more detail in the plan

annexed as **Exhibit A** hereto:

**CNA KEIP:**

    a.   Eligibility and Performance Objectives:

        i.   The CRO, in consultation with the Special Committee, has initially designated three (3) executives as eligible to participate in the CNA KEIP. The CRO has also tentatively identified three (3) additional executives as potentially eligible to participate in the CNA KEIP, for a total of six (6) executives.[3] All employees who are deemed eligible to participate in the CNA KEIP are defined as "**CNA KEIP Participants**".

        ii.   The CRO, in consultation with the Special Committee, may designate additional eligible executives who are critical to the operations and the ongoing success of the Debtors' businesses.

        iii.   Performance objectives include metrics such as (a) operating margin; (b) ticket and sponsorship sales; (c) adherence to event-level cost budgets; (d) selling, general & administrative expense ("**SG&A**") performance; (e) timely emergence from chapter 11; and (f) assistance with any asset sales.

        iv.   A CNA KEIP Participant shall be entitled to KEIP payments only if the CNA KEIP Participant is an employee of the Debtors at the time of payment. If a CNA KEIP Participant voluntarily terminates his or her employment with the Debtors, or if a CNA KEIP Participant is terminated with cause, in each case on or before the 365th calendar day after the date on which the payment is issued, that CNA KEIP Participant must return the amount of the payment within five (5) calendar days of termination; provided however, that the foregoing requirement may be modified in the discretion of the CRO or the Chief Executive Officer of the Reorganized Debtors.

        v.   If any employee of the Debtors participates in one KEIP or KERP related to any business of the Debtors, that employee cannot participate in any additional KEIP or KERP related to any business of the Debtors.

    b.   Performance Period: The term "**Performance Period**" as to an individual CNA KEIP Participant shall mean the period that begins as of the Petition Date and ends as of the effective date of a chapter 11 plan of reorganization (the "**Effective Date**").

---

[3] The inclusion of these three tentatively identified participants is the subject of discussion between the Debtors and the DIP Lenders. The Supplement will address the treatment of these individuals.

c.    Payment Amounts:

    i.    Upon achieving the threshold, target, or maximum performance metrics described herein, a CNA KEIP Participant shall receive a threshold, target, or maximum CNA KEIP payment, respectively.

    ii.    In no event shall any CNA KEIP Participant receive a KEIP payment in an amount in excess of $200,000 under the CNA KEIP.

    iii.    The maximum aggregate amount of all CNA KEIP payments to the 6 currently and tentatively identified CNA KEIP Participants shall not exceed $1,050,000 without further order of the Court.

    iv.    If the CRO, in consultation with the Special Committee, designates additional eligible CNA KEIP Participants, in no event shall the maximum aggregate amount of all CNA KEIP payments and React KEIP payments exceed $1.6 million without further order of the Court.

    v.    Individual payout awards were and shall be determined by the CRO, in consultation with the Special Committee.

d.    Bonus Adjustments:  To the extent that a CNA KEIP Participant is party to an executory employment agreement and is determined to be entitled to payments of incentive or retention compensation thereunder (whether in connection with payment of a cure amount or otherwise), then any KEIP payment payable to such CNA KEIP Participant hereunder shall be adjusted and reduced accordingly in the discretion of the CRO.

e.    Payment of Awards: Payments will be made within 30 days of the Effective Date.

**React KEIP:**

a.    Eligibility and Performance Objectives:

    i.    The CRO, in consultation with the Special Committee, has designated three (3) executives as eligible to participate in the React KEIP.  All employees who are deemed eligible to participate in the React KEIP are defined as "**React KEIP Participants**".

    ii.    The CRO, in consultation with the Special Committee, may designate additional eligible executives as critical to the operations and the ongoing success of React.

    iii.    Performance objectives and payments made under the React KEIP shall be tied to budgeted operating margin, sales, adherence to event-level cost budgets and SG&A metrics.

    iv.    A React KEIP Participant shall be entitled to KEIP payments only if such React KEIP Participant is an employee of the Debtors at the time of payment.  If a React KEIP Participant voluntarily terminates his or her employment with the Debtors, or if a React KEIP Participant is

terminated with cause, in each case on or before the 365th calendar day after the date on which the payment is issued, that React KEIP Participant must return the amount of the payment within five (5) calendar days of termination; provided however, that the foregoing requirement may be modified in the discretion of the CRO or the Chief Executive Officer of the Reorganized Debtors.

v.   If any employee of the Debtors participates in one KEIP or KERP related to any business of the Debtors, that employee cannot participate in any additional KEIP or KERP related to any business of the Debtors.

b.   <u>Performance Period</u>:  The term "**Performance Period**" as to an individual React KEIP Participant shall mean the period that begins as of the Petition Date and ends as of the Effective Date.

c.   <u>Payment Amounts</u>:

i.   Upon achieving the threshold, target, or maximum performance metrics described herein, a React KEIP Participant shall receive a threshold, target, or maximum React KEIP payment, respectively.

ii.  In no event shall any React KEIP Participant receive a KEIP payment in an amount in excess of $150,000 under the React KEIP.

iii. The aggregate amount of all React KEIP payments to currently identified React KEIP Participants shall not exceed $450,000 without further order of the Court.

iv.  If the CRO, in consultation with the Special Committee, designates additional eligible React KEIP Participants, in no event shall the maximum aggregate amount of all React KEIP payments and CNA KEIP payments exceed $1.6 million without further order of the Court.

d.   <u>Bonus Adjustments</u>: To the extent that a React KEIP Participant is party to an executory employment agreement and is determined to be entitled to payments of incentive or retention compensation thereunder (whether in connection with payment of a cure amount or otherwise), then any KEIP payment payable to such React KEIP Participant hereunder shall be adjusted and reduced accordingly in the discretion of the CRO.

e.   <u>Payment of Awards</u>: Payments will be made within 30 days of the Effective Date.

