**Exhibit A**

**Key Employee Incentive Plan and Retention Plan**

SFX ENTERTAINMENT, INC.

KEY EMPLOYEE INCENTIVE PLANS AND RETENTION PLAN WITH RESPECT TO RETAINED BUSINESSES

SECTION 1. PURPOSE

The purposes of the Key Employee Incentive Plan and Retention Plan (collectively, the "**Plan**") of SFX Entertainment, Inc. and its subsidiaries (the "**Company**") are (a) to provide selected key employees of the Company's Retained Businesses (as defined below) with certain payments upon the achievement of certain important business objectives as determined by the CRO (as defined below) during the pendency of the chapter 11 cases filed by the Debtors (as defined below) and (b) to provide selected key non-insider employees of the Retained Businesses with retention payments, in the sole discretion of the CRO. The awards payable under the Plan are intended to provide an incentive to ensure the continued, collective efforts of the participating key employees.

SECTION 2. DEFINITIONS

For the purposes of this Plan, the following terms shall have the meanings indicated, unless the context clearly indicates otherwise:

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Cause**" shall exist where, in the CRO's sole reasonable discretion, the CRO determines that (i) the Participant has been insubordinate or refused or failed to carry out the instructions of the CRO or the Special Committee; (ii) the Participant (as defined below) has engaged in misconduct or negligence in performing the Participant's duties and responsibilities; (iii) the Participant has engaged in conduct which is dishonest, criminal, fraudulent, or otherwise involves moral turpitude, or which is materially injurious to the Company; and/or (iv) the Participant has engaged in activity prohibited by any other agreement between Participant and the Company. For the avoidance of doubt, this definition of Cause shall apply only to this Plan and shall have no effect on any other agreement, plan or policy of the Company that may apply to the Participant and the definition of "cause" contained in such agreement, plan or policy shall control.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**CRO**" means Michael Katzenstein.

"**Debtors**" means the Company and its affiliates who have filed voluntary petitions for relief under the Bankruptcy Code and whose cases are jointly administered with that of the Company.

"**DIP Budget**" shall mean the budget as set forth in the Debtors' debtor-in-possession financing facility, as approved by the Bankruptcy Court on March 8, 2016 [Docket No. 203].

"**Disability**" shall have the meaning as provided under Section 409A of the Code.

"**Corporate Leadership**" shall have the meaning specified in **Section 4.4**.

"**CNA**" shall have the meaning specified in **Section 4.1**.

"**CNA KEIP**" shall have the meaning specified in **Section 4.1**.

"**CNA KEIP Participants**" shall have the meaning specified in **Section 4.1**.

"**CNA KEIP Payment**" shall have the meaning specified in **Section 4.4**.

"**CNA KEIP Performance Metrics**" shall have the meaning specified in **Section 4.4**.

"**CNA KEIP Performance Objectives**" shall have the meaning specified in **Section 4.2**.

"**CNA KEIP Performance Period**" shall have the meaning specified in **Section 4.3**.

"**Effective Date**" shall have the meaning specified in **Section 4.4**.

"**KERP**" shall have the meaning specified in **Section 6.1**.

"**KERP Participants**" shall have the meaning specified in **Section 6.1**.

"**KERP Payment**" shall have the meaning specified in **Section 6.4**.

"**KERP Performance Objectives**" shall have the meaning specified in **Section 6.2**.

"**KERP Performance Period**" shall have the meaning specified in **Section 6.3**.

"**NA Live**" shall have the meaning specified in **Section 4.4**.

"**NA Live and Operating Company Leadership**" shall have the meaning specified in **Section 4.4**.

"**Participant**" and "**Participants**" shall have the meaning specified in **Section 6.1**.

"**Petition Date**" means February 1, 2016.

"**React**" shall have the meaning specified in **Section 5.1**.

"**React KEIP**" shall have the meaning specified in **Section 5.1**.

"**React KEIP Participants**" shall have the meaning specified in **Section 5.1**.

"**React KEIP Payment**" shall have the meaning specified in **Section 5.4**.

"**React KEIP Performance Metric**" shall have the meaning specified in **Section 5.4**.

"**React KEIP Performance Objectives**" shall have the meaning specified in **Section 5.2**.

"**React KEIP Performance Period**" shall have the meaning specified in **Section 5.3**.

"**Retained Businesses**" means the Debtors' corporate and North American retained businesses.

