**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SFX ENTERTAINMENT, INC., *et al.*,[1] | Case No. 16-10238 (MFW) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF CHRISTOPHER T. NICHOLLS IN SUPPORT OF MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING THE IMPLEMENTATION OF (I) KEY EMPLOYEE INCENTIVE PLANS AND (II) A KEY EMPLOYEE RETENTION PLAN**

Christopher T. Nicholls makes this declaration under 28 U.S.C. § 1746:

1. I am the Associate Chief Restructuring Officer ("**ACRO**") of SFX Entertainment, Inc. and its subsidiaries (collectively, "**SFX**"), including the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**").

2. I am a senior managing director with FTI Consulting, Inc. ("**FTI**") and FTI Capital Advisors, a subsidiary of FTI. My business address is FTI's New York office located at 3 Times Square, New York, New York 10036.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: 430R Acquisition LLC (7350); Beatport, LLC (1024); Core Productions LLC (3613); EZ Festivals, LLC (2693); Flavorus, Inc. (7119); ID&T/SFX Mysteryland LLC (6459); ID&T/SFX North America LLC (5154); ID&T/SFX Q-Dance LLC (6298); ID&T/SFX Sensation LLC (6460); ID&T/SFX TomorrowWorld LLC (7238); LETMA Acquisition LLC (0452); Made Event, LLC (1127); Michigan JJ Holdings LLC (n/a); SFX Acquisition, LLC (1063); SFX Brazil LLC (0047); SFX Canada Inc. (7070); SFX Development LLC (2102); SFX EDM Holdings Corporation (2460); SFX Entertainment, Inc. (0047); SFX Entertainment International, Inc. (2987); SFX Entertainment International II, Inc. (1998); SFX Intermediate Holdco II LLC (5954); SFX Managing Member Inc. (2428); SFX Marketing LLC (7734); SFX Platform & Sponsorship LLC (9234); SFX Technology Services, Inc. (0402); SFX/AB Live Event Canada, Inc. (6422); SFX/AB Live Event Intermediate Holdco LLC (8004); SFX/AB Live Event LLC (9703); SFX-94 LLC (5884); SFX-Disco Intermediate Holdco LLC (5441); SFX-Disco Operating LLC (5441); SFXE IP LLC (0047); SFX-EMC, Inc. (7765); SFX-Hudson LLC (0047); SFX-IDT N.A. Holding II LLC (4860); SFX-LIC Operating LLC (0950); SFX-IDT N.A. Holding LLC (2428); SFX-Nightlife Operating LLC (4673); SFX-Perryscope LLC (4724); SFX-React Operating LLC (0584); Spring Awakening, LLC (6390); SFXE Netherlands Holdings Coöperatief U.A. (6812); SFXE Netherlands Holdings B.V. (6898). The Debtors' business address is 902 Broadway, 15th Floor, New York, NY 10010.

3. I have over 29 years of strategy consulting, restructuring and corporate finance experience. I have assessed the current operations, financial models and business strategies of companies including Tribune; MediaNews; Morris; GateHouse; Star Tribune; Sandy Alexander; Broadview Networks; One Communications; McLeod; Allegiance; XO Communications; Broadwing; Level 3; Valor; Fairpoint; Rural Cellular; Houghton Mifflin; Rodale Press; RH Donnelley and Dex. I have led more than 35 restructurings, managed numerous amendments, bondholder consent solicitations and exchanges, as well as advised on numerous pre-packaged, pre-arranged and free-fall bankruptcies and 363 sales. Recent representations include the $8 billion bank lender group of Tribune, the lenders of MediaNews, the bondholders of Morris Communications, the bondholders of Broadview Networks, creditors of Source Interlink, board of Readers Digest, board of Circuit of the Americas, the creditors of Cengage Publishing and the board of Freedom Communications. I also have experience growing investments under management and leading telecom workout and risk management teams at GE Capital.