16.    The KEIPs payouts are consistent with market standards.  FTI undertook to define a set of relevant market comparables to that of the Debtors.  FTI benchmarked comparable KEIP plans from select chapter 11 cases of seven different companies that filed petitions from 2012 to 2015, two of which of are in the technology, media and telecom sectors.  The total

liabilities of the companies reviewed by FTI ranged from $338.1 million to $826 million. Following a review of this set of market comparables, FTI observed a number of market practice factors. Notably, the targeted total cost of comparable KEIPs ranged from $540,000 to $2.3 million, with a median targeted cost of $1.1 million, with maximum payouts of $540,000 to $3.7 million and a median maximum of $1.46 million. As a percentage of annual base salary, awards ranged from 20% to 120%. In addition, maximum awards as a percentage of the target award ranged from 100% to 150%. Individual target payments ranged from $135,000 to $490,000, with maximum individual payments ranging from $135,000 to $740,000.

17.    FTI has determined the cost of the proposed KEIPs to be within the range of market practice as compared to the plans proposed and approved at similarly-situated companies. Payments under both KEIPs will not exceed $200,000 per KEIP Participant, or 80% of annual base salary, with proposed target payments ranging from $60,000 to $150,000 and maximum payments ranging from $110,000 to $200,000. In the aggregate, the proposed target cost is $975,000, with a maximum total cost for the nine (9) currently and tentatively identified KEIP Participants of $1.5 million. As a percentage of the target award, the maximum total awards for currently and tentatively identified KEIP Participants is approximately 154%, which is nearly within the range found in comparable plans proposed by similarly-situated companies. Moreover, the target payments under the proposed KEIPs range from 25% to 60% of the KEIP Participants' annual base salary. Therefore, the individual and aggregate target and maximum payments are well within the range of comparable KEIP transactions.

18.    The assistance of the KEIP Participants will be critical to the Debtors' ability to drive an expeditious chapter 11 process and maximize value for the Debtors' estates. Not only have the KEIP Participants continued to fulfill the normal tasks and projects required by the

normal terms of their employment, but they have been, and will continue to be, required to expend additional time and resources on tasks relating to the Debtors' reorganization process.

19.     In order to effectively and efficiently accomplish a successful restructuring and reorganization that maximizes recovery for all stakeholders, the Debtors determined that formulating the KEIPs was in the best interest of their estates and all parties in interest.  The KEIPs will help ensure that the key executives and employees designated by the CRO, in consultation with the Special Committee, are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest.  As a general matter, the use of key employee incentive plans is common practice in chapter 11 cases.  The structure of the plans varies based on the unique circumstances of each case, but the general terms and conditions are consistent with the KEIPs proposed by the Debtors, including the conditions and proposed payment amounts set forth therein.

### Description of KERP

20.     In addition to the KEIPs, the Debtors also seek to implement the KERP for certain individual non-insider employees, in order to ensure that the Debtors do not suffer significant and costly turnover of key employees during the Debtors' restructuring efforts.  The loss of the KERP Participants (as defined below) would be detrimental to the Debtors' ongoing business operations and the Debtors' ability to effectively reorganize.  In particular, the circumstances of these Chapter 11 Cases are likely to increase employee turnover, especially in light of the challenges posed and the availability of alternatives for the Debtors' employees, many of whom are highly skilled.  As a consequence, the Debtors and their advisors have determined that a non-insider retention program for certain of the Debtors' key employees will be effective to retain those employees through the consummation of a plan of reorganization.  Incentivizing the KERP

Participants is critical in order to ensure that these key members of the Debtors' team continue in their efforts to successfully maximize value for the benefit of all of the Debtors' stakeholders.

21.    Below is a summary of the material terms of the KERP which are set forth in more detail in the plan annexed as **Exhibit A** hereto:

a.    Eligibility and Performance Objectives:

i.    The CRO, in consultation with the Special Committee, has designated thirty-two (32) non-insider employees as eligible to participate in the KERP.  All employees who are deemed eligible to participate in the KERP are defined as "**KERP Participants**".

ii.    The CRO, in consultation with the Special Committee, may designate additional eligible employees as critical to the operations and the ongoing success of the Debtors' businesses.

iii.    KERP Participants are grouped into two tiers. Each Tier 1 KERP Participant shall receive a bonus based on the CRO's view of such employee's importance to the restructuring process and to the entity by which s/he is employed, with payouts ranging from 10% to 24.2% of annual base salary.  Each Tier 2 KERP Participant will receive a bonus payout equal to 7.5% of annual base salary.

iv.    A KERP Participant shall be entitled to KERP payments only if (i) the KERP Participant participates in good faith in ongoing business operations to the satisfaction of the CRO to ensure the success of the Debtors in these Chapter 11 Cases and (ii) the KERP Participant remains employed by the Debtors through the Effective Date.

v.    If a KERP Participant voluntarily terminates his or her employment with SFX, or if a KERP Participant is terminated with cause, in each case on or before the 75th calendar day after the date on which the payment is issued, that KERP Participant must return the amount of the payment within five (5) calendar days of termination.

vi.    If any employee of the Debtors participates in one KEIP or KERP related to any business of the Debtors, that employee cannot participate in any additional KEIP or KERP related to any business of the Debtors.

b.    Performance Period:  The term "**Performance Period**" as to an individual KERP Participant shall mean the period that begins as of the Petition Date and ends as of the Effective Date.

c.    Payment Amounts:

i.    In no event shall any KERP Participant receive a KERP payment in an amount in excess of $50,000 under the KERP.

    ii. The aggregate amount of all KERP payments shall not exceed $450,000 without further order of the Court.

    iii. Individual payout awards have been determined by the CRO, in consultation with the Special Committee.

d. <u>Bonus Adjustments</u>:  To the extent that a KERP Participant is party to an executory employment agreement and is determined to be entitled to payments of incentive or retention compensation thereunder (whether in connection with payment of a cure amount or otherwise), then any KERP payment payable to such KERP Participant hereunder shall be adjusted and reduced accordingly in the discretion of the CRO.

e. <u>Payment of Awards</u>: Payments will be made within 15 days of the Effective Date.