"**SG&A**" shall have the meaning specified in **Section 4.4**.

"**Special Committee**" means the Special Committee of the Board of Directors of SFX Entertainment, Inc., consisting of independent directors John Miller, Michael Meyer, Tim Bishop and Chip Barnes, formed by the Board of Directors of the Company on January 31, 2016 by unanimous consent.

### SECTION 3. ADMINISTRATION

The CRO, in consultation with the Special Committee, shall have the exclusive right, power and authority, in his sole, full and absolute discretion, to interpret any and all of the provisions of the Plan, to supervise the administration and operation of the Plan, to consider and decide conclusively any questions (whether of fact or otherwise) arising in connection with the administration of the Plan or any claim for benefits arising under the Plan, to correct any defect or omission or reconcile any inconsistency in the Plan or any payment to be made hereunder, and to make any other determinations that he believes necessary or advisable in the administration of the Plan. Any decision or action of the CRO shall be conclusive and binding on all Participants. The CRO may elect to delegate some or all of his administrative responsibilities under the Plan to such person(s) or entities as he shall determine in his sole and absolute discretion. Notwithstanding the foregoing, nothing in this Plan shall be deemed to vary the terms of any order of the Bankruptcy Court approving the Plan.

### SECTION 4. PAYMENT OF CNA INCENTIVE BONUSES

4.1   In General. The Debtors' corporate and retained North American businesses, exclusive of SFX-React Operating LLC, are defined as the "**CNA**" businesses. The CRO may, in his discretion and in consultation with the Special Committee, designate officers and employees of such CNA businesses as eligible to participate in the KEIP applicable only to CNAs (the "**CNA KEIP**"). All employees who are deemed eligible to participate in the CNA KEIP are defined as "**CNA KEIP Participants**." The CRO may, in his discretion and in consultation with the Special Committee, establish performance milestones such that a CNA KEIP Payment (as defined below) may only be earned upon achievement of a minimum level of such metrics and milestones.

4.2   CNA KEIP Performance Objectives. A CNA KEIP Participant shall be entitled to a CNA KEIP Payment only in the event that (i) such CNA KEIP Participant participates in good faith to achieve certain important business objectives to maximize value for the Debtors' estates, (ii) a CNA KEIP Participant remains employed at the time of payment, and (iii) the CNA KEIP

3

Participant meets certain performance thresholds and milestones, as more fully set forth below ((i) through (iii) together, the "**CNA KEIP Performance Objectives**").

4.3    CNA KEIP Performance Period.  The term "**CNA KEIP Performance Period**" as to an individual CNA KEIP Participant shall mean the period that begins on the Petition Date and ends as of the Effective Date.

4.4    Calculation of Earned Payment Amount.  The incentive bonus amount for each CNA KEIP Participant (the "**CNA KEIP Payment**") shall be determined on an individual basis by the CRO, in his sole discretion, and only to the extent such CNA KEIP Participant has met the CNA KEIP Performance Objectives during the CNA KEIP Performance Period.  The performance metrics and milestones used to determine CNA KEIP Payments, as well as the relative weight of each metric and milestone, are as set forth below (collectively, the "**CNA KEIP Performance Metrics**")[1]:

- Operating Margin:

    (i)    NA Live and Operating Company Leadership (50%):  For CNA KEIP Participants who are employed by a Debtor operating company or with a leadership role in North American live ("**NA Live**") operations (collectively, "**NA Live and Operating Company Leadership**"), the minimum threshold performance level is 75% of the event-level operating company or NA Live budgeted cumulative operating margin, as applicable.  The maximum performance level is 125% of the applicable budgeted operating margin.

    (ii)    Corporate Leadership (10%):  For CNA KEIP Participants who are employed by SFX Entertainment, Inc. ("**Corporate Leadership**"), the minimum threshold performance level is 75% of North American budgeted cumulative operating margin.  The target performance level is 100% of the North American budgeted operating margin.  The maximum performance level is 125% of the North American budgeted operating margin.

- Ticket and Sponsorship Sales:

    (i)    NA Live and Operating Company Leadership (35%):

        1)    Ticket Sales (26.25%):  The minimum threshold performance level is 75% of the budgeted ticket sales as of the Effective Date.  The target performance level is 100% of the budgeted ticket sales amount.  The maximum performance level is 125% of the budgeted ticket sales amount.