4. I submit this declaration (the "**Declaration**") in support of the *Motion of the Debtors for Entry of an Order Approving the Implementation of (I) Key Employee Incentive Plans and (II) A Key Employee Retention Plan* (the "**Motion**").[2]

5. As a preliminary matter, the Motion does <u>not</u> relate to the proposed incentive compensation programs in respect of the sale of certain of the Debtors' discrete non-core business units (the "**NCUs**"), as may be designated by the Special Committee of the Board of Directors of SFX Entertainment, Inc. (the "**Special Committee**"). The NCU Key Employee Programs proposed by the Debtors on March 2, 2016 [Docket No. 173] relate only to the NCUs and the necessity to properly incentivize and retain employees to assist in the maximization of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

value of the assets held for sale. The instant Motion seeks approval of the key employee programs related to the businesses the Debtors anticipate retaining. The Debtors will work with the DIP Lenders, the Committee and the Office of the United States Trustee to provide them with the specifics of the Key Employee Programs on a confidential basis, including the identities of the Participants, the amounts individual Participants would receive and the metrics behind the Key Employee Programs.

**A.     The KEIPs.**

6.     Without the expertise of the Debtors' senior management teams to efficiently and effectively operate the Debtors' businesses and the proper incentives to induce them to commit the time necessary to successfully navigate the Debtors through these Chapter 11 Cases, the Debtors' ability to successfully reorganize will be significantly inhibited. Accordingly, it is critical that the Debtors' senior managers, who continue to work against the backdrop of uncertainty regarding their continued employment, be properly incentivized and motivated to work harder than ever before to enhance the Debtors' operational performance and execute a comprehensive restructuring to maximize value for all of the Debtors' constituents.

7.     The Debtors worked with their advisors, FTI, their Chief Restructuring Officer, Michael Katzenstein (the "**CRO**") and me to develop the terms of the KEIPs and to establish a structure for incentives thereunder designed to motivate KEIP Participants to help the Debtors achieve certain important business objectives throughout these Chapter 11 Cases. Although KEIP payouts would not be made until the Debtors emerge from chapter 11, the Debtors seek this Court's approval of the KEIPs at this stage of these Chapter 11 Cases to assure KEIP Participants that their continued hard work and success will ultimately be rewarded.  In the Debtors' business judgment, incentivizing the KEIP Participants is critical in order to ensure that

these key members of the Debtors' retained businesses continue in their efforts to successfully maximize value for the benefit of all of the Debtors' stakeholders. The KEIPs we developed are annexed to the Motion as **Exhibit A** and summarized in the Motion.

B.   **Reasonableness of the KEIPs.**

8.   Based on my experience and the work that the CRO and I have done on this matter, the KEIPs (i) are designed to be consistent with market practice; (ii) are reasonable given the facts and circumstances of the Chapter 11 Cases; (iii) provide anticipated value that is appropriate to competitively motivate talented staff; and (iv) are required to maximize the value of the Debtors' estates in connection with the Debtors' successful restructuring and reorganization for the benefit of all parties in interest.

9.   In connection with FTI's work on the KEIP structures, FTI undertook to define a set of relevant market comparables to the Debtors' KEIPs. FTI benchmarked comparable KEIP plans from select chapter 11 cases of seven different companies that filed petitions from 2012 to 2015, two of which of are in the technology, media and telecom sectors. The total liabilities of the companies reviewed by FTI ranged from $338.1 million to $826 million. Following a review of this set of market comparables, FTI observed a number of market practice factors. Notably, the targeted total cost of comparable KEIPs ranged from $540,000 to $2.3 million, with a median targeted cost of $1.1 million, with maximum payouts of $540,000 to $3.7 million and a median maximum of $1.46 million. As a percentage of annual base salary, awards ranged from 20% to 120%. In addition, maximum awards as a percentage of the target award ranged from 100% to 150%. Individual target payments ranged from $135,000 to $490,000, with maximum individual payments ranging from $135,000 to $740,000.