22.     The KERP payouts are consistent with market standards.  FTI undertook to define a set of relevant market comparables to that of the Debtors.  FTI benchmarked comparable key employee retention plans from select chapter 11 cases of ten different companies which filed petitions from 2011 to 2015 with bankruptcy case durations of between two (2) months and two (2) years and with total liabilities ranging from $137 million to $784 million.  Following a review of this set of market comparables, FTI observed that the median total cost of KERPs approved for similarly situated companies was $900,863, the median number of participants was 43, average costs per participant ranged from $10,000 to $40,620 with an average cost per participant of $27,392, and payouts as a percentage of annual base salary ranged from 10.4% to 33.5% with an average payout of 24%.

23.     FTI has found the design and the cost of the proposed KERP to be within the range of market practice as compared to plans proposed and approved at similarly situated companies.  Specifically, the aggregate cost of the KERP will not exceed $450,000, which is significantly less than the $900,863 median aggregate cost of KERPs approved for similarly situated companies.  Moreover, the average cost per KERP Participant is $13,801, which is approximately 49% less than the average cost per participant for similarly situated companies reviewed by FTI and the anticipated number of KERP Participants (32) is lower than the median

number of participants in respect of plans approved for similarly situated companies (43).   In addition, KERP payouts as a percentage of the annual base salaries of the KERP Participants range from 7.5% to 24.2%, with an average payout of 11.2%.   Therefore, the proposed KERP payments are well within the range of those approved for similarly situated companies reviewed by FTI.

24.    Certain of the KERP Participants selected by the CRO hold the title of Vice President or another title which may suggest management control, but the CRO has not selected as a KERP Participant any individual that exercises management control over the Debtors.   The respective scopes of authority among the KERP Participants selected by the CRO are limited, and while their titles may reflect individual roles and functions, the same titles do not confer management authority over the Debtors.   The KERP Participants are critical employees who have the knowledge and experience to carry out the decisions of management in an efficient and effective manner, but will not be individuals who manage or control the Debtors' businesses. Thus, none of the KERP Participants will be properly considered "officers" and, as a consequence, the KERP Participants will not be "insiders" as defined in the Bankruptcy Code.

25.    The KERP Participants have been faced with significant pressure to leave the Debtors' employ during the pendency of these Chapter 11 Cases due to perceived uncertainty and concern over their job prospects.   Indeed, these Chapter 11 Cases have a necessary byproduct of creating a great deal of uncertainty for the very company personnel charged with maximizing the value of the Debtors' estates.   As a result, it is entirely appropriate to provide benefits to such key personnel in order to counterbalance the distraction that such uncertainty would engender.   Accordingly, it is critical to the Debtors' restructuring process that the Debtors retain the services of the KERP Participants throughout the duration of these Chapter 11 Cases.

13

The structure of other key employee retention plans approved by this and other courts varies based on the unique circumstances of each case but the general terms and conditions are consistent with the KERP proposed by the Debtors, including the conditions and proposed payment amounts set forth therein.

### The Debtors' Need for the Key Employee Programs

26.     The Debtors' success in these Chapter 11 Cases is dependent upon the goodwill and support of their employees.  As the Debtors develop and implement a plan of reorganization, it is imperative that the Debtors' key personnel are appropriately incentivized to maximize the value of the businesses to ensure a successful restructuring.  The Participants have been and will be called upon to expend significantly more hours during the restructuring process than contemplated by the normal terms of their employment, due to the numerous complexities involved with these Chapter 11 Cases.

27.     In order to successfully, effectively and efficiently confirm a plan that provides the most favorable recovery and value for all stakeholders, the Debtors determined that formulating the Key Employee Programs was in the best interest of their estates and all parties in interest.  The KEIPs will help ensure that key executives and employees who are essential to the Debtors' businesses are properly motivated to maximize value for the Debtors, their estates, their creditors and their stakeholders.  The KERP ensures that certain non-insider key employees, without whom the Debtors' ability to successfully exit from these Chapter 11 Cases would be adversely affected, remain with the Debtors throughout the restructuring process.

**Relief Requested**

28.     By this Motion, the Debtors request that the Court enter an order, pursuant to sections 105(a), 363(b), 503(b)(1) and 503(c) of the Bankruptcy Code, approving the implementation of the proposed Key Employee Programs.

**Basis for Relief Requested**

**A.     Implementation of the Key Employee Programs Is a Sound Exercise
of the Debtors' Business Judgment and Should Be Approved Pursuant
to Sections 105(a) and 363(b) of the Bankruptcy Code**

29.     Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a "sound business purpose" for it.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification); *In re Lionel Corp.*, 722 F. 2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 178-79 (D. Del. 1991).

30.     Once the debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

31.     The business judgment rule has vitality in chapter 11 cases and shields a debtor's management and board from judicial second-guessing.  Historically, courts have approved employee compensation programs that are outside of the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code.  *See id.*; *see also Martin*, 91 F.3d at 395; *Montgomery Ward*, 242 B.R. at 153 (affirming bankruptcy court approval of key employee retention program, stating that "[i]n determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); *In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment"); *In re Nobex Corp.*, Case No. 05-20050 (MFW), 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006) (approving incentive pay outside of ordinary course where it was "an appropriate exercise of the Debtors' business judgment").