---

[1] As used in this **Section 4.4**, the term "budget" means the approved operating budget for the respective event-level operating company or for NA Live operations, as applicable and as designated by the CRO.

4

        2)    <u>Sponsorship Commitments</u> (8.75%): The minimum threshold performance level is 75% of the budgeted sponsorship commitment amount. The target performance level is 100% of the budgeted sponsorship commitment amount. The maximum performance level is 125% of the budgeted sponsorship commitment amount.

    (ii)    <u>Corporate Leadership</u> (5%):

        1)    <u>Ticket Sales</u> (3.75%): The minimum threshold performance level is 75% of the budgeted ticket sales as of the Effective Date. The target performance level is 100% of the budgeted ticket sales amount. The maximum performance level is 125% of the budgeted ticket sales amount.

        2)    <u>Sponsorship Commitments</u> (1.25%): The minimum threshold performance level is 75% of the budgeted sponsorship commitment amount. The target performance level is 100% of the budgeted sponsorship commitment amount. The maximum performance level is 125% of the budgeted sponsorship commitment amount.

- <u>SG&A Performance</u>:

    (i)    <u>NA Live and Operating Company Leadership</u> (15%): The minimum threshold performance level is 110% of the budgeted selling, general and administrative expense, as provided for in the applicable cost reduction plan and measured on a pro forma annualized basis (the "**SG&A**"). The target performance level is 100% of the budgeted SG&A. The maximum performance level is 75% of the budgeted SG&A.

    (ii)    <u>Corporate Leadership</u> (65%): The minimum threshold performance level is 110% of the budgeted SG&A. The target performance level is 100% of the budgeted SG&A. The maximum performance level is 75% of the budgeted SG&A.

- <u>Emergence from Chapter 11</u> (20%): The effective date of a chapter 11 plan of reorganization approved by the Bankruptcy Court (the "**Effective Date**"). This metric is applicable only to Corporate Leadership.

- <u>Adherence to Event-Level Cost Budgets</u>: This CNA KEIP Performance Metric is based on adherence to event-level cost budgets. Measurement of performance under this metric is at the discretion of the CRO, and is applicable only to NA Live and Operating Company Leadership.

5

- <u>Assistance with Sales Processes</u>:  CNA KEIP Participants may be required to provide assistance with the sale of any or all of the assets of the Company.  Measurement of performance under this metric is at the discretion of the CRO.

Performance and payout levels in connection with the metrics set forth above shall be determined and may be summarized as follows:

| | NA Live and Operating Company Leadership | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Levels** | | | **Payout Levels*** | | |
| | <u>Threshold</u> | <u>Target</u> | <u>Maximum</u> | <u>Threshold</u> | <u>Target</u> | <u>Maximum</u> |
| **Operating Margin** (50%) | 75% | 100% | 125% | 20% – 24% | 50% – 60% | 66.7% – 80% |
| **Ticket and Sponsorship Sales** (35%) <br> • **Ticket Sales** (26.25%) <br> • **Sponsorship Commitments** (8.75%) | 75% | 100% | 125% | | | |
| **SG&A** (15%) | 110% | 100% | 75% | | | |
| **Adherence to Event-Level Cost Budgets**\*\* | -- | -- | -- | | | |
| **Assistance with Sale Processes**\*\* | -- | -- | -- | | | |
| | Corporate Leadership | | | | | |
| | **Performance Levels** | | | **Payout Levels*** | | |
| | <u>Threshold</u> | <u>Target</u> | <u>Maximum</u> | <u>Threshold</u> | <u>Target</u> | <u>Maximum</u> |
| **Operating Margin** (10%) | 75% | 100% | 125% | To be determined | To be determined | To be determined |
| **Ticket and Sponsorship Sales** (5%) <br> • **Ticket Sales** (3.75%) | 75% | 100% | 125% | | | |

6

| | | | | | | |
|---|---|---|---|---|---|---|
| • **Sponsorship Commitments** (1.25%) | | | | | | |
| **SG&A** (65%) | 110% | 100% | 75% | | | |
| **Emergence from Chapter 11** (20%) | 8/31/16 | 7/31/16 | 6/30/16 | | | |
| **Assistance with Sale Processes**\*\* | -- | -- | -- | | | |

\* Payout level as determined as a percentage of annual base salary as of the Petition Date, rounded to the nearest tenth of a percent. Percentages used in this column reflect the percentages of annual base salary of the currently identified CNA KEIP Participants who will be evaluated under the NA Live and Operating Company Leadership metrics. The CRO has also tentatively identified CNA KEIP Participants who will be evaluated under the Corporate Leadership metrics, to be included in a supplemental filing with the Bankruptcy Court at a later date.
\*\* Measurement of performance under this metric is at the discretion of the CRO.