4

10. FTI has determined the cost of the proposed KEIPs to be within the range of market practice as compared to the plans proposed and approved at similarly-situated companies. Payments under both KEIPs will not exceed $200,000 per KEIP Participant, or 80% of annual base salary, with proposed target payments ranging from $60,000 to $150,000 and maximum payments ranging from $110,000 to $200,000. In the aggregate, the proposed target cost is $975,000, with a maximum total cost for the nine (9) currently and tentatively identified KEIP Participants of $1.5 million. As a percentage of the target award, the maximum total awards for these KEIP Participants is approximately 154%, which is nearly within the range found in comparable plans proposed by similarly-situated companies. Moreover, the target payments under the proposed KEIPs range from 25% to 60% of the Participants' annual base salary. Therefore, the individual and aggregate target and maximum payments are well within the range of comparable KEIP transactions.

11. The assistance of the KEIP Participants will be critical to the Debtors' ability to drive an expeditious chapter 11 process and maximize value for the Debtors' estates. Not only have the KEIP Participants continued to fulfill the normal tasks and projects required by the normal terms of their employment, but they have been, and will continue to be, required to expend additional time and resources on tasks relating to the Debtors' reorganization process.

12. In order to effectively and efficiently accomplish a successful restructuring and reorganization that maximizes recovery for all stakeholders, the Debtors determined that formulating the KEIPs was in the best interest of their estates and all parties in interest. The KEIPs will help ensure that the key executives and employees designated by the CRO, in consultation with the Special Committee, are properly motivated to maximize value for the Debtors, their estates, their creditors and other parties in interest. As a general matter, the use of

key employee incentive plans is common practice in chapter 11 cases. The structure of the plans varies based on the unique circumstances of each case, but the general terms and conditions are consistent with the KEIPs proposed by the Debtors, including the conditions and proposed payment amounts set forth therein.

C. **The KERP.**

13. In addition to the KEIPs, both the CRO and I worked with the Debtors and FTI to develop the terms of the KERP for certain individual non-insider employees, in order to ensure that the Debtors do not suffer significant and costly turnover of key employees during the Debtors' restructuring. The loss of the KERP Participants would be detrimental to the Debtors' ongoing business operations and the Debtors' ability to effectively reorganize. In particular, the circumstances of these Chapter 11 Cases are likely to increase employee turnover, especially in light of the challenges posed by the Debtors' restructuring and the availability of alternatives for the Debtors' employees, many of whom are highly skilled. As a consequence, the Debtors and their advisors have determined that a non-insider retention program for certain of the Debtors' key employees will be effective to retain those employees through the consummation of a plan of reorganization. Incentivizing the KERP Participants is critical in order to ensure that these key members of the Debtors' team continue in their efforts to successfully maximize value for the benefit of all of the Debtors' stakeholders. The terms of the KERP are annexed to the Motion as **Exhibit A** and summarized in the Motion.

D. **Reasonableness of the KERP.**

14. Based on my experience and the work that the CRO and I have done on this matter, the KERP (i) is designed to be consistent with market practice; (ii) is reasonable given the facts and circumstances of the Chapter 11 Cases; (iii) provides anticipated value that is

appropriate to competitively motivate talented staff; and (iv) is required to maximize the value of the Debtors' estates in connection with the Debtors' successful restructuring and reorganization for the benefit of all parties in interest.

15. In connection with FTI's work on the KERP structure, FTI undertook to define a set of relevant market comparables to that of the Debtors. FTI benchmarked comparable key employee retention plans from select chapter 11 cases of ten different companies which filed petitions from 2011 to 2015 with bankruptcy case durations of between two (2) months and two (2) years and with total liabilities ranging from $137 million to $784 million. Following a review of this set of market comparables, FTI observed that the median total cost of KERPs approved for similarly situated companies was $900,863, the median number of participants was 43, average costs per participant ranged from $10,000 to $40,620 with an average cost per participant of $27,392, and payouts as a percentage of annual base salary ranged from 10.4% to 33.5% with an average payout of 24%.