32.     This and other courts have approved similar employee incentive and retention programs as valid exercises of business judgment.  *See, e.g.*, *In re Exide Techs.*, No. 13-11482 (KJC) (Bankr. D. Del. Aug. 15, 2013 and Sept. 17, 2013) (approving KEIP with payments based upon achieving certain EBITDA targets as well as non-insider KERP, payable upon the effective date of a plan of reorganization or after a sale); *In re Midway Games Inc.*, No. 09-10465 (KG)

(Bankr. D. Del. Apr. 23, 2009) (approving KEIP with payments tied to the achievement of certain events tied to the debtors' business plan); *In re Muzak Holdings, LLC*, No. 09-10422 (KJE) (Bankr. D. Del. Apr. 15, 2009) (authorizing KEIP with payments based in part on achieving certain EBITDAR targets); *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. D. Del. Mar. 5, 2009 and Mar. 20, 2009) (authorizing KEIP for senior leadership and executive team and non-insider KERP, with payments under both tied to the achievement of certain performance milestones); *In re Boscov's Inc.*, No. 08-11637 (KG) (Bankr. D. Del. Sept. 5, 2008) (approving senior executive incentive program tied to EBITDA targets); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. June 1, 2007 and June 28, 2007) (approving a senior and non-senior management incentive plan payable upon meeting certain EBITDA targets, submission of a business plan, filing of a plan of reorganization and disclosure statement, and confirmation of a chapter 11 plan of reorganization); *In re Werner Holding Co. (DE), Inc.*, No. 06-10578 (KJC) (Bankr. D. Del. Dec. 21, 2006 and Dec. 27, 2006) (approving KEIP providing for cash payments as rewards for achieving collective operational restructuring and personal performance goals, and a non-insider employee incentive plan tied to individual performance criteria); *In re Pliant Corp.*, No. 06-10001 (MFW) (Bankr. D. Del. Mar. 14, 2006) (approving management incentive compensation plan providing for cash awards for achievement of organizational performance goals); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Apr. 26, 2006) (approving a four-part incentive plan, including awards payable upon emergence).

33.     As set forth herein, the Debtors have articulated valid business reasons for the implementation of the Key Employee Programs.  The Debtors determined in their sound and reasonable business judgment that the implementation of the Key Employee Programs is in the best interests of the Debtors' estates, their creditors and other stakeholders.  As contemplated by

the Debtors' restructuring support agreement and the Senior Secured Superpriority Debtor-in-Possession Credit Agreement to which the Debtors are party, the Debtors must be on track to complete and obtain approval of a plan of reorganization on a very strict timeline, underscoring the need for the Debtors to have the assistance of their most critical employees during these Chapter 11 Cases.

34.    While working towards these objectives, the Participants must also minimize disruption to the Debtors' businesses so as to maintain their going-concern value and maximize the value of the Debtors' estates.  The Key Employee Programs will motivate the Participants to perform their tasks effectively, expeditiously and in a manner that will maximize the recoveries of the Debtors' estates, while only rewarding tangible results.  Moreover, the Key Employee Programs are structured to maximize value for the Debtors' estates and creditors by, in the KEIPs, incentivizing the Debtors' key executives to achieve the greatest levels of efficiency and productivity throughout the restructuring process, and in the KERP, incentivizing those employees crucial to the process to remain with the Debtors.  Additionally, as set forth above, payment levels under the Key Employee Programs are reasonable and were determined based on a thorough analysis of benchmarks performed by the FTI.  Accordingly, the Debtors believe that valid business reasons exist for the implementation of the Key Employee Programs and, thus, that their implementation should be approved.

**B.     The Key Employee Incentive Plans Are Incentivizing and Thus Are Not Governed by Bankruptcy Code Sections 503(c)(1) and 503(c)(2)**

35.    Section 503(c) of the Bankruptcy Code provides criteria for courts to use in approving certain types of payments to insiders and "other transfers or obligations that are outside the ordinary course of business."  Section 503(c) comprises three subsections: (1) a general prohibition against retention plans for insiders; (2) limitations on severance payments;

and (3) standards governing other transfers to certain employees and consultants, among others, that are outside of the ordinary course.

36.    Under the statute's plain language, section 503(c)(1) pertains solely to retention plans of insiders, and section 503(c)(2) addresses only the requirements for severance plans, and neither provision applies to performance-based incentive plans.  *See*, *e.g.*, *Global Home*, 369 B.R. at 783 ("If [the proposed plans] are plans to incentivize management, the analysis utilizes the more liberal business judgment review under [section] 363"); *In re Nobex Corp.*, Case No. 05-20050 (Walrath, J.), Jan. 12, 2006, Hr'g Tr. at 67 (Bankr. D. Del. 2006); *In re Calpine Corp.*, Case No. 05-60200, Apr. 26, 2006, Hr'g Tr. at 84-85 (Bankr. S.D.N.Y. 2006) (Lifland, J.). Indeed, one court held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of chapter 11 case.  As one treatise points out, the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under section 503(b)(1)(A).

*In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006).   For the reasons set forth below, neither section 503(c)(1) nor section 503(c)(2) are implicated by the KEIPs.

37.    The KEIPs are not structured to provide bonuses for retention.  Instead, the KEIPs are comprised of only targeted incentive payments to KEIP Participants who play critical roles in the Debtors' operations, the outcome of these Chapter 11 Cases and the achievement of certain metrics during the restructuring and reorganization process.  Payment of a bonus is based upon the successful achievement of the performance objectives designed by the CRO, in consultation with the Special Committee, which are designed to maximize value for the Debtors' estates.  The

KEIPs are therefore properly characterized as performance-based, goal-oriented incentive plans, not a retention plan for insiders subject to the requirements of section 503(c)(1) of the Bankruptcy Code.

38.     Although certain KEIP Participants may be deemed "insiders" within the meaning of the Bankruptcy Code, the KEIPs have been crafted with great care to ensure that it directly incentivizes all KEIP Participants to meet certain performance objectives.  Even if the KEIPs have the indirect effect of reducing the Debtors' attrition rate among those employees covered by the KEIPs, this does not convert the KEIPs to a "retention" plan.  All successful performance-based incentive plans accompany the byproduct of incentivizing eligible employees to remain with the debtor.  Thus, while the Debtors acknowledge that one benefit of the KEIPs may be a reduced attrition rate, this does not convert the KEIPs to a "retention" plan, nor does it detract from the primary purpose of the KEIPs, which is to motivate the Participants to meet certain performance criteria.