In no event shall any CNA KEIP Participant receive CNA KEIP Payments in an amount excess of $200,000 under the CNA KEIP. The aggregate CNA KEIP Payments to be paid under the CNA KEIP to currently and tentatively identified CNA KEIP Participants shall not exceed $1,050,000 without further order of the Bankruptcy Court. If the CRO, in consultation with the Special Committee, designates additional eligible CNA KEIP Participants, in no event shall the maximum aggregate amount of all CNA KEIP Payments and React KEIP Payments (as defined below) exceed $1.6 million without further order of the Court.

4.5    Bonus Adjustments. To the extent that a CNA KEIP Participant is party to an executory employment agreement and is determined to be entitled to payments of incentive or retention compensation thereunder (whether in connection with payment of a cure amount or otherwise), then any CNA KEIP Payment payable to such CNA KEIP Participant hereunder shall be adjusted and reduced accordingly in the discretion of the CRO.

4.6    Payment of Awards. Each CNA KEIP Payment shall be paid as promptly as practicable but shall be paid within 30 days of the Effective Date.

4.7    Termination of Employment. In the event that a CNA KEIP Participant's employment with the Company is terminated by the Company without Cause or due to the CNA KEIP Participant's death or Disability at any time prior to the payment of an incentive bonus, the CRO, in his sole discretion, may pay such CNA KEIP Participant an incentive bonus. If a CNA KEIP Participant's employment with the Company is terminated other than as described in the preceding sentence prior to payment of an incentive bonus, the CNA KEIP Participant shall not receive an incentive bonus. If a CNA KEIP Participant voluntarily terminates his or her employment with the Debtors, or if a CNA KEIP Participant is terminated with cause, in each case on or before the 365th calendar day after the date on which the payment is issued, that CNA KEIP Participant must return the amount of the payment within five calendar days of termination; provided, however, that the foregoing requirement may be modified in the discretion of the CRO or the Chief Executive Officer of the reorganized Debtors.

7

## SECTION 5. PAYMENT OF REACT INCENTIVE BONUSES

5.1     In General.  SFX-React Operating LLC is defined as the Debtors' "**React**" business.  The CRO may, from time to time and in his discretion and in consultation with the Special Committee, designate officers and employees of the React business as eligible to participate in the KEIP applicable only to React (the "**React KEIP**").  All employees who are deemed eligible to participate in the React KEIP are defined as "**React KEIP Participants**."  The CRO may, in his discretion and in consultation with the Special Committee, establish performance milestones such that a React KEIP Payment (as defined below) may only be earned upon achievement of a minimum threshold level of such metrics and milestones.

5.2     React KEIP Performance Objectives.  A React KEIP Participant shall be entitled to a React KEIP Payment only in the event that (i) such React KEIP Participant participates in good faith to achieve certain important business objectives to maximize value for the React business, (ii) a React KEIP Participant remains employed at the time of payment, and (iii) the React KEIP Participant meets certain performance thresholds and milestones, as more fully set forth below ((i) through (iii) together, the "**React KEIP Performance Objectives**").

5.3     React KEIP Performance Period.  The term "**React KEIP Performance Period**" as to an individual React KEIP Participant shall mean the period that begins on the Petition Date and ends as of the Effective Date.

5.4     Calculation of Earned Payment Amount.  The incentive bonus amount for each React KEIP Participant (the "**React KEIP Payment**") shall be determined on an individual basis by the CRO, in his sole discretion, and only to the extent such React KEIP Participant has met the React KEIP Performance Objectives during the React KEIP Performance Period.  The performance metrics and milestones used to determine React KEIP Payments, as well as the relative weight of each metric and milestone, are as set forth below (collectively, the "**React KEIP Performance Metrics**")[2]:

- Operating Margin (50%):  The minimum threshold performance level is 75% of React's budgeted cumulative operating margin.  The maximum performance level is 125% of budgeted cumulative operating margin.