16. FTI has found the design and the cost of the proposed KERP to be within the range of market practice as compared to plans proposed and approved at similarly situated companies. Specifically, the aggregate cost of the KERP will not exceed $450,000, which is significantly less than the $900,863 median aggregate cost of KERPs approved for similarly situated companies. Moreover, the average cost per KERP Participant is $13,801, which is approximately 49% less than the average cost per participant for similarly situated companies reviewed by FTI and the anticipated number of KERP Participants (32) is lower than the median number of participants in respect of plans approved for similarly situated companies (43). In addition, KERP payouts as a percentage of the annual base salaries of the KERP Participants range from 7.5% to 24.2%, with an average payout of 11.2%. Therefore, the proposed KERP

7

payments are well within the range of those approved for similarly situated companies reviewed by FTI.

17. Certain of the KERP Participants the CRO selected hold the title of Vice President or another title which may suggest management control, but the CRO has not selected as a KERP Participant any individual that exercises management control over the Debtors. The respective scopes of authority among the KERP Participants the CRO selected are limited, and while their titles may reflect individual roles and functions, the same titles do not confer management authority over the Debtors. The KERP Participants are critical employees who have the knowledge and experience to carry out the decisions of management in an efficient and effective manner, but will not be individuals who manage or control the Debtors' businesses. Thus, none of the KERP Participants will be properly considered "officers" and, as a consequence, the KERP Participants will not be "insiders" as defined in the Bankruptcy Code.

18. The KERP Participants have been faced with significant pressure to leave the Debtors' employ during the pendency of these Chapter 11 Cases due to perceived uncertainty and concern over their job prospects. Indeed, these Chapter 11 Cases have a necessary byproduct of creating a great deal of uncertainty for the very company personnel charged with maximizing the value of the Debtors' estates. As a result, it is entirely appropriate to provide benefits to such key personnel in order to counterbalance the distraction that such uncertainty would engender. Accordingly, it is critical to the restructuring process that the Debtors retain the services of the KERP Participants throughout the duration of these Chapter 11 Cases. The structure of other key employee retention plans approved by this and other courts varies based on the unique circumstances of each case but the general terms and conditions are consistent with

the KERP proposed by the Debtors, including the conditions and proposed payments amounts set forth therein.

### E.     The Debtors' Need for the KEIPs and the KERP.

19.    The Debtors' success in these Chapter 11 Cases is dependent upon the goodwill and support of their employees.  As the Debtors work to prepare and implement a plan of reorganization, it is imperative that the Debtors' key personnel are appropriately incentivized to maximize the value of the businesses to ensure a successful restructuring.  The Participants have been and will be called upon to expend significantly more hours during the restructuring process than contemplated by the normal terms of their employment, due to the numerous complexities involved with these Chapter 11 Cases.

20.    In order to successfully, effectively and efficiently confirm a plan that provides the most favorable recovery and value for all stakeholders, the Debtors determined that formulating the Key Employee Programs was in the best interest of their estates and all parties in interest.  The KEIPs will help ensure that key executives and employees who are essential to the Debtors' businesses are properly motivated to maximize value for the Debtors, their estates, their creditors and their stakeholders.  The KERP ensures that certain non-insider key employees, without whom the Debtors' ability to successfully exit from these Chapter 11 Cases would be adversely affected, remain with the Debtors throughout the restructuring process.

21.    As a general matter, the use of KEIPs is common practice in chapter 11 cases, and the use of a KERP is justified here given the restructuring process, the associated uncertainty, and the value that the KERP Participants provide to the Debtors' retained businesses.  The structure of the plans approved in other cases varies based on the unique circumstances of each

case but the general terms and conditions are consistent with the KEIPs and the KERP proposed by the Debtors.

Signed under penalty of perjury, pursuant to 26 U.S.C. § 1746, this 17th day of March 2016.

                                */s/ Christopher T. Nicholls*
                                **CHRISTOPHER T. NICHOLLS**