39.     Accordingly, the KEIPs exist to incentivize and reward the KEIP Participants for their extraordinary efforts that will be needed for the successful achievement of the performance objectives thereunder and, ultimately, the Debtors' reorganization.   Courts within this jurisdiction have approved similar management incentive plans.  *See*, *e.g.*, *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Dec. 1, 2015); *In re Allied Nevada Gold Corp.*, Case No. 15-10503 (MFW) (Bankr. D. Del. Aug. 19, 2015); *In re Exide Techs.*, No. 13-11482 (KJC) (Bankr. D. Del. Sept. 17, 2013); *In re Buffets Restaurants Holdings, Inc.*, Case No. 12-10237 (MFW) (Bankr. D. Del. Mar. 15, 2012); *In re Midway Games Inc.*, No. 09-10465 (KG) (Bankr. D. Del. Apr. 22, 2009); *In re Muzak Holdings, LLC*, No. 09-10422 (KJE) (Bankr. D. Del. Apr. 15, 2009); *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. D. Del. Mar. 5, 2009 and

Mar. 20, 2009); *In re Boscov's Inc.*, No. 08-11637 (KG) (Bankr. D. Del. Sept. 5, 2008); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. June 28, 2007); *In re Werner Holding Co. (DE), Inc.*, No. 06-10578 (KJC) (Bankr. D. Del. Dec. 27, 2006); *In re Pliant Corp.*, No. 06-10001 (MFW) (Bankr. D. Del. Mar. 14, 2006).

40.      Further, the KEIPs also do not constitute severance for insiders subject to the provisions of Bankruptcy Code section 503(c)(2), because the payment of bonuses thereunder occurs after performance goals are reached, not upon termination of the KEIP Participants' employment with the Debtors.     *See* 11 U.S.C. § 503(c)(2).     Therefore, the KEIPs are management incentive plans, not a severance plan for insiders subject to the requirements of Bankruptcy Code section 503(c)(2).

41.      The dedication of the KEIP Participants remains critical if the Debtors' restructuring is to be conducted successfully, in an expeditious fashion that brings maximum recovery for the Debtors' estates.     The Debtors submit that the KEIPs will be a critical component of the Debtors' success in these Chapter 11 Cases and are necessary to motivate the KEIP Participants to contribute the many additional hours needed to successfully reorganize.

**C.      The Key Employee Retention Plan Does Not Provide for Payments to Insiders and Thus Is Not Governed by Bankruptcy Code Sections 503(c)(1) and 503(c)(2)**

42.      Neither section 503(c)(1) nor section 503(c)(2) of the Bankruptcy Code are applicable to evaluating the KERP.  By the statute's plain language, sections 503(c)(1) and (2) of the Bankruptcy Code pertain solely to retention and severance plans for insiders.  None of the Participants selected by the CRO to participate in the KERP is an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code, as none of the KERP Participants will be a director, officer, person in control, or general partner of any Debtor.  *See* 11 U.S.C. § 101(31).

21

43.    In particular, although certain of the KERP Participants selected by the CRO hold a title higher of Vice President and certain others hold titles that could suggest a position of management control, none of the KERP Participants exercises management control over the Debtors.  *See 455 CPW Assocs. v. Greater N.Y. Sav. Bank* (*In re 455 CPW Assocs.*), 225 F.3d 645, No. 99-5068, 2000 WL 1340569 (2d Cir. Sept. 14, 2000) (affirming a bankruptcy court's holding that a vice president of a limited partnership that was a limited partner of the debtor was not an insider because he was not "in control"); *NMI Sys. Inc. v. Pillard* (*In re NMI Sys. Inc.*), 179 B.R. 357, 368 (Bankr. D.D.C. 1995) (concluding that a "vice president" was not an "officer" or a "person in control" within the meaning of insider in the Bankruptcy Code because the employee was not in a position to influence corporate policy); *cf. Gold v. Sloan*, 486 F.2d 340, 350 (4th Cir. 1973) (concluding, in the context of section 16(b) Securities Exchange Act of 1934 lawsuit, that an officer's title was "merely titular" because such officer was a member of lower level management and did not have access to or could not avail himself of insider information); *C.R.A. Realty Corp. v. Crotty*, 878 F.2d 562, 566 (2d Cir. 1989) (concluding that a vice president was not an "officer" within the meaning of section 16(b) of the Securities Exchange Act of 1934 because, among other things, the officer did not have access to inside information).

44.    The respective scopes of authority among the KERP Participants are limited, and while their titles reflect individual roles and functions, the same titles do not confer officer status upon the KERP Participants.  The KERP Participants are critical employees who have the knowledge and experience to carry out the decisions of management in an efficient and effective manner, but they will not be individuals with management control over the Debtors.  As a consequence, the KERP Participants will not be "insiders" as defined in the Bankruptcy Code, and accordingly sections 503(c)(1) and (c)(2) do not apply in this case.

**D.     The Key Employee Programs Are Justified
Under the Facts and Circumstances Under Section 503(c)(3)**

45.     Finally, the Key Employee Programs also satisfy the standard set forth in Bankruptcy Code section 503(c)(3).  To the extent that distributions under the Key Employee Programs are payments "outside the ordinary course of business," they should be evaluated under section 503(c)(3).  *See, e.g.*, *In re Nobex Corp.*, Case No. 05-20050 (Walrath, J.), Jan. 12, 2006, Hr'g Tr. at 86; *Dana*, 358 B.R. at 576; *In re Werner Holding Co. (DE). Inc.*, Case No. 06-10578 (KJC) (Bankr. D. Del. July 28, 2006, Aug. 22, 2006, and Dec. 27, 2006) (ordering various relief requested in connection with debtor's incentive bonus plans pursuant to sections 363(b) and 503(c) of the Bankruptcy Code).