- Ticket and Sponsorship Sales (35%):  This metric is separated into two sub-metrics, as set forth with its relative weight to overall performance below:

    (i)     Ticket Sales (26.25%):  The minimum threshold performance level is 75% of React's budgeted ticket sales.  The target performance level is 100% of React's budgeted ticket sales.  The maximum performance level is 125% of budgeted ticket sales.

    (ii)    Sponsorship Commitments (8.75%): The minimum threshold performance level is 75% of React's budgeted sponsorship commitments.  The target performance level is 100% of React's

---

[2] As used in this **Section 5.4**, the term "budget" means the approved operating budget as designated by the CRO.

8

> budgeted sponsorship commitments. The maximum performance level is 125% of React's budgeted sponsorship commitments.

- SG&A (15%): The minimum threshold performance level is 110% of the budgeted SG&A as provided in React's cost reduction plan. The target performance level is 100% of the budgeted SG&A as provided in React's cost reduction plan. The maximum performance level is 75% of the budgeted SG&A as provided in React's cost reduction plan.

- Adherence to Event-Level Cost Budgets: This React KEIP Performance Metric is based on adherence to an event-level cost budget. Measurement of performance under this metric is at the discretion of the CRO.

Performance and payout levels in connection with the metrics set forth above shall be determined as follows:

|  | Performance Levels | | | Payout Levels* | | |
|---|---|---|---|---|---|---|
|  | **Threshold** | **Target** | **Maximum** | **Threshold** | **Target** | **Maximum** |
| **Operating Margin** (50%) | 75% | 100% | 125% | 20% | 30% | 75% |
| **Ticket and Sponsorship Sales** (35%)<br>• **Ticket Sales** (26.25%)<br>• **Sponsorship Commitments** (8.75%) | 75% | 100% | 125% | | | |
| **SG&A** (15%) | 110% | 100% | 75% | | | |
| **Adherence to Event-Level Cost Budget**\*\* | -- | -- | -- | | | |

\* Payout level is determined as a percentage of annual base salary. Percentages used in this column reflect the percentages of annual base salary of the currently identified React KEIP Participants.
\*\* Measurement of performance under this metric is at the discretion of the CRO.

In no event shall any React KEIP Participant receive React KEIP Payments in an amount excess of $150,000 under the React KEIP. The aggregate React KEIP Payments to be paid under the React KEIP to currently identified React KEIP Participants shall not exceed $450,000 without further order of the Bankruptcy Court. If the CRO, in consultation with the Special Committee, designates additional eligible React KEIP Participants, in no event shall the maximum aggregate

9

amount of all React KEIP payments and CNA KEIP payments exceed $1.6 million without further order of the Court.

5.5     Bonus Adjustments.  To the extent that a React KEIP Participant is party to an executory employment agreement and is determined to be entitled to payments of incentive or retention compensation thereunder (whether in connection with payment of a cure amount or otherwise), then any React KEIP Payment payable to such React KEIP Participant hereunder shall be adjusted and reduced accordingly in the discretion of the CRO.

5.6     Payment of Awards.  Each React KEIP Payment shall be paid as promptly as practicable but shall be paid within 30 days of the Effective Date.

5.7     Termination of Employment.  In the event that a React KEIP Participant's employment with the Company is terminated by the Company without Cause or due to the React KEIP Participant's death or Disability at any time prior to the payment of an incentive bonus, the CRO, in his sole discretion, may pay such React KEIP Participant an incentive bonus.  If a React KEIP Participant's employment with the Company is terminated other than as described in the preceding sentence prior to payment of an incentive bonus, the React KEIP Participant shall not receive an incentive bonus.  If a React KEIP Participant voluntarily terminates his or her employment with the Debtors, or if a React KEIP Participant is terminated with cause, in each case on or before the 365th calendar day after the date on which the payment is issued, that React KEIP Participant must return the amount of the payment within five calendar days of termination; provided, however, that the foregoing requirement may be modified in the discretion of the CRO or the Chief Executive Officer of the reorganized Debtors.

### SECTION 6. PAYMENT OF RETENTION BONUSES

6.1     In General.  The CRO may, from time to time and in his discretion and in consultation with the Special Committee, designate non-insider employees of the Retained Businesses as eligible to participate in the KERP applicable only to Retained Businesses (the "**KERP**"). Eligibility for payment of a retention bonus amount shall be for those individual employees of the Company as may be designated by the Debtors' CRO in his discretion, in consultation with the Special Committee.  All employees who are deemed eligible to participate in the KERP are defined as "**KERP Participants**" (collectively with the CNA KEIP Participants and the React KEIP Participants, the "**Participants**" and each, individually, a "**Participant**").