46.     Section 503(c)(3) of the Bankruptcy Code states, in relevant part, that "there shall be neither allowed nor paid . . . other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case . . . ." 11 U.S.C. § 503(c)(3).  Since courts have begun to analyze various payments under section 503(c)(3), they have been unanimous in holding that they must use the "business judgment" standard as the proper standard for determining whether incentive programs and the payments thereunder are justified.  *See*, *e.g.*, *In re Werner Holding Co. (DE).  Inc.*, Case No. 06-10578 (KJC) (Bankr. D. Del. July 28, 2006, Aug. 22, 2006, and Dec. 27, 2006); *In re Nobex Corp.*, Case No. 05-20050 (MFW) (Bankr. D. Del. Dec. 21, 2005 and May 15, 2006); *In re Riverstone Networks. Inc.*, Case No. 06-10110 (CSS) (Bankr. D. Del. Mar. 28, 2006); *In re Pliant Corp.*, Case No. 06-10001 (MFW) (Bankr. D. Del. Mar. 14, 2006).

47.     In *Nobex*, this Court stated:

> So I do read (c)(3) to be the catch-all and the standard under (c)(3)
> for any transfers or obligations made outside the ordinary course of
> business are those that are justified by the facts and circumstances

23

> of the case.  Nothing more – no further guidance provided to the
> Court by Congress, I find it quite frankly nothing more than a
> reiteration of the standard under 363 . . . under which courts had
> previously authorized transfers outside the ordinary course of
> business and that is, based on the business judgment [sic] of the
> debtor, the court always considered the facts and circumstances of
> the case to determine whether it was justified.

*In re Nobex Corp.*, Case No. 05-20050 (Walrath, J.), Jan. 12, 2006, Hr'g Tr. at 86-87 (Bankr. D. Del. 2006).  *See also Dana*, 358 B.R. at 584 (agreeing that management incentive programs should be evaluated under the business judgment standard).

48.    In assessing a debtor's business judgment regarding the implementation of incentive programs, this Court has set forth factors to be considered for guidance to evaluate a proposed incentive or retention program under Bankruptcy Code section 503(c)(3).[4]

49.    Courts balance the foregoing factors, and a debtor need not satisfy every factor to demonstrate that its proposed compensation structure should be approved under section 503(c)(3).  *See Global Home*, 369 B.R. at 786 (holding that performance-based compensation structure was a proper exercise of business judgment, even though, for instance, the debtors did not use a benefits consultant to structure the program).  These factors weigh in favor of approval of the Key Employee Programs, and the Key Employee Programs represent a reasonable exercise of the Debtors' business judgment, for the following reasons:

    a.    The Key Employee Programs Are Reasonably
          Calculated to Maximize Recovery to the Estates

---

[4] The factors include: (a) whether there is a reasonable relationship between the plan proposed and the results to be obtained; (b) whether the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential; (c) whether the scope of the plan is fair and reasonable, applies to all employees, discriminates unfairly; (d) whether the plan or proposal is consistent with industry standards; (e) whether the debtor put forth sufficient due diligence efforts in formulating the plan; and (f) whether the debtor received sufficient independent counsel in performing any due diligence and formulating the plan.  *Global Home*, 369 B.R. at 786 (citing *Dana*, 358 B.R. at 576).

50.    The Key Employee Programs are reasonably calculated to achieve the desired result of maximizing recovery to the Debtors' estates by incentivizing the Participants to engage in activities that go beyond even the increased duties in normal bankruptcy cases.  The Debtors and FTI designed and refined the Key Employee Programs to (i) motivate and reward KEIP Participants for their significant efforts and the increased demands placed upon them in connection with these Chapter 11 Cases; (ii) ensure that the KERP Participants, whose specific skills and focused attention the Debtors require during these Chapter 11 Cases, remain with the Debtors; and (iii) maximize the value of the Debtors' estates.  The Key Employee Programs are predicated upon certain metrics that create a reasonable set of thresholds for payment of a bonus that are well within the Debtors' sound business judgment and more than amply justified by the facts and circumstances of these Chapter 11 Cases.

51.    The Key Employee Programs are designed to allocate bonuses to those employees who are in the best position to ensure the Debtors' successful reorganization, thereby maximizing value for the Debtors' estates.  The Participants are the only people with the requisite knowledge and experience to ensure the best possible restructuring outcome for the Debtors' estates.  With special knowledge of the Debtors' business models and capabilities, understanding of the Debtors' finances, and relationships with the various players in the Debtors' business networks, the Participants are able to communicate with and provide comfort to the Debtors' creditors and other constituents, enhancing the Debtors' ability to operate efficiently and effectively, and allowing the Debtors and their professionals to focus on the Debtors' successful reorganization.  Replacements for the Participants would require extensive training in both technical and commercial terms.  Attrition of the Participants would adversely affect the Debtors' business to the detriment of the Debtors' creditors.

52.     The Debtors have also been impacted by the recent departure of certain employees.   As a result, the remaining employees have been asked to assume additional responsibilities, for which their prepetition compensation did not account.   In light of the increased workload being borne by the Participants and the significant risk to the value of the Debtors' estates as a whole without the participation of the Participants, the Debtors believe the bonuses are reasonably proportionate as compared to prepetition compensation, and when compared to incentive and retention plans approved in this Court.   *See*, *e.g.*, *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Dec. 1, 2015) (authorizing incentive payments not to exceed an aggregate of $1,470,000 and non-insider employee pool in the amount of $859,556); *In re Allied Nevada Gold Corp.*, Case No. 15-10503 (MFW) (Bankr. D. Del. Aug. 19, 2015) (authorizing KEIP payments up to a maximum aggregate amount of $540,000, and total anticipated KERP payments up to a maximum aggregate amount of $682,276); *In re Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 6, 2014) (authorizing KEIP payments up to a maximum aggregate amount of $1,700,000, and KERP payments up to a maxi mum aggregate amount of $800,000); *In re Brookstone Holdings Corp.*, Case No. 14-10752 (BLS) (Bankr. D. Del. May 12, 2014) (authorizing incentive payments based on multiple metrics, estimated to be approximately $850,000 and KERP payments ranging from 17% to 50% of base salary and not to exceed an aggregate of $1,282,429); *In re Exide Techs.*, Case No. 13-11482 (KJC) (Bankr. D. Del. Aug. 15, 2013 and Sept. 17, 2013) (authorizing KEIP payments up to a maximum aggregate amount of $6.6 million, and total anticipated KERP payments up to a maximum aggregate amount of approximately $2 million); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (authorizing incentive payments not to exceed an aggregate of $2,200,000 and total anticipated KERP payments in the amount of $540,000); *In*

*re Buffets Restaurants Holdings, Inc.*, Case No. 12-10237 (MFW) (Bankr. D. Del. Mar. 15, 2012) (authorizing KEIP payments in a total aggregate bonus amount of $2,302,607); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 20, 2009) (authorizing incentive payments ranging from 20% to 183% of base salary and KERP with an aggregate payout not to exceed $12,400,000).