6.2     KERP Performance Objectives.  A KERP Participant shall be entitled to a KERP Payment (defined below) only in the event that (i) the KERP Participant participates in good faith in ongoing business operations to the satisfaction of the CRO to ensure the success of the Debtors in these Chapter 11 Cases and (ii) the KERP Participant remains employed by the Debtors through the Effective Date ((i) and (ii) together, the "**KERP Performance Objectives**").

6.3     KERP Performance Period.  The term "**KERP Performance Period**" as to an individual KERP Participant shall mean the period that begins as of the Petition Date and ends as of the Effective Date.

10

NY 245721211v7

6.4    Calculation of Earned Payment Amount.  The bonus payable to any individual KERP Participant (a "**KERP Payment**") shall be in an amount determined by the CRO, in consultation with the Special Committee.  Bonus payments to individual KERP Participants shall be contingent on a determination by the CRO, in his sole discretion, that an individual KERP Participant has satisfied the KERP Performance Objectives during the KERP Performance Period.  KERP Participants shall be grouped into two tiers, with payouts calculated as follows:

| Employee Tier | Payout Level* |
|---|---|
| 1** | 10% – 24.2% |
| 2 | 7.5% |

\* Payout level is determined as a percentage of annual base salary as of the Petition Date, rounded to the nearest tenth of a percent.
\*\* Each Tier 1 KERP Participant shall receive a bonus based on the CRO's view of such employee's importance to the restructuring process and to the entity by which s/he is employed.

6.5    Bonus Adjustments.  To the extent that a KERP Participant is party to an executory employment agreement and is determined to be entitled to payments of incentive or retention compensation thereunder, then any bonus payable to such KERP Participant hereunder shall be adjusted and reduced accordingly in the discretion of the CRO.

6.6    Maximum Aggregate Payment Amount.  The maximum KERP Payment amount that will be paid to any individual KERP Participant is $50,000.  The maximum aggregate amount of all KERP payments shall not exceed $450,000 without further order of the Bankruptcy Court.

6.7    Payment of Awards.  Each bonus shall be paid within 15 days of the Effective Date.  Nothing in the KERP shall create a trust or establish or evidence any employee's claim of any right.

6.8    Termination of Employment.  In the event that a KERP Participant's employment with the Company is terminated by the Company without Cause or due to the KERP Participant's death or Disability at any time prior to the payment of a retention bonus, the CRO, in his sole discretion, may pay such KERP Participant a retention bonus in an amount to be determined by the CRO.  If a KERP Participant's employment with the Company is terminated other than as described in the preceding sentence prior to the payment of a retention bonus, the KERP Participant shall forfeit any right to a retention bonus.  If a KERP Participant voluntarily terminates his or her employment with the Debtors, or if a KERP Participant is terminated with cause, in each case on or before the 75th calendar day after the date on which the payment is issued, that KERP Participant must return the amount of the payment within five calendar days of termination.

11

## SECTION 7. AMENDMENT AND TERMINATION OF PLAN

The CRO, in consultation with the Special Committee, by written instrument may, in his sole discretion, at any time and from time to time amend, modify, suspend or terminate this Plan, in whole or in part, provided that such amendment does not expand any authority granted to the CRO or the Special Committee in connection with any order of the Bankruptcy Court approving the Plan.

## SECTION 8. MISCELLANEOUS

8.1    <u>Unfunded Plan / Participant's Rights</u>.  No assets of the Company or its affiliates shall be segregated or earmarked to represent the liability for accrued benefits under the Plan.  The right of a Participant to receive any payment hereunder shall be in the sole discretion of the CRO.  All amounts that may be set aside by the Company or its affiliates prior to the distribution of the bonus payments under the terms of the Plan remain the property of the Company and its affiliates.

8.2    <u>Limitation on Participation</u>.  If any employee of the Debtors participates in any of the KEIPs or the KERP as provided for herein, that employee may not participate in any additional KEIP or KERP related to any other business of the Debtors.