53.     Here, the Key Employee Programs fall within the range of, and are reasonably proportionate to, incentive and retention plans approved in this Court.  Accordingly, the Debtors submit that the Key Employee Programs are reasonably calculated to achieve the desired and actual result of maximum recovery for the Debtors' businesses.

b.     Award Amounts Are Reasonable

54.     Beyond being reasonably calculated to achieve the desired performance, the Key Employee Programs are also reasonable in amount because they significantly improve the estates' chances of recovering value and involve a small cost relative to the potential benefit to be realized by the Debtors upon the occurrence of goals set forth in the Key Employee Programs. *See*, *e.g.*, Hr'g Tr., at 261:13-24, May 7, 2007, *In re New Century TRS Holdings Inc.*, Case No. 07-10416 (Carey, J.) (Bankr. D. Del. 2007) ("[T]he total amount to be paid is about $3.3 million . . . . But this amount is a fraction of the total value to be achieved and preserved by this Estate, and it's a small fraction.  So it seems to me that in the Debtor's business judgment, if it spends this amount of money, it can preserve literally tens of millions of dollars, or potentially more, worth the value for the Estate, it seems to me to be a very small amount of money well spent."); *see also In re Nortel Networks Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 20, 2009) (authorizing payment of incentive awards to senior managers with a certain percentage of the award vesting upon the achievement of each financial milestone).  Accordingly, the facts and

circumstances of these Chapter 11 Cases justify approval of the Key Employee Programs and the Debtors' reasonable business judgment thereon.

c.     The Key Employee Programs Are Reasonable in Scope and Do Not Discriminate Unfairly

55.     As mentioned above, the Key Employee Programs are narrowly tailored to incentivize only those employees that the CRO, in consultation with the Special Committee, believes will be significantly involved in achieving the performance goals set forth therein and who are essential to the Debtors' restructuring efforts.  The bonuses thereunder will be allocated according to the ability of such Participants to positively influence the outcome of the Debtors' restructuring efforts and contribute to the gain ultimately realized.  Courts frequently approve incentive awards and retention bonuses to a number of key senior managers or key employees in the context of a reorganization and restructuring process, which serves as the basis for the Key Employee Programs. *See, e.g.*, *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Dec. 1, 2015) (authorizing bonuses to three (3) key executive and fourteen (14) non-insider employees);  *In re Allied Nevada Gold Corp.*, Case No. 15-10503 (MFW) (Bankr. D. Del. Aug. 19, 2015) (authorizing bonuses for four (4) executive employees and fifty-one (51) non-insider employees); *In re Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 6, 2014) (authorizing transaction bonuses for four (4) executive employees and twenty-eight (28) non-insider employees); *In re Autoseis, Inc.*, Case No. 14-20130 (RSS) (Bankr. S.D.Tex. June 5, 2014 and Oct. 15, 2014) (authorizing bonuses for five (5) senior managers and forty-three (43) non-insider employees); *In re Exide Techs.*, Case No. 13-11482 (KJC) (Bankr. D. Del. Aug. 15, 2013 and Sept. 17, 2013) (authorizing bonuses for fifty-five (55) executives and fifty-one (51) non-insider employees); *In re Velo Holdings Inc.*, Case No. 12-11384 (MG) (Bankr. S.D.N.Y. June 6, 2012) (authorizing incentive bonuses for five (5) executive employees and fifty-eight

28

(58) non-insider employees); *In re Buffets Restaurants Holdings, Inc.*, Case No. 12-10237 (MFW) (Bankr. D. Del. Mar. 15, 2012) (authorizing bonuses to sixteen (16) executive employees); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 20, 2009) (authorizing bonuses for ninety-two (92) senior executives and eight-hundred and eighty (880) non-insider employees).  Here, the Key Employee Programs fall within the range of, and are reasonably proportionate to, incentive and retention plans approved in this Court.  In this case, the Key Employee Programs do not discriminate unfairly, as they are designed to compensate those employees that the Debtors believe can and will add distinct value to the Debtors' restructuring efforts based on their unique industry knowledge, experience, technical expertise and position within the Debtors' retained businesses.

56.    The Debtors' restructuring and reorganization process will require the talent, focus and energy of the Participants, who will ensure that creditors and other constituents recognize the retained value in the Debtors' core businesses.  It is extremely unlikely that any other party, including the Debtors' professionals, could provide similarly credible comfort. Accordingly, the Debtors submit that the Key Employee Programs are fair and reasonable and will not discriminate unfairly.

        d.     The Bonuses Comport with Incentives
              Provided in Recent Comparable Cases

57.    The structure, scope and amounts of the bonuses contemplated by the Key Employee Programs are consistent with other performance-based bonuses approved by this Court.  *See*, *e.g.*, *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Dec. 1, 2015) (approving incentive and retention programs for key employees upon successful reorganization or sale); *In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014) (approving incentive program for key employees upon sale or recapitalization); *In re Exide*