8.3    <u>The Plan is Not a Contract of Employment</u>.  The existence of this Plan, as in effect at any time or from time to time, or any right to a bonus payment under the Plan, shall not be deemed to constitute a contract of employment between the Company or any of its affiliates and any employee or Participant, nor shall it constitute a right to remain in the employ of the Company or any of its affiliates.  Nothing in this Plan shall give a Participant the right to be retained in the service of the Company or its affiliates or to interfere with the rights of the Company or its affiliates to discipline or discharge a Participant at any time.  Either party may terminate a Participant's employment at any time, for any reason, with or without cause or notice.

8.4    <u>Successors</u>.  All obligations of the Company under the Plan shall be binding upon and inure to the benefit of any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation or otherwise.

8.5    <u>No Guarantee of Benefits</u>.  Nothing contained in the Plan shall constitute a guaranty by the Company or any other person or entity that the assets of the Company will be sufficient to pay any benefit hereunder.

8.6    <u>Non-Alienation Provision; Third Party Rights</u>.  Subject to the provisions of applicable law, no interest of any person or entity in, or right to receive a benefit or distribution under, the Plan shall be subject in any manner to sale, transfer, assignment, pledge, attachment, garnishment, or other alienation or encumbrance of any kind; nor may such interest or right to receive a distribution be taken, either voluntarily or involuntarily, for the satisfaction of the debts of, or other obligations or claims against, such person or entity, including without limitation claims for alimony, support, separate maintenance and claims in bankruptcy proceedings. Nothing express or implied in the Plan is intended or may be construed to give any person other than eligible Participants any rights or remedies under the Plan.

8.7     Applicable Law.  The Plan shall be construed and administered under the laws of the state of Delaware without regard to its principles of conflicts of laws.

8.8     Taxes.  The Company (or such entities delegated by the Company) shall withhold from any bonus payments made pursuant to the Plan such amounts as may be required by federal, state or local law.

8.9     No Impact on Other Benefits.  Amounts paid or accrued under the Plan shall not be included in a Participant's compensation for purposes of calculating benefits under any other plan, program or arrangement sponsored by the Company or any of its affiliates, unless such plan, program or arrangement so provides by express reference to the Plan.

8.10    No Limitation on Corporate Actions.  Nothing contained in the Plan shall be construed to prevent the Company or any of its affiliates from taking any corporate action which is deemed by it to be appropriate or in its best interest, whether or not such action would have an adverse effect on the Plan or any rights under the Plan.  No Participant, employee or other person shall have any claim against the Company or any of its affiliates as a result of any such action.

8.11    Limitation on Liability.  The liability of the Company and its affiliates under the Plan is limited to the obligations expressly set forth in the Plan, and no term or provision of this Plan may be construed to impose any further additional duties, obligations, or costs on the Company or its affiliates, the CRO or the Special Committee or any other person or entity except as expressly set forth in the Plan.

8.12    Severability.  If any provision of the Plan is held unenforceable, the remainder of the Plan shall continue in full force and effect without regard to such unenforceable provision and shall be applied as though the unenforceable provision were not contained in the Plan.

8.13    Headings.  Any headings are included for ease of reference only and are to be ignored in the interpretation of the Plan.

8.14    Section 409A.  It is the intention of the Company that awards under the Plan not result in taxation under Section 409A of the Code.  Notwithstanding anything to the contrary herein, to the extent that any provision of this Plan would otherwise result in taxation under Section 409A of the Code, such provision shall be deemed null and void.  Notwithstanding anything in the Plan to the contrary, the CRO, in consultation with the Special Committee, shall have the authority to amend the Plan to the extent necessary to avoid the imposition of tax under Section 409A of the Code.  Notwithstanding anything contained herein to the contrary, a Participant shall not be considered to have terminated employment with the Company for purposes of this Plan, such Participant would be considered to have incurred a "separation from service" from the Company within the meaning of Section 409A of the Code.  Each amount to be paid or benefit to be provided under this Plan shall be construed as a separate identified payment for purposes of Section 409A of the Code, and any payments described in this Plan that are due within the "short-term deferral period" as defined in Section 409A of the Code shall not be treated as deferred compensation unless applicable law requires otherwise.

8.15    Condition Precedent to Plan Effectiveness.  The Company's obligations under the Plan, including any obligations to pay any bonus payments, are contingent upon approval by the

13

Bankruptcy Court. In the event that such approval is not obtained, the Plan shall be null and void, and no party shall be entitled to enforce