*Techs.*, No. 13-11482 (KJC) (Bankr. D. Del. Aug. 15, 2013 and Sept. 17, 2013) (approving incentive and retention programs for key employees upon sale or recapitalization); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (approving incentive and retention programs for key employees upon sale or recapitalization of debtor's business); *In re Buffets Restaurants Holdings, Inc.*, Case No. 12-10237 (MFW) (Bankr. D. Del. Mar. 15, 2012) (authorizing incentive program for key employees upon achievement of specific milestones related to the debtors' overall financial and operations performance, including exit from chapter 11 on or before a target date); *In re Solyndra LLC,* Case No. 11-12799 (MFW) (Bankr. D. Del. Feb. 23, 2012); (authorizing multi-tier incentive program where bonuses vested upon sale of debtor's assets and/or consummation of a plan of reorganization); *In re SSI Grp. Holding Corp.¸* Case No. 11-12917 (MFW) (Bankr. D. Del. Oct. 26, 2011) (approving incentive payments to employees based on result of sale transaction or confirmation of a plan of reorganization); *In re Midway Games Inc.*, No. 09-10465 (KG) (Bankr. D. Del. Apr. 23, 2009) (approving executive KEIP with payments tied to the achievement of certain milestones in the debtors' business plan); *In re Muzak Holdings, LLC*, No. 09-10422 (KJE) (Bankr. D. Del. Apr. 15, 2009) (authorizing executive KEIP with payments based in part on achieving certain EBITDAR targets); *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. D. Del. Mar. 5, 2009 and Mar. 20, 2009) (authorizing KEIP for senior leadership and executive team and non-insider KERP, with payments under both tied to the achievement of certain performance milestones); *In re Boscov's Inc.*, No. 08-11637 (KG) (Bankr. D. Del. Sept. 5, 2008) (approving senior executive incentive program tied to EBITDA targets); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. June 1, 2007 and June 28, 2007) (approving a senior and non-senior management incentive plan payable upon meeting certain EBITDA targets, submission of a business plan, filing of a

plan of reorganization and disclosure statement, and confirmation of a chapter 11 plan of reorganization); *In re Werner Holding Co. (DE), Inc.*, No. 06-10578 (KJC) (Bankr. D. Del. Dec. 21, 2006 and Dec. 27, 2006) (approving executive employee KEIP providing for cash payments as rewards for achieving collective operational restructuring and personal performance goals, and a non-insider employee incentive plan tied to individual performance criteria); *In re Pliant Corp.*, No. 06-10001 (MFW) (Bankr. D. Del. Mar. 14, 2006) (approving management incentive compensation plan providing for cash awards for achievement of organizational performance goals).

> e.    Debtors' Diligence and Assistance of Professionals
>        In Structuring Key Employee Programs

58.    The Key Employee Programs reflect reasonable incentive payments that will compensate the Participants for realizing maximum recoveries for the Debtors' estates.  The Key Employee Programs were principally designed by the Debtors and FTI.   The CRO, in consultation with the Special Committee, conducted due diligence on the Debtors' employee roster and will compensate only those employees that are absolutely essential to the Debtors' restructuring efforts.  FTI has reviewed key employee incentive and retention plans proposed by chapter 11 debtors in this district, and the Key Employee Programs, while generally comporting with such performance-based incentive and retention plans, are structured to also address the particular circumstances of these Chapter 11 Cases.

59.    The Key Employee Programs and bonuses contemplated thereunder are appropriate under the facts and circumstances of these Chapter 11 Cases and the Key Employee Programs satisfy the applicable standards.   The Key Employee Programs are calibrated to achieve the desired performance.  The proposed bonus structure is fair and reasonable in scope

and payments made thereunder are proportionate to the benefits realized by the Debtors upon the occurrence of the performance goals set forth in the Key Employee Programs.

60.    As outlined above, the Key Employee Programs are structured to maximize recoveries for the Debtors' estates.  Indeed, the bonuses under the Key Employee Programs are all related to any financial and other milestones being realized by the Debtors during these Chapter 11 Cases.  Through the implementation of the Key Employee Programs, the interests and motivations of Participants will be aligned with the motivations of the Debtors and their creditors and other stakeholders.  Providing incentives to encourage the Participants to focus on the Debtors' objectives and to motivate them to provide optimal levels of performance beyond their normal duties is necessary for the success of the Debtors' restructuring efforts and, ultimately, the Debtors' success in these Chapter 11 Cases.

61.    In addition, the overall cost of the Key Employee Programs is reasonable, particularly in light of the additional work beyond the duties placed on employees in normal bankruptcy cases and the extraordinary speed at which the Participants are demanded to perform those additional duties.  Given the various complex issues in these Chapter 11 Cases and the accelerated timeline under which the Debtors must propose and confirm a plan of reorganization, it is critical to the Debtors' restructuring and the value of their estates that the Participants remain in the Debtors' employ.  Accordingly, the Debtors submit that the Key Employee Programs constitute a reasonable exercise of the Debtors' sound business judgment and should be approved, as the Key Employee Programs are in the best interests of the Debtors' estates, their creditors and other stakeholders.

**The Court Should Waive the Stay Under Bankruptcy Rule 6004(h)**

62.     To implement the relief requested herein as soon as possible, the Debtors request a waiver of the 14-day stay of an order authorizing, *inter alia*, the use of the Debtors' property under Bankruptcy Rule 6004(h).  The Debtors view the Key Employee Programs as critical to the morale of their workforce and accordingly view the relief sought herein as exigent in nature. Therefore, the Debtors submit that immediate relief is justified under the circumstances.

**Notice**

63.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the DIP Lenders; (c) the Committee; (d) those parties requesting notice pursuant to Bankruptcy Rule 2002; (e) the Office of the United States Attorney General for the District of Delaware;  (f) the  Internal  Revenue  Service;  and  (g) the  Securities  and  Exchange Commission.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

64.     No prior request for the relief sought in this Motion has been made to this or any other court.

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form attached hereto as **Exhibit B** granting the relief sought requested herein and such other and further relief as is just.

Dated: March 17, 2016

**GREENBERG TRAURIG, LLP**

By: */s/ Dennis A. Meloro*
Dennis A. Meloro (DE Bar No. 4435)
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: melorod@gtlaw.com

-and-

Nancy A. Mitchell (admitted *pro hac vice*)
Maria J. DiConza (admitted *pro hac vice*)
Nathan A. Haynes (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mitchelln@gtlaw.com
          diconzam@gtlaw.com
          haynesn@gtlaw.com

*Counsel for the Debtors and*
*Debtors-in-Possession*